IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA ex rel. )<br>FREDERIC P. ZOTOS, and, )<br>)<br>COMMONWEALTH OF )<br>MASSACHUSETTS ex rel. )<br>FREDERIC P. ZOTOS, )<br>)<br>       Plaintiffs, )<br>v. )<br>)<br>TOWN OF HINGHAM, Massachusetts, )<br>)<br>ROGER FERNANDES, individually, )<br>and as Town Engineer, Town of Hingham, )<br>)<br>TOM MAYO, individually, )<br>and as Town Administrator, )<br>Town of Hingham, )<br>)<br>TED C. ALEXIADES, individually, )<br>and as former Town Administrator, )<br>former Town Accountant/Finance Director, )<br>Town of Hingham, )<br>)<br>KEVIN PAICOS, individually, )<br>and as former Town Administrator, )<br>Town of Hingham, )<br>)<br>SUSAN NICKERSON, individually, )<br>and as Town Accountant, )<br>Town of Hingham, and, )<br>)<br>      Defendants )<br>                               ) | CIVIL ACTION NO.<br>1:19-cv-_____-____<br><br><br><br><br><br><br><br><br>**QUI TAM COMPLAINT**<br><br>**FILED IN CAMERA<br>AND UNDER SEAL<br>PURSUANT TO<br>31 U.S.C. § 3730(b)(2) and<br>Mass. Gen. L. ch. 12, § 5C(3)** |

FILED
IN CLERKS OFFICE
2019 SEP 24  PM 12: 35
U.S. DISTRICT COURT
DISTRICT OF MASS.

# Table of Contents

INTRODUCTION ................................................................................................................ 1

JURISDICTION, VENUE AND PRELIMINARY MATTERS ................................... 2

PARTIES ........................................................................................................................... 5

BACKGROUND ............................................................................................................... 7

    Federal Statutes and Regulations ................................................................................ 7

    Massachusetts Statutes and Regulations .................................................................. 10

STATEMENT OF FACTS ............................................................................................. 22

    Federal-Aid Highway Program (FAHP) .................................................................. 22

    MassDOT/Federal-Aid Project No. 600518 ............................................................ 26

    MassDOT/Federal-Aid Project No. 607309 ............................................................ 27

    Commonwealth's Chapter 90 Program .................................................................... 28

    Commonwealth's 10-Year Chapter 90 Contract with Hingham .............................. 28

    Hingham's Chapter 90 Apportionments (Fiscal Years 2009 – 2020) ...................... 30

    Hingham's  Chapter 90 Reimbursement Requests (2009 – 2019) ........................... 31

    Hingham's Chapter 90 Final Reports (2009 – 2019) ............................................... 39

    Hingham's Chapter 90 Balances/Payments ............................................................. 44

    Forfeiture of Chapter 90 Funds due to MUTCD Noncompliance ............................ 44

    Hingham's Authorized Special Speed Regulations .................................................. 46

    Speed Limit Signs (R2-1/White) & Advisory Speed Plaques (W13-1P/Yellow) ......... 50

    Hingham's Erection and Maintenance of Speed Limit Signs (R2-1) ........................ 51

    Hingham's Enforcement of Speed Limit Signs (R2-1) ............................................. 53

    Hingham's Erection and Maintenance of Advisory Speed Plaques (W13-1P) ............ 54

    Hingham's Enforcement of Advisory Speed Plaques (W13-1P) .............................. 57

    Traffic Study of Beal Street/West Street/Fort Hill Street, Hingham, MA .................. 58

    Road Safety Audit of Cushing Street, Hingham, MA ............................................... 61

    Speed Study of Gardner Street, Hingham, MA ........................................................ 63

    Mr. Zotos's Independent Knowledge of Hingham's Traffic Signs/Plaques .............. 65

    MassDOT Notice re: "Installation of Regulatory Signs And Speed Limit Signs" ....... 69

CLAIMS FOR RELIEF ................................................................................................. 71

PRAYERS FOR RELIEF .............................................................................................. 76

TABLE OF EXHIBITS .................................................................................................... i

TABLE OF FIGURES ..................................................................................................... ii

## INTRODUCTION

1.      This is an action to recover damages and penalties on behalf of the United States of America (the "Government") and the Commonwealth of Massachusetts (the "Commonwealth") arising from false records, statements and claims, and conspiracy to commit such acts in violation of the Federal False Claims Act, 31 U.S.C. §§ 3729, *et seq*. ("FCA"), as amended by the Fraud Enforcement and Recovery Act of 2009, Pub. L. 111-21, 123 Stat. 1617 (2009) ("FERA"), and the Massachusetts False Claims Act, Mass. Gen. L. ch. 12, §§ 5A, *et seq*. ("MFCA"), as amended by St. 2012, c. 139, §§ 22, *et seq*.

2.      Plaintiff/Attorney-Relator Frederic P. Zotos ("Relator" or "Mr. Zotos") brings this action on behalf of the Government and the Commonwealth under the *Qui Tam* provisions of the FCA and MFCA alleging that the Town of Hingham ("Hingham") and/or its agents and employees, has violated these laws by: (i) knowingly presenting (or causing to be presented) false or fraudulent claims for payment or approval; (ii) knowingly making or using (or causing to be made or used), false records or statements material to false or fraudulent claims; and (iii) conspiring to commit such acts, in relationship to the Government's Federal Highway Administration ("FHWA") funding programs, including the Federal-Aid Highway Program ("FHAP"), and in relationship to the Commonwealth's Mass. Gen. L. ch. 90, § 34 (a/k/a "Chapter 90") local transportation aid funding program.

3.      As a result of these false records, statements and claims, the Government was fraudulently induced to pay approximately $3.3 mm (with $2.7 mm remaining of $6 mm aid) to the Commonwealth through FHWA reimbursements (since 2009).

1

4.     As a result of these false records, statements and claims, the Commonwealth was fraudulently induced to pay approximately \$7.3 mm (with \$1.7 mm remaining of \$9 mm Chapter 90 apportionments) to the Town of Hingham through Chapter 90 reimbursements (since 2009).

## JURISDICTION, VENUE AND PRELIMINARY MATTERS

5.     This court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345, and 31 U.S.C. §§ 3730 and 3732. This complaint also alleges statutory violations of the Commonwealth of Massachusetts. Supplemental jurisdiction arises pursuant to 31 U.S.C. § 3732 and 28 U.S.C. § 1367, and the principals of supplemental jurisdiction. The Federal and state law claims arise out of a common nucleus of operative facts, and the entire suit commenced by this complaint would ordinarily be tried in one judicial proceeding. The exercise of supplemental jurisdiction will avoid duplication and multiplicity of action, and will promote the interests of judicial economy and fairness.

6.     Venue is proper in this Court based upon 28 U.S.C § 1391 and 31 U.S.C. § 3732, in that the defendants can be found, reside, and transact business within the district, and a substantial part of the events or omissions giving rise to the claims occurred in this district as alleged below.

7.     To the Relator's knowledge, jurisdiction over this action is not barred by 31 U.S.C. § 3730(e). This action is not based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party. Substantially the same allegations or transactions as alleged in this action or claims have not been publicly disclosed – (i) in a Federal

2

criminal, civil, or administrative hearing in which the Government or its agent is a party; (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or (iii) from the news media.

8.    To Relator's knowledge, jurisdiction over this action is not barred by Mass. Gen. L. ch. 12, § 5G. This action is not based upon allegations or transactions which are the subject of a civil suit or an administrative proceeding in which the Commonwealth is already a party. Substantially the same allegations or transactions as alleged in this action or claims have not been publicly disclosed: (1) in a Massachusetts criminal, civil or administrative hearing in which the Commonwealth is a party; (2) in a Massachusetts legislative, administrative, auditor's or inspector general's report, hearing, audit or investigation; or (3) from the news media.

9.    Statements by Mr. Zotos concerning certain of the facts alleged in the complaint may have appeared in the news media. The allegations herein are not based upon any public disclosure.

10.    Unless otherwise stated herein, Mr. Zotos is an "original source" pursuant to 31 U.S.C. § 3730(e)(4)(B), because he is an individual who either (1) prior to public disclosure under 31 U.S.C. § 3730(e)(4)(A), has voluntarily disclosed to the Government the information on which allegations or transactions in the claims are based; or (2) has knowledge that is independent of and materially adds to the publicly-disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing this false claims action.

3

11.     Unless otherwise stated herein, Mr. Zotos is an "original source" pursuant to Mass. Gen. L. ch. 12, § 5A, because he is an individual who: (1) prior to public disclosure under Mass. Gen. L. ch. 12, § 5G(3), has voluntarily disclosed to the Commonwealth the information on which allegations or transactions in the claims are based; or (2) has knowledge that is independent of and materially adds to the publicly-disclosed allegations or transactions, and who has voluntarily provided the information to the Commonwealth before filing this false claims action.

12.     As required by 31 U.S.C. 3730(b)(2), and as permitted by Mass. Gen. L. ch. 12, § 5C(7), Realtor will be serving the United States Attorney General and the United States Attorney for the District of Massachusetts pursuant to Rule 4(i) (formerly Rule 4(d)(4)) of the Federal Rules of Civil Procedure with copies of this complaint along with a written disclosure of all material evidence and information he possesses. The written disclosure supports the allegations herein of false claims against the United States. As further required, this complaint is being filed in camera under seal and shall not be served on the defendants until the court so orders.

13.     As required by Mass. Gen. L. ch. 12, § 5C(3), and as permitted by 31 U.S.C. § 3732(c), Relator will be serving the attorney general of the Commonwealth with a copy of this complaint along with a written disclosure of substantially all material evidence and information the Relator possesses pursuant to Rule 4(d)(3) of the Massachusetts Rules of Civil Procedure. The written disclosure supports the allegations herein of false claims against the Commonwealth by the defendants. As further required, this complaint is being filed under seal, and it shall not be served on the defendants until the court so orders.

4

## PARTIES

14.     Plaintiff/Attorney-Relator Frederic P. Zotos (hereinafter "Relator" or "Mr. Zotos"), is an individual residing at all relevant times at 28 Old Coach Road, Cohasset, Norfolk County, Massachusetts 02025.  Mr. Zotos is bringing this action for violations of the False Claims Act, 31 U.S.C. §§ 3729, *et seq*., on behalf of himself and the Government, pursuant to 31 U.S.C. § 3730(b).  Mr. Zotos is bringing this action for violations of the Massachusetts False Claims Act, Mass. Gen. L. ch. 12, §§ 5A, *et seq.*, on behalf of himself and the Commonwealth, pursuant to Mass. Gen. L. ch. 12, § 5C(2).

15.     Defendant Town of Hingham (hereinafter "Town") is a municipal corporation organized under the laws of the Commonwealth of Massachusetts and having its principal office at 210 Central Street, Hingham, Plymouth County, Massachusetts 02043.  The Town is responsible for the care and upkeep of the public roads and unaccepted subdivisions under its jurisdiction, and installs, repairs, and maintains the traffic and speed limit signs thereon.  The Town receives Chapter 90 local transportation aid funding apportionments from the Commonwealth.

16.     Defendant Roger Fernandes (hereinafter "Fernandes") is the Town Engineer of the Town at all relevant times.  As such, Fernandes is responsible for the daily management of the Department of Engineering ("Engineering") of the Town. Engineering provides a wide variety of support services to Town departments, commissions, and boards.  It undertakes annual management of various capital projects in addition to the reconstruction of the Town's roadway system by management of the

5

Chapter 90 road building monies. He is a contractor authorized signatory with the Commonwealth on behalf of the Town.

17.     Defendant Thomas Mayo (hereinafter "Mayo") is the Town Administrator of the Town at relevant times. As such, Mayo is responsible for the daily management of the Town. Upon information and belief, Mayo is a resident of Massachusetts. He is a contractor authorized signatory with the Commonwealth on behalf of the Town.

18.     Defendant Ted C. Alexiades (hereinafter "Alexiades") is the former Town Accountant/Finance Director and the former Town Administrator of the Town at relevant times. As Town Accountant/Finance Director, Alexiades was responsible for managing the Town's accounting and financial systems. As Town Administrator, Alexiades was responsible for the daily management of the Town. Upon information and belief, Alexiades is a resident of 42 West Street, Kingston, Plymouth County, Massachusetts 02364. He was a contractor authorized signatory with the Commonwealth on behalf of the Town.

19.     Defendant Kevin Paicos (hereinafter "Paicos") was the Town Administrator of the Town at relevant times. As such, Paicos was responsible for the daily management of the Town. Upon information and belief, Paicos is a resident of 21 Christopher Drive, South Easton, Bristol County, Massachusetts 02375. He was a contractor authorized signatory with the Commonwealth on behalf of the Town.

20.     Defendant Susan M. Nickerson (hereinafter "Nickerson") is the Town Accountant of the Town at relevant times. As such, Nickerson is responsible for managing the Town's accounting and financial systems. Work includes planning,

6

organizing and supervising the financial activities of the Town, including the maintenance of revenue records, and the maintenance and control of expenditures and financial records pertaining to the Town appropriations. Upon information and belief, Nickerson is a resident of Massachusetts.

## **BACKGROUND**

### **Federal Statutes and Regulations**

21.     Failure to comply with Federal laws and regulations could result in the withdrawal of Federal-Aid Highway Program funds under 23 C.F.R. 1.36, entitled "Compliance with Federal Laws and regulations", which provides the following in pertinent part:

> If the Administrator determines that a State has violated or failed to comply with the Federal laws or the regulations in this part with respect to a project, he may withhold payment to the State of Federal funds on account of such project, withhold approval of further projects in the State, and take such other action that he deems appropriate under the circumstances, until compliance or remedial action has been accomplished by the State to the satisfaction of the Administrator.

23 C.F.R. 1.36.

22.     In accordance with 23 U.S.C. §§ 109(d), 114(a), 217, 315, and 402(a), 23 C.F.R. 655, and 49 C.F.R. 1.48(b)(8), 1.48(b)(33), and 1.48(c)(2) the Federal Highway Administrator approved the Manual on Uniform Traffic Control Devices ("MUTCD"). (2009).   MUTCD at i.   The MUTCD provides the following general Standards in pertinent part:

> a. The MUTCD is incorporated by reference in 23 C.F.R. 655, Subpart F and shall be recognized as the national standard for all traffic control devices

7

installed on any street, highway, bikeway, or private road open to public travel in accordance with 23 U.S.C. §§ 109(d) and 402(a). Id. at 1-1.

b. The U.S. Secretary of Transportation, under authority granted by the Highway Safety Act of 1966, decreed that traffic control devices on all streets and highways open to public travel in accordance with 23 U.S.C. §§ 109(d) and 402(a) in each State shall be in substantial conformance with the Standards issued or endorsed by the FHWA. Id.

c. In cases involving Federal-aid projects for new highway or bikeway construction or reconstruction, the traffic control devices installed (temporary or permanent) shall be in conformance with the most recent edition of the National MUTCD before that highway is opened or re-opened to the public for unrestricted travel [23 C.F.R. 655.603(d)(2) and (d)(3)]. Id. at 1-3.

d. The responsibility for the design, placement, operation, maintenance, and uniformity of traffic control devices shall rest with the public agency or the official having jurisdiction. Id. at 2.

e. 23 C.F.R. 655.603 also states that traffic control devices on all streets, highways, and private roads open to public travel in each State shall be in substantial conformance with the standards issued or endorsed by the Federal Highway Administrator. Id. at 2.

8

      f.  All regulatory traffic control devices shall be supported by laws, ordinances, or regulations.  Id. at 3.

23.    With respect to Speed Limit Sign(s) (R2-1), the MUTCD § 2B.13 expressly provides the following Standard in pertinent part:

> 01 Speed zones (other than statutory speed limits) *shall only be established on the basis of an engineering study* that has been performed in accordance with traffic engineering practices. The engineering study shall include an analysis of the current speed distribution of free-flowing vehicles.
>
> 02 The Speed Limit (R2-1) sign (see Figure 2B-3) shall display the limit established by law, ordinance, regulation, or as adopted by the authorized agency based on the engineering study. The speed limits displayed shall be in multiples of 5 mph.
>
> *Guidance ... 12 When a speed limit within a speed zone is posted, it should be within 5 mph of the 85th-percentile speed of free-flowing traffic.*

MUTCD § 2B.13 at 56-58 (emphasis added).

24.    With respect to Advisory Speed Plaque(s) (W13-1P), the MUTCD § 2C.08 expressly provides the following Standard in pertinent part:

> 04 Except in emergencies or when the condition is temporary, an Advisory Speed plaque shall not be installed until the advisory speed has been determined by an engineering study.
>
> 05 The Advisory Speed plaque shall only be used to supplement a warning sign and shall not be installed as a separate sign installation.
>
> 06 The advisory speed shall be determined by an engineering study that follows established engineering practices.

MUTCD § 2C.08 at 112 (emphasis added).

25.     When traffic control devices are installed on a Federal-aid project, they

shall conform to the MUTCD under 23 C.F.R. 655.603, which provides the following in

pertinent part:

(d) *Compliance - ... (2) New or reconstructed highways.* Federal-aid projects for
the construction, reconstruction, resurfacing, restoration, or rehabilitation of
streets and highways shall not be opened to the public for  unrestricted use until
all appropriate traffic control devices, either temporary or permanent, are installed
and functioning properly.  Both temporary and permanent devices shall conform
to the MUTCD.

23 C.F.R. 655.603(d)(2) (4-1-12 Edition).

## **Massachusetts Statutes and Regulations**

26.     Mass. Gen. L. ch. 85, § 2, as amended through St. 1986, c. 689, § 3,

entitled "Traffic signs or devices; erection and maintenance; rules and regulations," is the

enabling statute that authorizes cities and towns to erect and maintain traffic signs (except

speed control signs (a/k/a speed limit signs)) "on any way within its control" without

department of highways approval "provided such signs ... are in conformance with the

department's current manual on uniform traffic control devices...".  Mass. Gen. L. ch. 85,

§ 2.

a.  With respect to the Chapter 90 program, it provides in pertinent part:

If any city or town installs and maintains any of the aforesaid traffic control
devices without either requesting or obtaining the required approval or after being
notified of such disapproval, or in noncompliance with said manual [on uniform
traffic devices], *the department shall withhold or withdraw the unexpended
balance of any funds assigned to the said city or town under the provisions of
section thirty-four of chapter ninety* or sections twenty-five and twenty-six of
chapter eighty-one.

(Id.) (emphasis added) (comments added in brackets).

10

b. With respect to speed control signs, it expressly provides in pertinent part: "*speed control signs may be established only in accordance with the provisions of section eighteen of chapter ninety*." (Id.) (emphasis added).

27. Mass. Gen. L. ch. 90, § 18, as amended through St. 1986, c. 689, §§ 8-9, entitled "Special regulations, speed and use of vehicles," is the enabling statute that authorizes cities and towns to "make special regulations as to the speed of motor vehicles" within their jurisdiction subject to the approval of the department of highways and the registrar of motor vehicles. (See Speed Zoning (2012), infra, at A2-A3). "No such special speed regulation shall be effective until there shall have been erected ... *signs conforming to standards adopted by the department*, setting forth the speed or other restrictions established by the regulation." Mass. Gen. L. ch. 90, § 18 (emphasis added).

28. In accordance with the authority granted by Mass. Gen. L. ch. 90, § 18 (and set forth in Mass. Gen. L. ch. 85, § 2), the Highway Division ("MassHwy") of the Massachusetts Department of Transportation ("MassDOT") promulgated regulatory standards entitled "Procedures for Speed Zoning on State and Municipal Roads." (2012) ("Speed Zoning (2012)").

a. With respect to Mass. Gen. L. ch. 90, § 18, it provides in pertinent part:

*Chapter 90, Section 18 authorizes the posting of numerical speed limits on all roadways in Massachusetts.* The foundation for the actual posting of a speed limit is a thorough traffic engineering study. After a study has been completed, a Special Speed Regulation is drafted and approved by the governing authority of the roadway, the Registry of Motor Vehicles and MassDOT. All posted regulatory speed limit signs must adhere to this approval process. *If a speed limit is posted without this procedure, it is in violation of Chapter 90, Section 18, and is therefore considered illegal and unenforceable*.

(emphasis added) (Speed Zoning (2012), supra, at 3-4).

11

b. With respect to Special Speed Regulations, it provides in pertinent part:

Following the determination of the appropriate speed zones and the subsequent approval by the Boston Office, a Special Speed Regulation will be drafted by the Boston Office Speed Zoning Section to be signed by the Chief Deputy Registrar for the Registry of Motor Vehicles and the State Traffic Engineer for MassDOT. In the case of a City or Town regulation, the Special Speed Regulation must first be adopted by the appropriate City or Town officials before being approved by Registry and MassDOT officials. (see Speed Control Flow Charts, fig. 6a & 6b). *After the regulation is adopted by all of the previously mentioned agencies, the authority in control of the subject roadway may then proceed with the erection of the appropriate speed limit signs at which point the regulation then becomes legal and enforceable.*

(Id. at 19-20) (emphasis added).

**SPEED LIMIT PROCEDURE ON MUNICIPAL ROADWAYS**

TOWN REGULATIONS



(Id., fig. 6a, at 20).

    c. With respect to speed limit ("Speed Limit") signs, it expressly defines

them as follows:

*Speed Limit signs are* rectangular in shape, with black numerals on a white reflectorized background. (see fig. 7).

(Id. at 21-22) (emphasis added).

13



R2-1

(Id., fig. 7, at 22).

    d.  With respect to advisory speed ("Advisory Speed") plaques, it expressly

provides in pertinent part:

Section 2C-08 of the 2009 Manual on Uniform Traffic Control Devices (M.U.T.C.D.) states:

Section 2C.08 Advisory Speed Plaque (W13-1P) [rectangular in shape, with black numerals on a yellow reflectorized background, as shown below in M.U.T.C.D.]



W13-1
Advisory Speed plaque

14

Option:

01 The Advisory Speed (W13-1P) plaque (see Figure 2C-1) may be used to supplement any warning sign to indicate the advisory speed for a condition.

## WARNING SIGN WITH ADVISORY
## SPEED PLAQUE IN RURAL AREA



Standard:

02 The use of the Advisory Speed plaque for horizontal curves shall be in accordance with the information shown in Table 2C-5. The Advisory Speed plaque shall also be used where an engineering study indicates a need to advise road users of the advisory speed for other roadway conditions.

03 If used, the Advisory Speed plaque shall carry the message XX MPH. The speed displayed shall be a multiple of 5 mph.

04 Except in emergencies or when the condition is temporary, *an Advisory Speed plaque shall not be installed until the advisory speed has been determined by an engineering study.*

05 *The Advisory Speed plaque shall only be used to supplement a warning sign* and *shall not be installed as a separate sign installation.*

06 *The advisory speed shall be determined by an engineering study that follows established engineering practices.*

*Unlike regulatory speed signs, advisory speed signs can be erected by municipalities without any further approval provided they comply with the*

15

*M.U.T.C.D.  Also, advisory speeds are not enforceable, since their intent is to advise motorists of an appropriate speed through a particular condition, not regulate it.*

(Id. at 18-19; fig. 2C-1) (emphasis added) (comments added in brackets).

   e.   With respect to establishing Speed Limits, it provides in pertinent part:

*Speed limits shall be established only after an engineering and traffic investigation* has been conducted in compliance with established traffic engineering practices.  The ideal speed limit is both acceptable to the prudent driver and enforceable by our police departments.

(Id. at 2) (emphasis added).

*A prerequisite to establishing speed regulations and posting speed limits is a comprehensive engineering study* at each location where speed control is contemplated.  The purpose of the study is to establish a speed limit that is safe, reasonable and self-enforcing.    The most important step is measuring the prevailing speeds of motorists on a particular section of a roadway under ideal conditions.  The speed at or below which 85 percent of the motorists travel is the principle value used for establishing speed control.  This is commonly referred to as the **85 percentile speed**.  This method is based on numerous studies which indicate that the majority of motorists are prudent and capable of selecting safe speeds.  The 85th percentile speed is the national standard for establishing safe speed limits.

(Id. at 4) (emphasis added).

The **85th percentile speed** of vehicles passing a given point is the speed at or below which 85 percent of the vehicles passing the point are traveling. This is the principle value used for establishing speed controls. This method assumes that the majority of motorists are prudent and capable of selecting safe speeds; therefore, *speeds established in this manner meet the legal requirement that they be "reasonable and proper."*

(Id. at 12) (emphasis added).

Posted limits are rounded off to the nearest 5 mile per hour increment.

(Id. at 13).

Successful speed zoning is a cooperative project which includes the traffic engineer, the enforcement agencies and the judiciary. It requires careful engineering, conformance to recognized standards, state-wide uniformity, and development of public understanding and support. Under this approach, speed zoning is a valuable aid to the conscientious motorist and to enforcement officials.

16

(Id. at 23).

29.     In accordance with the authority granted by Mass. Gen. L. ch. 90, § 18

(and set forth in Mass. Gen. L. ch. 85, § 2), MassHwy promulgated regulatory standards

entitled "Procedures for Speed Zoning on State and Municipal Roads." (2017) ("Speed

Zoning (2017)").

> a.  With respect to the laws governing Massachusetts speed regulations, it
>
> provides in pertinent part:

Sections 17, 17A, 17C, 18 and 18B of Chapter 90 of the Massachusetts General
Laws (MGL) govern speed limits on all streets and highways throughout the
Commonwealth, with exception to the Massachusetts Turnpike.  In addition,
MassDOT and all municipalities are required by MGL c. 85 § 2 to conform to the
*Manual on Uniform Traffic Control Devices* (MUTCD) for the posting of all
regulatory and warning signage, including speed limit signs, on all streets and
highways.

(Id. at 1).

> b.  With respect to classification of speed limits, it provides in pertinent part:

Under satisfactory operating conditions, speed limits can be classified into two
different categories: regulatory (posted) speed limits and statutory (unposted, with
some exceptions) speed limits.   MGL c. 90 §§ 18 and 18B establish the
requirements for posting regulatory speed limits.  MGL c. 90 §§ 17, 17A and 17C
cover the criteria for statutory speed limits.

(Id. at 2).

> c.  With respect to regulatory speed limits, it provides in pertinent part:

*A regulatory speed limit is* one that has a completed a thorough traffic engineering
study, has a Special Speed Regulation that has been signed by the roadway owner,
the Registry of Motor Vehicles, and the MassDOT Traffic & Safety Engineering
Section, and has the appropriate numerical speed limit signage erected to clearly
define the special speed zones.  A detailed description of these procedures may be
found in **Part 3** of this document.  With exception to Safety Zones as noted in
**Section 9.c**, *the establishment of a regulatory speed limit must follow this*
*procedure or it is in violation of MGL c. 90 § 18 and is therefore considered*
*unenforceable*.

17

(Id.) (emphasis added).

    d.  With respect to statutory speed limits, it provides in pertinent part:

*Statutory speed limits* exist in the absence of Special Speed Regulations.  With exception to School Zones [as provided in Mass. Gen. L. ch. 85, § 2 at 20 mph], if a Special Speed Regulation exists it will always supersede the statutory speed limit.  On roads without posted speed limits, MGL c. 90 § 17 requires that drivers operate motor vehicles at a rate of speed that is no greater than reasonable and proper with regard to the use of the road and safety of the public.  [e.g., as provided in Mass. Gen. L. ch. 90, § 17(3) at 30 mph "inside a thickly settled or business district"].

(Id.) (emphasis added) (comments added in brackets).

    e.  With respect to establishing new speed limits, it provides in pertinent part:

With exception to those noted in **Part 9**, MassDOT requires Special Speed Regulations for all new speed limits on all State Highways and municipally-owned streets and highways.  However, the steps for initiating this process are contingent upon road ownership.

For locally-owned ways, the city or town should put a request for a new Special Speed Regulation in writing to their MassDOT District Office.  The District may advise the municipality on matters such as extents of proposed speed zones, overlap with any existing Special Speed Regulations, and other items that may assist in the municipality's development of the Traffic Engineering Study (see **Part 5**).  Upon receipt of the city or town's completion of the Traffic Engineering Study, the District will review for accuracy and, if in conformance with **Part 5**, will forward to the MassDOT Traffic & Safety Section.  The Traffic & Safety Section will then prepare the Special Speed Regulation and return it to the city or town for approval by the body that governs their municipal traffic code.  Once the municipality has adopted the regulation, signed copies are returned to the Traffic & Safety Section where they are signed and approved by the State Traffic Engineer and the Registrar of Motor Vehicles.  Following this final approval from MassDOT, the municipality may erect the new speed limit signage and the limit is now enforceable.  The municipality is required to notify the District Office that the signs have been erected so that MassDOT personnel may review for conformance.  A flow chart of this process is shown in **Fig. 4-1**.

18



**Fig. 4-1: Speed Limit Procedures on Municipal Roads**

(Id. at 4-5, Fig. 4-1, at 6).

f. With respect to regulatory speed limit ("Speed Limit") signs, it expressly

defines them as follows:

Standard *Speed Limit (MUTCD code R2-1) signs*, as shown in **Fig. 8-1**, are rectangular in shape with black, non-reflective legend and border on white, reflectorized sheeting.

(Id. at 17) (emphasis added).



**Fig. 8-1: Standard R2-1 (Speed Limit) Sign with Dimensions**
**(Source: *Standard Highway Signs*, 2004)**

(Id., Fig. 8-1, at 18).

g.  With respect to traffic engineering studies for Special Speed Regulations,

it provides in pertinent part:

MassDOT conforms to MUTCD standards and guidance for developing Special
Speed Regulations both because it is the law, but also to ensure that speed limits
are applied consistently across all streets and highways within the
Commonwealth.  Specifically, when developing a Special Speed Regulation, it
must "be established on the basis of an engineering study that has been performed
in accordance with traffic engineering practices.  The engineering study shall
include an analysis of the current speed distribution of free-flowing vehicles."
The purpose of this study is to document the conditions that will justify a
proposed speed limit that is safe, reasonable, and self-enforcing.

(Id. at 7) (footnote omitted).

h.  With respect to establishing speed zoning, it provides in pertinent part:

The observed 85th percentile speed is the basis for establishing speed zoning. This
method assumes that a majority of motorists are prudent and capable of selecting
safe speeds and is in conformance with the MUTCD. Thus, speeds established in
this manner meet the legal requirement that they be "reasonable and proper."

Generally, once the 85th percentile speed has been calculated, the value is rounded
to the nearest multiple of 5 to determine the limit. However, there may be some
conditions that justify a speed limit that varies from the 85th percentile speed,
including:

- *In sections that have been identified as having an unusual rate of crashes
  that can be attributed to speeding the area may be zoned lower than the
  85th percentile speed, but in no case more than 7 miles per hour lower.*
  This should be considered more as an exception than the rule, and should
  be done only where enforcement agencies will ensure consistent
  enforcement which will increase the effectiveness of the zone to an
  acceptable level of conformance.

(Id. at 15) (emphasis added).

30.    In accordance with the authority granted by Mass. Gen. L. ch. 85, § 2,

MassHwy promulgated regulatory standards entitled "The Massachusetts Amendments to

the 2009 Manual on Uniform Traffic Control Devices." (2012).  With respect to speed

control and "official" Speed Limit signs, it expressly provides in pertinent part:

21

**Section 10A-8** **Speed Control**: Of the special regulations adopted by municipalities under the provisions of Chapter 90, Section 18 of the General Laws, the most commonly used is the special regulation of the speed of motor vehicles. Considerable data including speed observations and trial runs must be obtained by municipal officials, usually the Police Department. The final determination is based upon the *85-percentile method*, which is that speed at or below which 85% of the vehicles observed were actually traveling. Department representatives are available to demonstrate the proper method for conducting the necessary studies and drafting the covering regulation, upon written request of local officials.

Procedure for Establishment of Legal Speed Zones

(1) The municipality is to conduct proper studies and submit data to the Department. (Municipalities usually accept the available services of the Department in conducting studies and assembling the data).

(2) After the speed zones, proposed by the local authorities, are reviewed by the Department, they are returned to the municipality for formal adoption by the rule-making body. During this time, the municipality is responsible for any and all hearings required for adoption.

(3) Upon receipt of notice of formal adoption by the municipality, the Department, acting jointly with the Registry, will certify and approve.

(4) Certified regulation is returned to municipality.

(5) *Official Speed Limit signs may then be installed in accordance with the specific provisions of the approved speed regulation.*

(6) *The Special Speed Regulation is then enforceable against violators.*

"The Massachusetts Amendments to the 2009 Manual on Uniform Traffic Control

Devices," § 10A-8, 10-11 at 10-11 (2012) (emphasis added).

## STATEMENT OF FACTS

### Federal-Aid Highway Program (FAHP)

31.    "The Federal-Aid Highway Program (FAHP) is an umbrella term for the

separate highway programs administered by the Federal Highway Administration

22

(FHWA)."  Congressional Research Service Report R44332, "Federal-Aid Highway

Program (FAHP): In Brief", at 1 (June 5, 2019).

> Each state is required to have a State Transportation Improvement Plan ["STIP"],
> which sets priorities for the state's use of FAHP funds.  State DOT's largely
> determine which projects are funded, let the contracts, and oversee project
> development and construction. ...

> Under the 2015 surface transportation reauthorization act, the Fixing America's
> Surface Transportation Act (FAST Act; P.L. 114-94), which authorized funding
> for FY2016-FY2020, 92% of FAHP funding is distributed through five core
> programs.

Id.    n. 1 (citing Federal Highway Administration, Fixing America's Surface

Transportation Act or "FAST Act," December 2015, http://www.fhwa.dot.gov/fastact/).

These five core programs include the following:

   a. The Surface Transportation Block Grant Program (STBG; FAST Act §
      1109), "is the federal-aid highway program with by far the broadest
      eligibility criteria.  ...  The STBG replaces the former Surface
      Transportation Program ["STP"]."  Id. at 8.

   b. The Highway Safety Improvement Program (HSIP; FAST Act § 1113),
      "supports projects that improve the safety of road infrastructure by
      correcting hazardous road locations, such as dangerous intersections, or
      making road improvements, such as adding rumble strips."  Id. at 9.

   c. The Congestion Mitigation and Air Quality Improvement Program
      (CMAQ; FAST Act §1114), "was established to fund projects and
      programs that may reduce emissions of transportation-related pollutants."
      Id.

23

32.     Before the Federal government pays cash for a Federal-aid highway project, "a State or other eligible recipient must submit to FHWA a voucher associated with a valid obligation of Federal-aid highway funding." FHWA Publication No. FHWA-PL-17-011, "Funding Federal-aid Highways," at 37 (January 2017). The FHWA describes the "Outlay of Funding" as follows in pertinent part:

**Payments to States**.  Under the FAHP, FHWA does not distribute cash in advance to States. Instead, it notifies each State of the balances of Federal funds available for its use, meaning that the State may request obligations, begin projects, and then later be paid for eligible costs incurred. The project need not be completed, however, before a State begins to receive payments.  Depending upon the type of the project, the time elapsing from obligation to outlay (payment) can vary from a few days to several years; see "outlay rates" below for additional detail.

Payments are normally made to States. ...

The normal sequence of events for payment to the States is as follows:

1) A contractor does work on the project.

2) The contractor sends a bill to the State, which processes the bills for all work done throughout the State. At this point, the State has incurred the cost.

3) The State sends FHWA electronic vouchers to review and approve for payment.

4) The FHWA certifying officer certifies the State transportation department's claim for payment.

5) FHWA submits these certifications to the Treasury Department.

6) The Treasury Department transfers the Federal share of the cost for all projects on the vouchers directly to the State's bank account by electronic funds transfer. ...

This general framework—obligation of funding, progression (or completion) of work, and only then outlay of cash—has led many to refer to the FAHP as a "reimbursable" program.  In many States the program operates in this manner: the State, as the contracting agency pays the contractors' invoices, submits the necessary vouchers to FHWA, and uses the Federal cash to reimburse itself. However, there is no legal requirement for a State to front the bill payment with State revenues; at its discretion, a State may instead use the Federal cash to pay the contractor's Federal share of the bill.  The timing of the Federal payment to the State is governed by an agreement between the State and the Treasury

24

> Department in accordance with the Cash Management Improvement Act of 1990.
> FHWA's payments are generally deposited in the State's account on the same day
> payments to the contractor are made.

Id. at 37-39.

33.    The "Rapid Approval and State Payment System" ("RASPS"), is used to
reimburse States for the Federal Share of highway construction and highway related
projects.    FHWA Records and Disposition Manual, September 12, 2019,
https://www.fhwa.dot.gov/legsregs/directives/orders/eislist.cfm.

34.    "RASPS is the primary method used to reimburse states for their Federal
share of highway construction & highway related projects."    "TPF Program Financial
Process Guidebook," at 33 (August 2012).

> The State DOT collects project expenditures in their accounting system. A file of
> required project data is prepared from their system and transmitted electronically
> to RASPS. Both the State DOT and FHWA Division Office review and
> electronically approve the payment.

Id.

35.    The RASPS replaced the legacy Current Bill Warehouse system which
utilized FHWA Form PR-20 (Rev. 4-14), entitled "Voucher for Work Performed Under
Provisions of the Federal Aid and Federal Highways Acts, as Amended." (Exhibit No.
1). The Form PR-20 voucher includes the following certification to be executed by an
"Authorized Official" of the "State Highway Agency": "I certify that the cost shown in
this voucher has been incurred in accordance with the terms of project agreements;
applicable State and Federal laws or regulations; and that no claim has previously been
submitted for costs claimed." Id.

25

## **MassDOT/Federal-Aid Project No. 600518**

36.     MassDOT/Federal-Aid Project No. 600518 ("Project No. 600518"), is

entitled "Hingham – Intersection Improvements at Derby Street, Whiting Street (Route

53) and Gardner Street." (Exhibit No. 2). The Project Description is as follows:

> Work on this project will consist of intersection improvements at Derby Street,
> Whiting Street (Route 53) and Gardner Street. Work includes the installation of a
> new traffic signal system and extends the Cushing Street Intersection and will also
> provide a turn lane at Recreation Park Road [sic.] This project will also include
> improved accommodation for bicycles and pedestrians.

Id. The project is located in the "Town of Hingham". Id. Construction is scheduled to

begin in "Autumn 2018" and end in "Summer 2020". Id. The Construction bid price is

"$2,436,413.19". Id. Notice to Proceed was "October 11, 2018". Id.

37.     Gardner Street and Cushing Street are under the jurisdiction of the Town

of Hingham, and Derby Street and Whiting Street (Route 53) are under the jurisdiction of

the Commonwealth.

38.     Project No. 600518 involves the use of FAHP funds as follows: $550,392

(HSIP) and $1,956,950 (STP). MassDOT, "State Transportation Improvement Program

(2017-2021)" 48-49. (Exhibit No. 3).

39.     In the period from February 5, 2019, to August 20, 2019, MassDOT

submitted nineteen (19) weekly invoices (including seventy-six (76) vouchers for

payment) to the Federal Government transmitted electronically via RASPS in connection

with Project No. 600518, and in the total amount of $426,240.48, which the Government

later paid in full. (See Exhibit No. 4, "RASPS LF02D41A Report," (August 29, 2019)).

26

**MassDOT/Federal-Aid Project No. 607309**

40.    MassDOT/Federal-Aid Project No. 607309 ("Project No. 607309"), is entitled "Hingham – Reconstruction & Related Work on Derby Street, from Pond Park Road to Cushing Street." (Exhibit No. 5). The Project Description is as follows:

> This project is proposed to address ongoing safety and capacity issues at the Derby Street/Route 3 ramps. Ramp modifications including signalization of ramps are proposed. In addition, there is a need to provide improved multi-modal accommodation on this targeted segment of Derby Street.

Id. The project is located in the "Town of Hingham". Id. Construction is scheduled to begin in "Spring 2018" and end in "Spring 2020". Id. The Construction bid price is "$4,940,445.35". Id. Notice to Proceed was "April 5, 2018". Id.

41.    Pond Park Road and Cushing Street are under the jurisdiction of the Town of Hingham, and Derby Street and Route 3 are under the jurisdiction of the Commonwealth.

42.    Project No. 607309 involves the use of FAHP funds as follows: $2,556,344 (CMAQ), $886,999 (HSIP), and $597,428 (TAP).    MassDOT, "State Transportation Improvement Program (2017-2021)" 31-32, 36. (Exhibit No. 3, supra).

43.    In the period from January 24, 2018, to September 3, 2019, MassDOT submitted forty-five (45) weekly invoices (including 221 vouchers for payment) to the Federal Government transmitted electronically via RASPS in connection with Project No. 607309, and in the total amount of $2,884,837.12, which the Government later paid in full. (See Exhibit No. 6, "RASPS LF02D41A Report" (September 13, 2019)).

27

## Commonwealth's Chapter 90 Program

44.     The Chapter 90 Program was enacted on March 23, 1973, by vote of the
Public Works Commission to entitle Municipalities to 100% reimbursement of
documented expenditures on approved roadway projects under the provisions of Mass.
Gen. L. ch. 90, § 34.

## Commonwealth's 10-Year Chapter 90 Contract with Hingham

45.     On May 16, 2007, Charles J. Cristello, Town Administrator (as
"Contractor's Authorized Signatory"), Town of Hingham ("Contractor"), executed
"COMMONWEALTH OF MASSACHUSETTS STANDARD CONTRACT FORM
AND INSTRUCTIONS" with the Massachusetts Highway Department. (Exhibit No. 7)
(the "Contract").

> a.  The preamble of the Contract expressly provides in pertinent part:

By executing this Contract, the Contractor under pains and penalties of perjury,
makes all certifications required by law and certifies that it shall comply with the
following requirements: ... that the Contractor is responsible for reviewing the
Standard Contract Form Instructions ... ; ... and that the Contractor agrees that all
terms governing performance of this Contract and doing business in
Massachusetts are attached to this Contract or incorporated by reference herein,
including the following requirements: all relevant Massachusetts state and federal
laws, regulations, Executive Orders, treaties, requirements for access to
Contractor records, the terms of the applicable Commonwealth Terms and
Conditions, the terms of this Standard Contract Form and Instructions including
the Contractor Certifications and Legal References, the Request for Response
(RFR) or solicitation (if applicable), the Contractor's response to the RFR or
solicitation (if applicable), and any additional negotiated provisions.

> b.  The "Contractor Certifications and Legal References" expressly referred

to by the Contract provide in pertinent part:

By signing the Standard Contract Form the Contractor certifies, under the pains
and penalties of perjury, that it is compliance with, and shall remain in

28

compliance with, all legal requirements governing performance of this Contract and the Contractor's doing business in Massachusetts. ... **Please note that not all laws or requirements have been cited.** ... Massachusetts General Laws; Code of Massachusetts Regulations; ... .

    c.  The clause "Payment Method: The Contractor agrees to be paid by Electronic Funds Transfer (EFT is the Commonwealth's Preferred Payment Method):" is checked "Yes".

    d.  The "Brief Description of Contract Performance " is as follows:

In accordance with Chapter 90 Section 34 of the MGLs and the Transportation Department's Chapter 90 Guidelines. The source of funds is subject to appropriation. The rate is based on the c. 90 formula. The formula is comprised of the most updated city/town accepted road mileage, census population data and employment within that community. The terms of the formula are non-negotiable.

    e.  Under the heading "Performance or Exception Type" the option entitled "Grant (as defined by 815 CMR 2.00)" is checked.

    f.  The "Anticipated Contract Effective Start Date" was "July 1, 2007."

    g.  The "Termination Date of this Contract" is "June 30, 2017."

46.  On April 27, 2017, Ted C. Alexiades, Town Administrator (as "Authorizing Signature for Contractor"), Town of Hingham ("Contractor"), executed "MASSDOT STANDARD CONTRACT FORM" with the Massachusetts Highway Department. (Exhibit No. 8) (the "Amendment").

    a.  The "Brief Description of Contract Performance or Reason for Amendment" is as follows: "Extending the original Chapter 90 Contract for 10 more years."

    b.  The "Contract End Date" is "June 30, 2027."

    c.  The "Certifications" are as follows in pertinent part:

29

The Contractor makes all certifications under the attached <u>Contractor Certifications</u> (incorporated by reference if not attached hereto) under the pains and penalties of perjury, agrees to provide any required documentation upon request to support compliance, and agrees that all terms governing performance of this Contract and doing business in Massachusetts are attached or incorporated by reference herein according to the following hierarchy of document precedence, the <u>MassDOT Terms and Conditions,</u> this Standard Contract Form including the <u>Instructions and Certifications,</u> the Request for Response (RFR) or other solicitation, the Contractor's Response, and additional negotiated terms, provided that additional negotiated terms will take precedence over the relevant terms in the RFR and the Contractor's Response only if made using the process outlined in 801 CMR 21.07, incorporated herein, provided that any amended RFR or Response terms result in best value, lower costs, or a more effective Contract.

  d.  The "<u>Contractor Certifications and Legal References</u>" expressly referred

      to by the Contract provide in pertinent part:

The Contractor makes all certifications required under this Contract under the pains and penalties of perjury, and agrees to provide any required documentation upon request to support compliance, and agrees that all terms governing performance of this Contract and doing business in Massachusetts are attached or incorporated by reference herein:

... **Applicable Laws.** The Contractor shall comply with all applicable state laws and regulations including but not limited to the applicable <u>Massachusetts General Laws</u>; the <u>Official Code of Massachusetts Regulations</u>; <u>Code of Massachusetts Regulations</u> (unofficial); ...

### <u>Hingham's Chapter 90 Apportionments (Fiscal Years 2009 – 2020)</u>

47.     In the period from April 1, 2008, to February 28, 2019, the Town of

Hingham's received fourteen (14) Chapter 90 apportionments in the total amount of

$8,966,059. (See Exhibit No. 9). (See Table 1 below).

Table 1: Hingham Chapter 90 Apportionments ('09 - '20)

| Date Granted | Fiscal Year | Amount |
|---|---|---|
| 4/1/2008 | 2009 | $511,338 |
| 3/30/2009 | 2010 | $547,642 |
| 4/1/2010 | 2011 | $565,744 |
| 3/31/2011 | 2012 | $753,618 |
| 4/1/2012 | 2013 | $752,647 |
| N/A | 2014 | $752,837 |
| 4/1/2014 | 2015 | $750,917 |
| 1/8/2015 | 2015 | $375,458 |
| 4/9/2015 | 2016 | $753,666 |
| 3/30/2016 | 2017 | $762,177 |
| 3/31/2017 | 2018 | $759,774 |
| 2/26/2018 | 2019 | $763,512 |
| 10/22/2018 | 2019 | $152,702 |
| 2/28/2019 | 2020 | $764,027 |
| Total | 14 | $8,966,059 |

## **Hingham's Chapter 90 Reimbursement Requests (2009 – 2019)**

48.       Standard Chapter 90 Reimbursement Request forms are submitted by municipalities to the District office of the MassDOT Highway Division (formerly MassHwy) to document expenditures in order to request reimbursement for previously approved Chapter 90 Projects. (See, e.g., Exhibit No. 10). The forms include the following standard certifications:

a. The Municipal Highway Officer's Certification is as follows:

I hereby certify under the penalty of perjury, that the charges for labor, materials, equipment, and services itemized and summarized on the attached forms are true and correct, and were incurred on this project in conformance with the Massachusetts Highway Department [a.k.a. MassDOT Highway Division (2010)] Policies and established Municipal Standards that were approved for this project.

b. The Accounting Officer's and Duly Authorized Municipal Official's

Certification is as follows:

I/We under penalty of perjury that the forms as listed or summarized on the attached forms were examined; *that they are in conformity with* our existing wage

31

schedule, equipment rates, and *all applicable statutes and regulations*; that they are properly chargeable to the appropriation(s) designated for this work; and that Executive Order No. 195, dated April 27, 1981 [and Chapter 11, Section 12 (2012)], is acknowledged as applicable.

(emphasis added) (comments added in brackets).

49.     The Chapter 90 Reimbursement Request form is submitted with the Chapter 90 List of Materials HED-454 Form, as well as, copies of individual invoices. (See, e.g., Exhibit No. 10). It is forwarded to and used by the District State Aid Engineer to verify that all materials (or services) and their quantities qualify under the specific Memorandum of Agreement used to fund the specific Chapter 90 project.

50.     On November 23, 2009, MassHwy received a Chapter 90 Reimbursement Request from Hingham requesting $47,436.10 for Project #09-03 (including seven (7) invoices), which the Commonwealth later paid in full. (Exhibit No. 10, supra). It was certified by Roger Fernandes, Projects Engineer (Highway Officer); Ted Alexiades, Town Accountant/Finance Director (Accounting Officer); and, Kevin Paicos, Town Administrator (Duly Authorized Municipal Official).

51.     On November 23, 2009, MassHwy received a Chapter 90 Reimbursement Request from Hingham requesting $265,057.13 for Project #09-04 (including five (5) invoices), which the Commonwealth later paid in full. (Exhibit No. 10, supra). It was certified by Roger Fernandes, Projects Engineer (Highway Officer); Ted Alexiades, Town Accountant/Finance Director (Accounting Officer); and, Kevin Paicos, Town Administrator (Duly Authorized Municipal Official).

32

52.     On February 5, 2010, MassHwy received a Chapter 90 Reimbursement Request from Hingham requesting $8,295.00 for Project #09-03 (including one (1) invoice), which the Commonwealth later paid in full. (Exhibit No. 10, supra). It was certified by Roger Fernandes, Projects Engineer (Highway Officer); Ted Alexiades, Town Accountant/Finance Director (Accounting Officer); and, Kevin Paicos, Town Administrator (Duly Authorized Municipal Official).

53.     On February 5, 2010, MassHwy received a Chapter 90 Reimbursement Request from Hingham requesting $69,892.74 for Project #09-04 (including one (1) invoice), which the Commonwealth later paid in full. (Exhibit No. 10, supra). It was certified by Roger Fernandes, Projects Engineer (Highway Officer); Ted Alexiades, Town Accountant/Finance Director (Accounting Officer); and, Kevin Paicos, Town Administrator (Duly Authorized Municipal Official).

54.     On November 15, 2010, MassHwy received a Chapter 90 Reimbursement Request from Hingham requesting $412,102.93, for Project #11-01 (including twelve (12) invoices), which the Commonwealth later paid in full. (Exhibit No. 10, supra). It was certified by Roger Fernandes, Projects Engineer (Highway Officer); Susan Nickerson, Interim Town Accountant (Accounting Officer); and, Ted Alexiades, Interim Town Administrator (Duly Authorized Municipal Official).

55.     On January 24, 2011, MassHwy received a Chapter 90 Reimbursement Request from Hingham requesting $132,828.36, for Project #11-01 (including one (1) invoice), which the Commonwealth later paid in full. (Exhibit No. 10, supra). It was certified by Roger Fernandes, Projects Engineer (Highway Officer); Susan Nickerson,

33

Interim Town Accountant (Accounting Officer); and, Ted Alexiades, Interim Town Administrator (Duly Authorized Municipal Official).

56.    On May 16, 2011, MassHwy received a Chapter 90 Reimbursement Request from Hingham requesting $29,876.13 for Project #09-04 (including one (1) invoice), which the Commonwealth later paid in full. (Exhibit No. 10, supra).

57.    On May 16, 2011, MassHwy received a Chapter 90 Reimbursement Request from Hingham requesting $13,242.79, for Project #11-01 (including three (3) invoices), which the Commonwealth later paid in full. (Exhibit No. 10, supra). It was certified by Roger Fernandes, Projects Engineer (Highway Officer); Susan Nickerson, Town Accountant (Accounting Officer); and, Ted Alexiades, Town Administrator (Duly Authorized Municipal Official).

58.    On August 12, 2011, MassHwy received a Chapter 90 Reimbursement Request from Hingham requesting $198,376.37, for Project #11-01 (including five (5) invoices), which the Commonwealth later paid in full. (Exhibit No. 10, supra). It was certified by Roger Fernandes, Projects Engineer (Highway Officer); Susan Nickerson, Town Accountant (Accounting Officer); and, Ted Alexiades, Town Administrator (Duly Authorized Municipal Official).

59.    On October 5, 2011, MassHwy received a Chapter 90 Reimbursement Request from Hingham requesting $527,373.09, for Project #12-01 (including eleven (11) invoices), which the Commonwealth later paid in full. (Exhibit No. 10, supra). It was certified by Roger Fernandes, Projects Engineer (Highway Officer); Susan

34

Nickerson, Town Accountant (Accounting Officer); and, Ted Alexiades, Town Administrator (Duly Authorized Municipal Official).

60.     On December 2, 2011, MassHwy received a Chapter 90 Reimbursement Request from Hingham requesting $351,290.21, for Project #12-01 (including four (4) invoices), which the Commonwealth later paid in full. (Exhibit No. 10, supra). It was certified by Roger Fernandes, Projects Engineer (Highway Officer); Susan Nickerson, Town Accountant (Accounting Officer); and, Ted Alexiades, Town Administrator (Duly Authorized Municipal Official).

61.     On August 13, 2012, MassHwy received a Chapter 90 Reimbursement Request from Hingham requesting $361,366.70, for Project #12-01 (including four (4) invoices), which the Commonwealth later paid in full. (Exhibit No. 10, supra). It was certified by Roger Fernandes, Projects Engineer (Highway Officer); Susan Nickerson, Town Accountant (Accounting Officer); and, Ted Alexiades, Town Administrator (Duly Authorized Municipal Official).

62.     On November 5, 2012, MassHwy received a Chapter 90 Reimbursement Request from Hingham requesting $319,848.76, for Project #13-01 (including nine (9) invoices), which the Commonwealth later paid in full. (Exhibit No. 10, supra). It was certified by Roger Fernandes, Projects Engineer (Highway Officer); Susan Nickerson, Town Accountant (Accounting Officer); and, Ted Alexiades, Town Administrator (Duly Authorized Municipal Official).

63.     On August 26, 2013, MassHwy received a Chapter 90 Reimbursement Request from Hingham requesting $432,798.24, for Project #13-01 (including five (5)

35

invoices), which the Commonwealth later paid in full. (Exhibit No. 10, supra). It was certified by Roger Fernandes, Town Engineer; Susan Nickerson, Town Accountant; and, Ted Alexiades (Duly Authorized - Town Administrator).

64.     On October 4, 2013, MassHwy received a Chapter 90 Reimbursement Request from Hingham requesting $393,155.51, for Project #14-01 (including five (5) invoices), which the Commonwealth later paid in full. (Exhibit No. 10, supra). It was certified by Roger Fernandes, Town Engineer (Municipal Highway Officer); Susan Nickerson, Town Accountant (Accounting Officer); and, Ted Alexiades, Town Administrator (Duly Authorized).

65.     On November 3, 2014, MassHwy received a Chapter 90 Reimbursement Request from Hingham requesting $359,681.49, for Project #14-01 (including ten (10) invoices), which the Commonwealth later paid in full. (Exhibit No. 10, supra). It was certified by Roger Fernandes, Town Engineer (Municipal Highway Officer); Susan Nickerson, Town Accountant (Accounting Officer); and, Ted Alexiades, Town Administrator (Duly Authorized).

66.     On November 3, 2014, MassHwy received a Chapter 90 Reimbursement Request from Hingham requesting $750,917, for Project #14-02 (including fifteen (15) invoices), which the Commonwealth later paid in full. (Exhibit No. 10, supra). It was certified by Roger Fernandes, Town Engineer (Municipal Highway Officer); Susan Nickerson, Town Accountant (Accounting Officer); and, Ted Alexiades, Town Administrator (Duly Authorized).

36

67. On October 13, 2015, MassHwy received a Chapter 90 Reimbursement Request from Hingham requesting $365,558, for Project #15-01 (including twenty-six (26) invoices), which the Commonwealth later paid in full. (Exhibit No. 10, supra). It was certified by Roger Fernandes, Town Engineer (Municipal Highway Officer); Susan Nickerson, Town Accountant (Accounting Officer); and, Ted Alexiades, Town Administrator (Duly Authorized).

68. On August 15, 2016, MassHwy received a Chapter 90 Reimbursement Request from Hingham requesting $10,000.00, for Project #15-01 (including one (1) invoice), which the Commonwealth later paid in full. (Exhibit No. 10, supra). It was certified by Roger Fernandes, Town Engineer (Municipal Highway Officer); Susan Nickerson, Town Accountant (Accounting Officer); and, Ted Alexiades, Town Administrator (Duly Authorized).

69. On August 15, 2016, MassHwy received a Chapter 90 Reimbursement Request from Hingham requesting $753,666.00, for Project #16-01 (including twelve (12) invoices), which the Commonwealth later paid in full. (Exhibit No. 10, supra). It was certified by Roger Fernandes, Town Engineer (Municipal Highway Officer); Susan Nickerson, Town Accountant (Accounting Officer); and, Ted Alexiades, Town Administrator (Duly Authorized).

70. On August 15, 2016, MassHwy received a Chapter 90 Reimbursement Request from Hingham requesting $449,672.17, for Project #16-02 (including thirty-three (33) invoices), which the Commonwealth later paid in full. (Exhibit No. 10, supra). It was certified by Roger Fernandes, Town Engineer (Municipal Highway Officer); Susan

37

Nickerson, Town Accountant (Accounting Officer); and, Ted Alexiades, Town Administrator (Duly Authorized).

71.     On November 18, 2016, MassHwy received a Chapter 90 Reimbursement Request from Hingham requesting $312,504.83, for Project #16-02 (including five (5) invoices), which the Commonwealth later paid in full. (Exhibit No. 10, supra). It was certified by Roger Fernandes, Town Engineer (Municipal Highway Officer); Susan Nickerson, Town Accountant (Accounting Officer); and, Ted Alexiades, Town Administrator (Duly Authorized).

72.     On November 28, 2017, MassHwy received a Chapter 90 Reimbursement Request from Hingham requesting $700,635.23, for Project #17-01 (including nine (9) invoices), which the Commonwealth later paid in full. (Exhibit No. 10, supra). It was certified by Roger Fernandes, Town Engineer (Municipal Highway Officer); Susan Nickerson, Town Accountant (Accounting Officer); and, Tom Mayo, Interim Town Administrator (Duly Authorized).

73.     On July 2, 2018, MassHwy received a Chapter 90 Reimbursement Request from Hingham requesting $59,136.77, for Project #17-01 (including one (1) invoice), which the Commonwealth later paid in full. (Exhibit No. 10, supra). It was certified by Roger Fernandes, Town Engineer (Municipal Highway Officer); Susan Nickerson, Town Accountant (Accounting Officer); and, Tom Mayo, Town Administrator (Duly Authorized).

74.     In the period from November 3, 2009, to July 2, 2018, MassHwy received twenty-four (24) Chapter 90 Reimbursement Requests (including a total of 186 invoices)

38

from Hingham in the total amount of $7,324,688.  (See Exhibit No. 10, supra).  (See

Table 2 below).

Table 2:  Hingham Chapter 90 Reimbursement Requests w/Invoices ('09 - '18)

| Date Received | Project No. | Amount | Invoices (qty.) |
|---|---|---|---|
| 11/23/2009 | 09-03 | $47,436 | 7 |
| 11/23/2009 | 09-04 | $265,057 | 5 |
| 2/5/2010 | 09-03 | $8,295 | 1 |
| 2/5/2010 | 09-04 | $69,893 | 1 |
| 11/15/2010 | 11-01 | $412,103 | 12 |
| 1/24/2011 | 11-01 | $132,828 | 1 |
| 5/16/2011 | 09-04 | $29,876 | 1 |
| 5/16/2011 | 11-01 | $13,243 | 3 |
| 8/12/2011 | 11-01 | $198,376 | 5 |
| 10/5/2011 | 12-01 | $527,373 | 11 |
| 12/2/2011 | 12-01 | $351,290 | 4 |
| 8/13/2012 | 12-01 | $361,337 | 4 |
| 11/5/2012 | 13-01 | $319,849 | 9 |
| 8/26/2013 | 13-01 | $432,798 | 5 |
| 10/4/2013 | 14-01 | $393,156 | 5 |
| 11/3/2014 | 14-01 | $359,681 | 10 |
| 11/3/2014 | 14-02 | $750,917 | 15 |
| 10/13/2015 | 15-01 | $365,558 | 26 |
| 8/15/2016 | 15-01 | $10,000 | 1 |
| 8/15/2016 | 16-01 | $753,666 | 12 |
| 8/15/2016 | 16-02 | $449,672 | 33 |
| 11/18/2016 | 16-02 | $312,505 | 5 |
| 11/28/2017 | 17-01 | $700,635 | 9 |
| 7/2/2018 | 17-01 | $59,137 | 1 |
| Total | 24 | $7,324,681 | 186 |

## Hingham's Chapter 90 Final Reports (2009 – 2019)

75.     Standard Chapter 90 Final Report forms are submitted by municipalities to

the District office of the MassDOT Highway Division (formerly MassHwy).  (See, e.g.,

Exhibit No. 11).  The forms include the following standard certification jointly for the

Highway Officer, Accounting Officer, and Duly Authorized Municipal Official:

The undersigned hereby certify that documentation to substantiate the above expenditures is available for examination in accordance with Executive Order No. 195 (April 27, 1981).

*We further certify* that all equipment rental costs are within the approved limits established by the MassDOT Highway Division, *that the Municipality has complied with all applicable statutes and regulations*, that the requests for reimbursements for allowable project expenses actually incurred are in conformance with the "Chapter 90" Project Request, and that the Municipality will be responsible for the future maintenance of this project including the cost thereof.

(emphasis added) (comments added in brackets).

76.     On May 16, 2011, MassHwy received a Chapter 90 Final Report from Hingham documenting $364,817.00 (State Funds @ 100%), for Project #09-04, which the Commonwealth later paid in full. (Exhibit No. 11, supra). It was certified by Roger Fernandes, Projects Engineer (Highway Officer); Susan Nickerson, Town Accountant (Accounting Officer); and, Ted Alexiades, Town Administrator (Duly Authorized Municipal Official).

77.     On August 12, 2011, MassHwy received a Chapter 90 Final Report from Hingham documenting $55,731.10 (State Funds @ 100%), for Project #09-03, which the Commonwealth later paid in full. (Exhibit No. 11, supra). It was certified by Roger Fernandes, Projects Engineer (Highway Officer); Susan Nickerson, Town Accountant (Accounting Officer); and, Ted Alexiades, Town Administrator (Duly Authorized Municipal Official).

78.     On August 12, 2011, MassHwy received a Chapter 90 Final Report from Hingham documenting $565,744.00 (State Funds @ 100%) and $190,806.45 (Amendment to project) (together totaling $756,550.45), for Project #11-01, which the Commonwealth later paid in full. (Exhibit No. 11, supra). It was certified by Roger

40

Fernandes, Projects Engineer (Highway Officer); Susan Nickerson, Town Accountant (Accounting Officer); and, Ted Alexiades, Town Administrator (Duly Authorized Municipal Official).

79.     On August 23, 2012, MassHwy received a Chapter 90 Final Report from Hingham documenting $1,240,000.00 (State Funds @ 100%), for Project #12-01, which the Commonwealth later paid in full. (See Exhibit No. 12, infra). It was certified by Roger Fernandes, Projects Engineer (Highway Officer); Susan Nickerson, Town Accountant (Accounting Officer); and, Ted Alexiades, Town Administrator (Duly Authorized Municipal Official).

80.     On August 26, 2013, MassHwy received a Chapter 90 Final Report from Hingham documenting $752,647.00 (State Funds @ 100%), for Project #13-01, which the Commonwealth later paid in full. (Exhibit No. 11, supra). It was certified by Roger Fernandes, Projects Engineer (Highway Officer); Susan Nickerson, Town Accountant (Accounting Officer); and, Ted Alexiades, Town Administrator (Duly Authorized Municipal Official).

81.     On November 3, 2014, MassHwy received a Chapter 90 Final Report from Hingham documenting $752,318.93 (State Funds @ 100%), for Project #14-01, which the Commonwealth later paid in full. (Exhibit No. 11, supra). It was certified by Roger Fernandes, Projects Engineer (Highway Officer); Susan Nickerson, Town Accountant (Accounting Officer); and, Ted Alexiades, Town Administrator (Duly Authorized Municipal Official).

41

82.     On November 3, 2014, MassHwy received a Chapter 90 Final Report from Hingham documenting $750,917 (State Funds @ 100%), for Project #14-02, which the Commonwealth later paid in full. (Exhibit No. 11, supra). It was certified by Roger Fernandes, Projects Engineer (Highway Officer); Susan Nickerson, Town Accountant (Accounting Officer); and, Ted Alexiades, Town Administrator (Duly Authorized Municipal Official).

83.     On October 13, 2015, MassHwy received a Chapter 90 Final Report from Hingham documenting $759,817.00 (State Funds @ 100%) and $375,558.00 (Additional State Funds (1/8/15)) (together totaling $1,135,375.00), for Project #15-01, which the Commonwealth later paid in full. (Exhibit No. 11, supra). It was certified by Roger Fernandes, Projects Engineer (Highway Officer); Susan Nickerson, Town Accountant (Accounting Officer); and, Ted Alexiades, Town Administrator (Duly Authorized Municipal Official).

84.     On August 15, 2016, MassHwy received a Chapter 90 Final Report from Hingham documenting $759,817.00 (State Funds @ 100%) and $375,558.00 (Additional State Funds (1/8/15)) (together totaling $1,135,375.00), for Project #15-01, which the Commonwealth later paid in full. (Exhibit No. 11, supra). It was certified by Roger Fernandes, Projects Engineer (Highway Officer); Susan Nickerson, Town Accountant (Accounting Officer); and, Ted Alexiades, Town Administrator (Duly Authorized Municipal Official).

85.     On August 15, 2016, MassHwy received a Chapter 90 Final Report from Hingham documenting $753,666.00 (State Funds @ 100%), for Project #16-01, which

42

the Commonwealth later paid in full. (Exhibit No. 11, supra). It was certified by Roger Fernandes, Projects Engineer (Highway Officer); Susan Nickerson, Town Accountant (Accounting Officer); and, Ted Alexiades, Town Administrator (Duly Authorized Municipal Official).

86.    On November 18, 2016, MassHwy received a Chapter 90 Final Report from Hingham documenting $762,177.00 (State Funds @ 100%), for Project #16-02, which the Commonwealth later paid in full. (Exhibit No. 11, supra). It was certified by Roger Fernandes, Projects Engineer (Highway Officer); Susan Nickerson, Town Accountant (Accounting Officer); and, Ted Alexiades, Town Administrator (Duly Authorized Municipal Official).

87.    On July 2, 2018, MassHwy received a Chapter 90 Final Report from Hingham documenting $759,774.00 (State Funds @ 100%), for Project #17-01, which the Commonwealth later paid in full. (Exhibit No. 11, supra). It was certified by Roger Fernandes, Projects Engineer (Highway Officer); Susan Nickerson, Town Accountant (Accounting Officer); and, Tom Mayo, Town Administrator (Duly Authorized Municipal Official).

88.    In the period from May 16, 2011, to July 2, 2018, MassHwy received twelve (12) Chapter 90 Final Reports from Hingham documenting the total amount of $8,084,973. (See Exhibit No. 11, supra). (See Table 3 below).

43

Table 3: Hingham Chapter 90 Final Reports ('11 - '18)

| Date Received | Project No. | Amount |
|---|---|---|
| 5/16/2011 | 09-04 | $364,817 |
| 8/12/2011 | 09-03 | $55,731 |
| 8/12/2011 | 11-01 | $756,550 |
| 8/23/2012 | 12-01 | $1,240,000 |
| 8/26/2013 | 13-01 | $752,647 |
| 11/3/2014 | 14-01 | $752,319 |
| 11/3/2014 | 14-02 | $750,917 |
| 10/13/2015 | 15-01 | $1,135,375 |
| 8/15/2016 | 15-01 | (resubmission) |
| 8/15/2016 | 16-01 | $753,666 |
| 11/18/2016 | 16-02 | $762,177 |
| 7/2/2018 | 17-01 | $759,774 |
| Total | 12 | $8,083,973 |

## Hingham's Chapter 90 Balances/Payments

89.     MassDOT created a spreadsheet entitled "Chapter 90 Balances/Payments"
and "Hingham" dated February 12, 2018, together with a "Project List." (Exhibit No.
12). The "Project List" has a column entitled "Project Encumberance [sic]" under which
the amount of $11,464,018.62 appears in a row entitled "Total Projects." (Id. at 3). It
also has a column entitled "Unpaid Balance" under which appears the amount of
$59,138.77 (the only amount which appears other than $0.00). (Id.).

## Forfeiture of Chapter 90 Funds due to MUTCD Noncompliance

90.     Town of Hingham, Board of Selectmen, "Minutes of May 29, 2013 -
Traffic Committee Meeting," (Exhibit No. 13) note the following Conservatory Park,
Hingham, MA, residents request for stop signs to be installed at four (4) locations, and
speed limit signs of 15 MPH:

> Speed limit signs of 15 MPH are also being requested. ... The standard speed limit
> is 30 MPH. Any change to that speed limit requires a speed study, needs to meet
> warrants and must be approved by Mass DOT.  Harry Sylvester [DPW] also

44

explained that Mass DOT used to have to approve the installation of stop signs but now the Town has the authority to do that. *There are still warrants which need to be met in order to approve the installation of a stop sign and in the event that it is challenged, the State can relinquish Chapter 90 funds*.

(Exhibit No. 13, supra) (emphasis added).

91.     Town of Hingham, Board of Selectmen, "Minutes of May 28, 2014 -

Traffic Committee Meeting," (Exhibit No. 13, supra) note the following regarding a

traffic speed study on Conservatory Park, Hingham, MA, the residents request for stop

signs at problem intersections, and the installation of four (4), 15 m.p.h. Advisory Speed

plaques:

Sgt. Horte [Police Department] replied that *in order to install a stop sign, certain criteria must be met as dictated by the MUCAD [sic] regulations*. ... Harry Sylvester [DPW] said that *Chapter 90 funds can be withdrawn from [sic] Mass DOT if signs are installed which do not meet the proper criteria.*

(Exhibit No. 13, supra) (emphasis added) (comments added in brackets).

92.     Town of Hingham, Board of Selectmen, "Minutes of January 27, 2016 -

Traffic Committee Meeting," (Exhibit No. 13, supra) note the following regarding

"Revisit Request for Four Way Stop at Fearing/North/Main":

*Harry Sylvester [DPW] reminded the committee that we need to be careful regarding stop sign placement and installation since they need to meet MUTCD criteria*, two of which this intersection does not: accident history and excessive speed. *If these warrants/criteria are not met, the State can revoke Chapter 90 funds that are due to the Town if the Town is found to be in violation.* ...

Harry Sylvester made a motion to take no action, seconded by John Haley. ... After discussion that more need to be done, he amended his motion to say that we recommend that the Board of Selectmen hire an independent traffic engineer to do a study of the intersection and ensure that it meets MUTCD standards and warrants and sign it. John Haley seconded the motion. Bill Ramsey said that must meet MUTCD standards was too strong and suggested amending it to say that the traffic engineer will advise the committee if it does not meet the MUTCD standards. This was seconded by Clark Frazier and voted affirmatively by Sgt.

45

Horte [Police Department], and Francis Dolan. The motion was passed 4-2 and will be sent to the Board of Selectmen.

(Exhibit No. 13, supra) (emphasis added) (comments added in brackets).

## Hingham's Authorized Special Speed Regulations

93. On August 22, 1973, The Massachusetts Department of Public Works and the Registrar of Motor Vehicles, acting jointly, certified in writing that Special Speed Regulation No. 824 is consistent with the public interest, and thereby established speed limits on Route 228 (Main, East and Hull Streets), Town of Hingham (Authority in Control). (Exhibit No. 14). A copy of this regulation was provided by Superintendent Sylvester ("Sylvester"), Hingham DPW, on March 13, 2012, in compliance with a public information request by Mr. Zotos.

94. On November 5, 1973, The Massachusetts Department of Public Works and the Registrar of Motor Vehicles, acting jointly, certified in writing that Special Speed Regulation No. 824A is consistent with the public interest, and thereby amended speed limits on Route 228, Town of Hingham (Authority in Control). (Exhibit No. 14, supra). A copy of this regulation was provided by Superintendent Sylvester, Hingham DPW, on March 13, 2012, in compliance with a public information request by Mr. Zotos.

95. On October 6, 1976, The Massachusetts Department of Public Works and the Registrar of Motor Vehicles, acting jointly, certified in writing that Special Speed Regulation No. 824-B is consistent with the public interest, and thereby amended speed limits on Hull Street (Route 228), Town of Hingham (Authority in Control). (Exhibit No. 14, supra). A copy of this regulation was provided by Superintendent Sylvester,

46

Hingham DPW, on March 13, 2012, in compliance with a public information request by Mr. Zotos.

96. In a letter dated December 13, 1983, Robert J. McDonagh, Chief Engineer, The Commonwealth of Massachusetts, Executive Office of Transportation and Construction, Department of Public Works, wrote to Mr. Robert A. Smith, District Highway Engineer. (Exhibit No. 15). This letter entitled "SPEED ZONING – MUNICIPAL WAYS," outlines the procedures to be followed in response to municipal speed zoning requests, and the responsibilities of a municipality for accumulating and submitting data including: (1) Radar observations; (2) Trial runs; (3) Proposed limits and sign locations; and, the (4) Accident history for 2-years. (Id.). It further states that "[t]he District shall analyze the submission and make its recommendation to the Boston Office." (Id.). The letter notes that this procedure will be put into effect January 14, 1984. (Id.). A copy of this letter was provided by Superintendent Sylvester, Hingham DPW, on March 13, 2012, in compliance with a public information request by Mr. Zotos.

97. On August 26, 1988, The Massachusetts Department of Public Works and the Registrar of Motor Vehicles, acting jointly, certified in writing that Special Speed Regulation No. 7440 is consistent with the public interest, and thereby established speed limits on Charles Street & Lazell Street, Town of Hingham (Authority in Control). (Exhibit No. 14, supra). A copy of this regulation was provided by Superintendent Sylvester, Hingham DPW, on March 13, 2012, in compliance with a public information request by Mr. Zotos.

47

98.    In a letter dated June 21, 1989, Sergeant Robert F. Myers, Traffic Safety
Division, Hingham Police Department, Chairman, Traffic, Hingham Traffic Committee
wrote to "[a]ny resident or town group seeking a reduction in an existing posted speed
sign or implementation of a speed sign where one has never been recorded.". (Exhibit
No. 16). This letter outlines "THE LAW REGARDING NON POSTED ROADWAYS"
and the "PROCEDURE BY RESIDENT AND STEPS BY TOWN AND STATE" to
reduce an existing posted speed sign or implement a speed sign where one has never been
recorded. (Id.). The seven-step procedure requires an engineering study at an estimated
cost of 30 man hours (approximately $300 - $500 plus cost of signing), and multiple
approvals from the Town Traffic Committee, Selectmen and the State D.P.W. – which
could take up to 1 ½ years. (Id.). The letter notes the following:

> The State D.P.W., upon receiving the town study and reviewing the same, makes
> the final decisions as to the speed of the roadway. *It is very possible the D.P.W.*
> *might possibly increase instead of lowering the posted speed of the area in*
> *question*.

(Id.) (emphasis added). In closing, the letter states that "[u]ntil the above steps are taken,
and the speed of the roadway is legally recorded with the state, then and only then may a
Police Officer issue a citation on this roadway." (Id.). A copy of this letter was provided
by Superintendent Sylvester, Hingham DPW, on March 13, 2012, in compliance with a
public information request by Mr. Zotos.

99.    In a letter dated June 3, 2008, Mr. Charles J. Cristello, Town
Administrator, the Town of Hingham wrote to Mr. Bernard McCourt, District 5 Highway
Director, Massachusetts Highway Department ("Mass Highway"). (Exhibit No. 17). In
this letter, "RE: Main Street (Route 228) Special Speed Regulation No. 824 A,B
Hingham, MA," the Town petitions Mass Highway and the Registry of Motor Vehicles to

48

amend the referenced Town of Hingham Special Speed Regulation. (Id.). The letter states: *"We understand the process and the requirements associated with establishing or amending Special Speed Regulations* ... . We request your support in granting this petition ...". (emphasis added). (Id.). A copy of this letter was provided by Superintendent Sylvester, Hingham DPW, on March 13, 2012, in compliance with a public information request by Mr. Zotos.

100.    On August 12, 2008, The Massachusetts Highway Department and the Registry of Motor Vehicles, acting jointly, certified in writing that Special Speed Regulation No. 824-C is consistent with the public interest, and thereby amended speed limits on Main Street (Route 228), Town of Hingham (Authority in Control). (Exhibit No. 14, supra). A copy of this regulation was provided by Superintendent Sylvester, Hingham DPW, on March 13, 2012, in compliance with a public information request by Mr. Zotos.

101.    Town of Hingham, Board of Selectmen, "Minutes of August 27, 2008 - Traffic Committee Meeting," (Exhibit No. 13, supra) note the following regarding a resident request that posted speed limit sing be placed on Abington Street, Hingham, MA:

> A resident of Abington Street has requested that a posted speed limit sign be placed on Abington Street. ... The members explained to the resident that *if a study was done by the State, they could come back and post a higher speed limit than what is in place now*.

(Exhibit No. 13, supra) (emphasis added).

102.    Town of Hingham, Board of Selectmen, "Minutes of March 24, 2010 - Traffic Committee Meeting," (Exhibit No. 13, supra) note the following regarding a

49

resident suggestion to reduce the current 30 m.p.h. posted speed on Main Street,

Hingham, MA:

> Mr. Boland suggested a reduction of the current 30 MPH posted speed limit [on
> Main Street]. Sergeant Horte [Police Department] responded that this *would
> require a traffic study and Mass Highway approval which would most likely result
> in the speed limit being raised rather than reduced* which would not be in the best
> interest of public safety.

(Exhibit No. 13, supra) (emphasis added) (comments added in brackets).

## Speed Limit Signs (R2-1/White) & Advisory Speed Plaques (W13-1P/Yellow)

103.    Town of Hingham, Board of Selectmen, "Minutes of January 25, 2012 -

Traffic Committee Meeting," (Exhibit No. 13, supra) note the following regarding a

request for a speed sign on South Street, Hingham, MA:

> South Street residents in attendance presented a petition signed by 44 residents of
> South Street and South Lane requesting that signs be posted on both sides of the
> South Street. *They would like to have a yellow speed limit sign for 20 MPH* ...
> [discussion ensued] ... Paul Healey (Planning Board) noted that sometimes data is
> revealed to be different than the perception. *As for speed signs, the white signs
> need to be approved by the State after studies, etc. A "Thickly Settled" sign might
> work better.* ... [discussion continued] ...
>
> ... Sgt. Dearth [Police Department] made a motion to conduct the speed study and
> report his findings in May. Jay Costello seconded the motion.

(Exhibit No. 13, supra) (emphasis added) (comments added in brackets).

104.    Town of Hingham, Board of Selectmen, "Minutes of September 26, 2012 -

Traffic Committee Meeting," (Exhibit No. 13, supra) note the following regarding the

results of a traffic speed study on South Street, Hingham, MA:

> Sgt. Dearth [Police Department] presented the committee with the results of the
> Speed Study which took place during the period of 5/27/12-6/2/12. Based upon
> the data that was reviewed, the crash rates in the area were insignificant. ...
>
> ... The data collected showed that 85% of the traffic was travelling 37 MPH
> which is very close to the speed limit. Sgt. Dearth stated that this was

50

encouraging and shows that cars are not going in excess of the speed limit. *Tickets and warnings are issued at the officers' discretion but normally are given in cases when the operator is going 10-15 MPH over the speed limit.* 95% of cars were going 39 MPH which is still not a dangerous rate. ... [discussion ensued]

... Harry Sylvester [DPW] said that if the results of the speed study were submitted to Mass. DOT (Department of Transportation), the posted speed limit on the street would be increased to 35 MPH. Dan Zivkovich agreed as it is based on average speed taken from the speed study. *If yellow signs are posted (suggested speed limits), they are not enforceable.* The State defines 30 MPH as areas with houses less than 200 feet apart.

*Sgt. Dearth recommends that a yellow and black "Thickly Settled" sign be installed as an advisory sign (which means 30 MPH)* on the straightaway near SSCC and prior to Forget Me Not Lane. ... [discussion ensued] ... Sgt. Dearth recommends "Thickly Settled" signs due to volume and revisit the issue in 6 months. Harry Sylvester stated the crash data was insignificant and that the speed study showed that only 5% of drivers exceeded the speed limit. There is no need to add signs- they cost money, are a maintenance problem, are a drain on the budget and people do not pay attention to signs.

(Exhibit No. 13, supra) (emphasis added) (comments added in brackets).

105.    Town of Hingham, Board of Selectmen, "Minutes of February 24, 2016 -

Traffic Committee Meeting," (Exhibit No. 13, supra) note the following regarding

suggested speed signs  on High Street, Hingham, MA:

Lt. Haley (Fire) also suggested moving the *20 MPH suggested speed sign* to that area to see if that helps to deter people from speeding. Harry Sylvester [DPW] reminded everyone that *this sign is a suggested speed sign only and cannot be enforced. These signs are yellow and the regular speed signs are white. Those are the ones that can be enforced.* All thickly settled areas of the Town are 30 MPH.

(Exhibit No. 13, supra) (emphasis added) (comments added in brackets).

## Hingham's Erection and Maintenance of Speed Limit Signs (R2-1)

106.    As of March 2012, there were at least twenty-six (26) Speed Limit signs

(R2-1) posted on the public roadways under the sole jurisdiction of the Town of

Hingham, and without having approved Special Speed Regulations on file with

51

MassDOT. (Exhibit No. 18, "GPS Survey Posted Speed Limits Town of Hingham" (2012), Table 3, at 5-6; GPS maps, at 10-24).

    a. All of these Speed Limit signs were "rectangular in shape, with black numerals on a white reflectorized background" (R2-1) designating a special speed regulation lawfully made under the authority of Mass. Gen. L. ch. 90, § 18. (Id.).

    b. These Speed Limit signs (R2-1) were located on at least eight (8) roadways (i.e., Cushing, Fort Hill, Free, Gardner (upper), Longmeadow, Prospect, Shipyard, and Tuckers). (Id.).

    c. Of these Speed Limit signs (R2-1), fifteen (15) were 30 m.p.h., nine (9) were 20 m.p.h. (and were not "within a school zone which may be established by a city or town as provided in section 2 of chapter 85," pursuant to Mass. Gen. L. ch. 90, § 17(4)), and two (2) were 15 m.p.h. (See, e.g., Figure 1 (2012), below).



Figure 1: 30 m.p.h., 20 m.p.h., and 15 m.p.h. Speed Limit signs (R2-1) in Hingham, MA

## **Hingham's Enforcement of Speed Limit Signs (R2-1)**

107. The Hingham Police Department issues traffic citations for operating a vehicle a rate of speed in excess of Speed Limit signs (R2-1), on public roadways under the sole jurisdiction of the Town, and without having approved Special Speed Regulations on file with MassDOT. For example, the Hingham Police Department issued a total of at least 2,695 traffic citations during the period starting from September 28, 2011, and ending January 28, 2018.

> a. Of these 2,695 traffic citations, 1,247 (approximately 46.3%) were issued on public roadways under the sole jurisdiction of the Town, and without having approved Special Speed Regulations on file with MassDOT.

> b. Of these 1,247 traffic citations, 823 (approximately $2/3^{rd's}$) were issued for violations of Mass. Gen. L. ch. 90, § 17, i.e., operating a motor vehicle at a rate of speed greater than is reasonable and proper.

> c. Of these 1,247 traffic citations, the remaining balance of 384 (approximately $1/3^{rd}$) were issued for violations of a special speed regulation lawfully made under the authority of Mass. Gen. L. ch. 90, § 18, i.e., operating a vehicle a rate of speed in excess of a posted Speed Limit sign (R2-1).

53

**Hingham's Erection and Maintenance of Advisory Speed Plaques (W13-1P)**

108.     As of March 2012, there were at least thirty-four (34) Advisory Speed plaques (W13-1P) posted on the public roadways under the sole jurisdiction of the Town of Hingham. (Exhibit No. 18, supra, GPS maps, at 8-26).

> a.   All of these Advisory Speed plaques were rectangular in shape, with black letters on a yellow reflectorized designating an Advisory Speed (W13-1P) as provided for by the provisions of Mass. Gen. L. ch. 85, § 2, the "2009 Manual on Uniform Traffic Control Devices," and "The Massachusetts Amendments to the 2009 Manual on Uniform Traffic Control Devices." (Id.).

> b.   These Advisory Speed plaques (W13-1P) were located on at least twelve (12) public roadways (i.e., Bare Cove Park, Beal, Fort Hill, French, Gardner (lower), Grenadier, Martins, North, Ship, Spring, Water, and West). (Id.).

> c.   Eight (8) of these Advisory Speed plaques (W13-1P) supplemented warning signs carrying the message "thickly settled," that are diamond in shape, with black letters on a yellow reflectorized background. (Id.).

>> i.   Four (4) of these are 30 m.p.h. plaques. (See, e.g., Figure 5, infra).

>> ii.   Four (4) of these are 25 m.p.h. plaques. (See, e.g., Figure 9, infra, 25 m.p.h. Advisory Speed plaques on Gardner Street (lower)).

54

    d.  Sixteen (16) of these Advisory Speed plaques (W13-1P) were installed as separate sign installations.  (See, e.g., Figure 2 (2012), below).

        iii.  Two (2) of these are 25 m.p.h. plaques.

        iv.  Ten (10) of these are 20 m.p.h. plaques (not within a school zone).

        v.  Four (4) of these are 15 m.p.h. plaques.



Figure 2: 25 m.p.h., 20 m.p.h., and 15 m.p.h. Advisory Speed plaques (W13-1P) installed as separate sign installations in Hingham, MA

109.    Town of Hingham, Board of Selectmen, "Minutes of May 26, 2010 - Traffic Committee Meeting," (Exhibit No. 13, supra) note the following regarding the erection of two (2), 20 m.p.h. Speed Limit signs on Bare Cove Park Drive, Hingham, MA:

> Patricia Coyle, Treasurer of Bare Cove Park Committee, revisited the issue of speed limit signs being installed on Bare Cove Park Drive.  This request was originally made last May.  At that time, the Committee suggested that the matter be revisited this spring after the Carlson Field had been in operation. It was noted that traffic has increased on the road due to field users as well as by people going to Bare Cove Park.  *As a result of these dynamics, the Committee unanimously agreed to recommend the installation of two 20 MPH speed limit signs to be located near the field.  It should be noted that these speed signs cannot be enforced by Hingham Police Department.  Harry Sylvester [DPW] stated that he would have the signs placed promptly.*

(Exhibit No. 13, supra) (emphasis added) (See Figure 3 (2012), below).

 

Figure 3: Two (2), 20 m.p.h. Advisory Speed plaques (W13-1P), Bare Cove Park Drive

110.    Town of Hingham, Board of Selectmen, "Minutes of May 28, 2014 -

Traffic Committee Meeting," (Exhibit No. 13, supra) note the following regarding a

traffic speed study on Conservatory Park, Hingham, MA, and the installation of four (4),

15 m.p.h. Advisory Speed plaques:

> Sgt. Horte [Police Department] presented the results of the *Conservatory Park*
> *speed study* which was conducted by Sgt. Steven Dearth [Police Department].
> Two studies were conducted: ...   *Both were within the 85th percentile as*
> *measured by Mass Highway which means that they are within the proper*
> *parameters and that speed is not excessive.*  Gia Ramza of Franklin Rogers Road
> said that their intention was not to control speed on the road as *the speed limit is*
> *30 MPH.* ...
>
> *The suggested solution was to install suggested speed signs (yellow signs) which*
> *are not enforceable.  This is not common knowledge, however so this would be*
> *helpful.*  The residents in attendance were very happy with this suggestion. Signs
> will be installed at Charles Everett, Dwiggins Path and Franklin Rogers at John
> Hazlitt and Isaac Sprague. *There will be four 15 MPH suggested speed signs*
> *installed* as motioned by Sgt. Horte, seconded by Dan Zivkovich and
> unanimously voted.

(Exhibit No. 13, supra) (emphasis added) (comments added in brackets). (See Figure 4

(2019), below).

  

Figure 4: Three (3), 15 m.p.h. Advisory Speed plaques (W13-1P), Charles Everett Way,
Franklin Rogers Rd, and John Hazlitt Ln

### **Hingham's Enforcement of Advisory Speed Plaques (W13-1P)**

111.    The Hingham Police Department issues traffic citations for operating a
vehicle a rate of speed in excess of Advisory Speed plaques (W13-1P), which do not
coincide with the prima facie rates of speed pursuant to Mass. Gen. L. ch. 90, § 17(1) -
(4). For example:

      i.     On January 22, 2012, a Hingham police officer issued Ms. Tori Glover a
citation for operating a vehicle at a rate of speed in excess of a 25 m.p.h.
posted speed limit on North Street (See, e.g., Exhibit No. 18, supra,
"North St." map at 19);

      ii.    On June 1, 2012, a Hingham police officer issued Ms. Cynthia Castro a
citation for operating a vehicle at a rate of speed in excess of a 35 m.p.h.
posted speed limit on Water Street (See Id., e.g., "Water St." map at 25);

      iii.   On March 7, 2014, a Hingham police officer issued Mr. Patrick Jenkins a
citation for operating a vehicle at a rate of speed in excess of a 25 m.p.h.
posted speed limit on Gardner Street (See Id., e.g., "Gardner St. (lower)"
map at 14);

      iv.   On October 17, 2014, a Hingham police officer issued Ms. Marijane
Deitsch a citation for operating a vehicle at a rate of speed in excess of a
20 m.p.h. posted speed limit on Beal Street (See Id., e.g., "Beal St." map
at 9). Ms. Deitsch was not travelling "within a school zone which may be

57

established by a city or town as provided in section 2 of chapter 85"
pursuant to Mass. Gen. L. ch. 90, § 17(4);

v.    On December 30, 2014, a Hingham police officer issued Mr. Liam
      Richmond a citation for operating a motor vehicle at a rate of speed in
      excess of a 25 m.p.h. posted speed limit on Bare Cove Park Drive,
      Hingham, MA. (See Id., e.g., "Bare Cove Park Drive" map at 8); and,

vi.   On May 25, 2016, a Hingham police officer issued Ms. Kimberly Barrow
      a citation for operating a vehicle at a rate of speed in excess of a 15 m.p.h.
      posted speed limit on North Street (See Id., e.g., "North St." map at 19).

## Traffic Study of Beal Street/West Street/Fort Hill Street, Hingham, MA

112.   Vanasse & Assoc., Inc., "Beal Street/West Street/Fort Hill Street Corridor
Study" (July 2006), was commissioned by the Town of Hingham as a comprehensive
study of traffic conditions on these three public roadways under the Town's jurisdiction.
(Exhibit No. 19).

      a. The study tabulates the results of vehicle travel speed measurements
         performed on Beal Street and Fort Hill Street, and notes in pertinent part:

... the mean (average) vehicle travel speed along Beal Street, north of West Street,
was found to be approximately 42 miles per hour (mph). *The average measured
85th percentile vehicle travel speed*, or the speed at which 85 percent of the
observed vehicles traveled at or below, *was found to be approximately 48 mph, or
18 mph above the posted speed limit of 30 mph*. The mean vehicle travel speed
along Fort Hill Street, south of New Bridge Street was found to be approximately
37 miles per hour (mph). *The average measured 85th percentile vehicle travel
speed*, or the speed at which 85 percent of the observed vehicles traveled at or
below, *was found to be approximately 44 mph, or 14 mph above the posted speed
limit of 30 mph*. The 85th percentile speed is used as the basis of engineering

design and in the evaluation of sight distances, and is often used in establishing posted speed limits.

(Id. at 8) (emphasis added).

      b.  The study tabulates the results of motor vehicle crash trends occurring within the study area, and notes in pertinent part:

... the study area intersections averaged approximately 3 or fewer reported motor vehicle crashes per year over the three-year review period and were found to have a *__motor vehicle crash rate below the MassHighway average__* for unsignalized intersections for the MassHighway District in which the Town of Hingham is located (District 5).

(Id. at 8-9) (emphasis added).

    113.  As of March 2012, Hingham erected and maintained at least nine (9) Advisory Speed plaques that are rectangular in shape, with black letters on a yellow reflectorized background (W13-1P) designating Advisory Speeds on Beal Street, Hingham, MA.  (See Exhibit No. 18, supra, "Beal St." GPS map at 9).

      a.  Two (2) of these were 30 m.p.h. Advisory Speed plaques (W13-1P) supplement warning signs carrying the message "thickly settled," that are diamond in shape, with black letters on a yellow reflectorized background. (See, Figure 5 (2012) below).

 

Figure 5: Two (2), 30 m.p.h. Advisory Speed plaques (W13-1P) on Beal Street

  b. Seven (7) of these 20 m.p.h. Advisory Speed plaques (W13-1P) were installed as a separate sign installation. (See, e.g., Figure 2, supra).

114. Town of Hingham, Board of Selectmen, "Board of Selectmen – Meeting Minutes," dated May 18, 2010 (Exhibit No. 20) note the following regarding a resident question raising the speed limit of 20 mph to 30 mph and enforcing it on Beal Street, Hingham, MA:

> Richard Leatherbee asked if the speed limit of 20 on one section of Beal Street was reasonable to expect. He recommended raising the speed limit to 30 mph and enforcing it. The Board said the question is should there be a fully functioning traffic light, a flashing light, etc.

(Exhibit No. 20, supra).

115. As of March 2012, Hingham erected and maintained at least four (4), 30 m.p.h. Speed Limit signs that "are rectangular in shape, with black numerals on a white reflectorized background" (R2-1) designating a special speed regulation lawfully made under the authority of Mass. Gen. L. ch. 90, § 18, on Fort Hill Street, Hingham, MA. (See Figure 6 (2012) below).

 

 

Figure 6: Four (4), 30 m.p.h. Speed Limit signs (R2-1) on Fort Hill Street

    a. None of these Speed Limit signs (R2-1) have approved Special Speed Regulations on file with MassDOT.

## Road Safety Audit of Cushing Street, Hingham, MA

116.    Howard/Stein-Hudson Assoc., "Road Safety Audit: Cushing St." (June 22, 2011), was commissioned by MassDOT as a comprehensive Road Safety Audit ("RSA") of Cushing Street, Hingham, MA, a public roadway under the Town's jurisdiction. (Exhibit No. 21).

    a. The audit described the Cushing Street location, and notes in pertinent part:

Project Location Description: ... Cushing Street is a rural minor collector and falls under Town jurisdiction. ... *The speed limit along Cushing Street is posted 30 miles per hour (mph) in both directions. There is no speed regulation on file.*

(Id. at 3) (emphasis added).

    b. The participating audit team members included "Roger Fernandes", "Hingham Projects Engineer". (Id.).

    c. The audit observed vehicle travel speeds, and notes in pertinent part:

Observations: RSA team members noted that *vehicle travel speeds appear to be faster than the posted 30 mph regulation. The Hingham Police Department noted that they routinely write tickets along the Cushing Street corridor.*

(Id. at 10) (emphasis added).

    d. The audit recommended enhancements, and notes in pertinent part:

Enhancements: [] *Conduct a speed survey in the vicinity.* If appropriate, *submit the speed study to MassDOT requesting a posted regulatory speed* along Cushing Street.

(Id.) (emphasis added).

117. Town of Hingham, Board of Selectmen, "Minutes of March 28, 2012 -
Traffic Committee Meeting," (Exhibit No. 13, supra) note the following regarding a
traffic speed study on Cushing Street, Hingham, MA:

> I. Cushing Street Speed Study – Sergeant Dearth [Police Department] presented
> the Speed Study that was conducted by the Massachusetts Department of
> Transportation at the request of the Hingham Police Department as part of the
> Road Safety Audit which concentrated on the 400 block of Cushing Street. The
> study was done over a 7 day period and showed that the average speed travelling
> both northbound and southbound was 38 mph. The majority of the cars (82%)
> were travelling at a pace speed of between 34-43 mph. Sergeant Dearth noted
> that the _speed was lower than he would have predicted and indicates that speed
> isn't a factor on Cushing Street. Another reason is that enforcement is consistent
> on the street and tickets are issued on a regular basis which is a deterrent.
> Sergeant Dearth advised against contacting the State to adjust the speed on the
> street as the posted speed limit [30 mph] would most likely be posted higher 40
> (mph) which is not the desired outcome_.

(Exhibit No. 13, supra) (emphasis added) (comment added in brackets).

118. As of March 2012, Hingham erected and maintained at least five (5), 30
m.p.h. Speed Limit signs that "are rectangular in shape, with black numerals on a white
reflectorized background" (R2-1) designating a special speed regulation lawfully made
under the authority of Mass. Gen. L. ch. 90, § 18, on Cushing St., Hingham, MA. (See
Figure 7 (2012) below).



 

Figure 7: Five (5), 30 m.p.h. Speed Limit signs (R2-1) on Cushing Street

a.  None of these Speed Limit signs (R2-1) have approved Special Speed Regulations on file with MassDOT.

## Speed Study of Gardner Street, Hingham, MA

119.    Town of Hingham, Board of Selectmen, "Minutes of August 26, 2015 - Traffic Committee Meeting," (Exhibit No. 13, supra) note the following regarding a traffic speed study on Gardner Street, a public roadway under the Town of Hingham's jurisdiction:

> The Lower Gardner Street Association is requesting signs for speed enforcement as well as an extension of the sidewalk. *There are currently 30 MPH speed signs but there is no record of them.* Most residential neighborhoods have a speed limit of 30 MPH as it is and this neighborhood is thickly settled as well. Sgt. Horte [Police Department] conducted a speed study and found the average speed travelled is 37 MPH which is not excessive. *The signs which are currently posted are not permitted but are still enforceable.* The question is whether they are challenged in court, if it would they would be found to be illegal and the Town might be sued. Sgt. Horte has contacted Town Counsel about this and will be speaking with them this week.

(Exhibit No. 13, supra) (emphasis added) (comments added in brackets).

120.    The 85th percentile speed of motor vehicles travelling along Gardner Street, Hingham, MA, is greater than 40 m.p.h., which is also greater than the 30 m.p.h.

Speed Limit signs (R2-1) posted on Gardner Street (upper) and the 25 m.p.h. Advisory Speed plaques (W13-1P) posted on Gardner Street (lower).

121.    As of March 2012, Hingham erected and maintained a total of two (2), 30 m.p.h. Speed Limit signs (R2-1) designating a special speed regulation lawfully made under the authority of Mass. Gen. L. ch. 90, § 18, on the portion of Gardner Street that lies north of Massachusetts Route 53, and which is commonly referred to as "upper" Gardner Street.  (Exhibit No. 18, supra, "Gardner St. (upper)" GPS map at 15).  (See Figure 8, below).

 

Figure 8: Two (2), 30 m.p.h. Speed Limit signs (R2-1) on Gardner Street (upper)

    a.  None of these Speed Limit signs (R2-1) have approved Special Speed Regulations on file with MassDOT.

122.    As of March 2012, Hingham erected and maintained a total of seven (7), 25 m.p.h. Advisory Speed plaques (W13-1P) on the portion of Gardner Street that lies south of Massachusetts Route 53, and which is commonly referred to as "lower" Gardner Street.  (See Exhibit No. 18, supra, "Gardner St. (lower)" GPS map at 16).

    a.  Three (3) of these 25 m.p.h. Advisory Speed plaques supplement warning signs carrying the message "thickly settled," that are diamond in shape,

with black letters on a yellow reflectorized background. (See Figure 9 (2012), below).



Figure 9: Three (3), 25 m.p.h. Advisory Speed plaques (W13-1P), Gardner Street (lower)

b. Two (2) of these 25 m.p.h. Advisory Speed plaques were installed as separate sign installations, and do not supplement any warning signs. (See Figure 10 (2012), below).



Figure 10: Two (2), 25 m.p.h. Advisory Speed plaques (W13-1P), Gardner Street (lower)

## Mr. Zotos's Independent Knowledge of Hingham's Traffic Signs/Plaques

123.    On November 9, 2002, an officer of the Town of Hingham Police Department issued to Mr. Zotos Massachusetts Uniform Citation No. K3011030, a warning for Speeding in excess of a 30 m.p.h. posted speed limit duly established under Mass. Gen. L. ch. 90, § 18, on Cushing Street, Hingham, MA. (Exhibit No. 22). Mr.

65

Zotos later discovered that there is no Special Speed Regulation for Cushing Street, Hingham, MA.

124. On June 25, 2009, Officer Sullivan of the Town of Hingham Police Department issued to Mr. Zotos Massachusetts Uniform Citation No. M7680768 for the Civil Motor Vehicle Infraction ("CMVI") of Speeding in excess of a 30 m.p.h. posted speed limit duly established under Mass. Gen. L. ch. 90, § 18, on Charles Street at Maryknoll Drive, Hingham, MA. (Exhibit No. 22, supra). Mr. Zotos later discovered that there is no Special Speed Regulation for this section of Charles Street at Maryknoll Drive, Hingham, MA.

125. On December 2, 2010, Officer Chessler of the Town of Hingham Police Department issued to Mr. Zotos Massachusetts Uniform Citation No. M9825472 for the CMVI of Speeding in excess of a 30 m.p.h. posted speed limit duly established under G.L. c. 90, § 18, on Gardner Street, Hingham, MA. (Exhibit No. 22, supra). Mr. Zotos later discovered that there is no Special Speed Regulation for Gardner Street, Hingham, MA.

126. In the period from March 2 - 23, 2012, Mr. Zotos conducted a visual and photographic GPS survey of roadways in the Town of Hingham and identified a total of one-hundred and thirty-six (136) posted speed limit signs on these streets. (Exhibit No. 18, supra). Mr. Zotos identified seventy-four (74) speed limit signs corresponding to all the Special Speed Regulations that had been issued for roadways passing through a portion of the Town of Hingham. Forty-two (42) of these speed limit signs were located on nine (9) roadways under the jurisdiction of the Commonwealth, and thirty-two (32) of

66

these were located on five (5) roadways under the jurisdiction of the Town.  He also

identified sixty (60) speed limit signs and advisory speed plaques for which there was no

record (either in the Town or the MassDOT files) of any Special Speed Regulations

having been issued.  These were all located on eighteen (18) roadways all under the

exclusive jurisdiction of the Town.

127.   In a letter dated July 12, 2012, Mr. Zotos wrote to Richard M. Davey,

Secretary of Transportation and Chief Executive Officer, MassDOT, regarding

"Regulatory Investigation and Enforcement Request."  (Exhibit No. 23).

a. Mr. Zotos's stated purpose in contacting Secretary Davey is as follows:

I am contacting you to notify the Massachusetts Department of Transportation
("DOT") of long-standing, municipal violations by the Town of Hingham, its
officials and employees of Massachusetts statutes G.L. c. 90, § 18, G.L. c. 85, § 2,
and the Massachusetts Highway Department Procedures for Speed Zoning on
State and Municipal Roadways (2005).

(Id. at 1).

b. Accordingly, as concerned citizen of the Commonwealth, Mr. Zotos

requested MassDOT promptly undertake the following regulatory

enforcement actions:

1)      enter upon the local ways under the jurisdiction of the Town of
Hingham, inspect the signs I have identified as not having Special Speed
Regulations as required under G.L. c. 90, § 18 and G.L. c. 85, § 2 (Exhibit
No. 16, Table 3), determine whether they comply with the required
provisions, and if such signs do not comply, notify the Town of Hingham
to remove the signs pursuant to DOT's regulatory authority under G.L. c.
85, § 2 and G.L. c. 90, § 18 (Exhibit No. 18); and,

2)      in the event non-compliant signs are not removed by the Town of
Hingham after being notified in writing, then direct DOT personnel to
remove the non-compliant signs as permitted by both G.L. c. 85, § 2 and
G.L. c. 90, § 18 (Exhibit No. 18).

(Id. at 4, citing Table 3, "Photographic GPS Survey of Posted Speed Limits,

Town of Hingham, MA" (2012)) (See Exhibit No. 18, supra Table 3, at 5-6).

    c.  In the event MassDOT identified any non-compliant signs stemming from

        the requested compliance inspection, Mr. Zotos formally requested:

the DOT promptly undertake the non-discretionary, statutorily mandated action of immediately withholding or withdrawing the unexpended balance of any funds assigned to the Town of Hingham under the provisions of G.L. c. 90, § 34 and G.L. c. 81, § 25 (Exhibit No. 30), until such time as all the non-compliant signs are removed.

(Id. at 4).

    d.  In the event MassDOT failed to act, Mr. Zotos explained that he would

        have no alternative other than to compel "compliance by requesting relief

        in the nature of mandamus or prospective injunctive relief." (Id. at 5).

128.    In a letter dated July 22, 2012, Mr. Zotos wrote to Richard M. Davey,

Secretary of Transportation and Chief Executive Officer, MassDOT, regarding "Denial of

Regulatory Investigation and Enforcement Request." (Exhibit No. 24). Mr. Zotos noted

Rachael Rollins's, General Counsel, MassDOT, denial of his July 13, 2012, request, and

the unacceptability of her response. (Id. at 2). The letter was cc'd to "His Excellency

Deval L. Patrick, Governor, Commonwealth of Massachusetts," and "Martha Coakley,

Attorney General, Commonwealth of Massachusetts." (Id.).

129.    In the period from July 10 - 17, 2019, Mr. Zotos conducted a visual and

photographic GPS survey of certain roadways in the Town of Hingham (and under its

sole jurisdiction) and identified a total of fifty-two (52) posted speed limit signs (R2-1)

and advisory speed plaques (W13-1P) on these streets. (Exhibit No. 25). Mr. Zotos

identified twenty-six (26) speed limit signs (R2-1) for which there was no record (either in the Town or the MassDOT files) of any Special Speed Regulations having been issued. These were all located on eight (8) roadways all under the exclusive jurisdiction of the Town. These speed limit signs (R2-1) correspond to the exact same speed limit signs (R2-1) as those he had previously surveyed in March 2012. (See Exhibit No. 18, supra). Mr. Zotos also identified twenty-six (26) advisory speed plaques (W13-1P), sixteen (16) of which were installed as separate sign installations without advisory plaques, and ten (10) of which were installed together with various advisory plaques. These were all located on nine (9) roadways and five (5) roadways, respectively, and all under the exclusive jurisdiction of the Town. These advisory speed plaques (W13-1P) generally correspond to the same advisory speed plaques (W13-1P) as those he had previously surveyed in March 2012, along with several additional plaques. (See Exhibit No. 18, supra).

## MassDOT Notice re: "Installation of Regulatory Signs And Speed Limit Signs"

130.     In a letter dated August 24, 2012, Neil Boudreau, State Traffic Engineer, MassDOT, wrote to the Board of Selectmen, Town of Hingham, regarding the "Installation of Regulatory Signs And Speed Limit Signs." (Exhibit No. 26).

> a. The letter notified Hingham that Mr. Zotos has notified MassDOT "that the special speed regulation signs set forth in Exhibit 28, Table 3 were not installed consistent with the requirements of MGL c. 85, Section 2 and MGL c. 90, Section 18."

(Id. at 2, citing Table 3, "Photographic GPS Survey of Posted Speed Limits, Town of Hingham, MA" (2012)) (See Exhibit No. 18, supra Table 3, at 5-6).

69

b. The letter notes that MassDOT "is required ... to give MGL c.85, Section 2

Notice to the Town of Hingham regarding the Special Speed Regulations

listed as improperly installed."

(Id. at 3, citing Table 3, "Photographic GPS Survey of Posted Speed Limits,

Town of Hingham, MA" (2012)) (See Exhibit No. 18, supra Table 3, at 5-6).

c. With respect to approved Special Speed Regulations on ways in the Town,

the letter provides in pertinent part:

Consistent with the statutory duty under MGL c.85, Section 2 and MGL. C 90, Section 18, the Massachusetts Department of Transportation has reviewed its files and determined that its files contain Special Speed Regulations for the following town ways in the Town of Hingham and have been approved by the Department of Transportation and the Registrar of Motor Vehicles, as required by MGL c. 90, Section 18:

i.  Main Street, East Street, Hull Street (Route 228) – Special Speed Regulation 824, 824-A, 824-B, and 824-c, dated August 22, 1973, November 5, 1923, October 6, 1976 and August 12, 2008, respectively.

ii. Charles Street and Lazell Street – Special Speed Regulation 7440, dated August 26, 1988.

(Id. at 2-3).

d. MassDOT reminded the Town of its Speed Zoning Procedures, and

offered its assistance by providing guidance on policies and procedures:

The Massachusetts Department of Transportation, never the less, would remind the Board of Selectmen that the primary objective of MGL. c. 85, Section 2, MGL. c.90, Section 18 and MassDOT's Speed Zoning Procedures (a copy is attached) [See Exhibit 1, supra] is to provide safe and appropriate speed limits on all paved streets and highways in the Commonwealth of Massachusetts with full recognition of the general motoring public's right to use a roadway in a demonstrably reasonable and proper manner. An ideal speed limit posting is one that is readily acceptable to prudent drivers and subsequently becomes self-enforcing. If the Town of Hingham wishes to establish speed limits in accordance with the aforementioned statutes on any way under its custody and control, the Massachusetts Department of Transportation Highway Division District Five Office would be more than willing to assist the Town of Hingham by providing guidance on policies and procedures.

(Id. at 3-4) (comments added in brackets).

## **CLAIMS FOR RELIEF**

### **COUNT I**

All Defendants

(Federal Statutory Violation)

False Claims Act, 31 U.S.C. § 3729(a)(1)(A)

131.    Relator repeats, re-alleges and incorporates by reference the above allegations as if hereinafter set forth in full.

132.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq*.

133.    By virtue of the acts described above, defendants knowingly presented, or caused to be presented, false or fraudulent claims to the United States Government for payment or approval, all in violation of the FCA, 31 U.S.C. § 3729(a)(1)(A).

134.    The United States Government, unaware of the falsity of the claims, and in reliance on the accuracy thereof, paid and continues to pay claims in amounts in excess of what would be paid had the claims not been false.

135.    By reasons of these payments, the United States Government has been damaged, and continues to be damaged, in substantial amount.

### **COUNT II**

All Defendants

(Federal Statutory Violation)

71

False Claims Act, 31 U.S.C. 3729(a)(1)(B)

136.    Relator repeats, re-alleges and incorporates by reference the above allegations as if hereinafter set forth in full.

137.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq*.

138.    By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims to the United States Government for payment or approval, all in violation of the FCA, 31 U.S.C. § 3729(a)(1)(B).

139.    The United States Government, unaware of the falsity of the records and statements, and in reliance on the accuracy thereof, paid and continues to pay claims in amounts in excess of what would be paid had the records and statements not been false.

140.    By reasons of these payments, the United States Government has been damaged, and continues to be damaged, in substantial amount.

## **COUNT III**

All Defendants

(Federal Statutory Violation)

False Claims Act, 31 U.S.C. § 3729(a)(1)(C)

141.    Relator repeats, re-alleges and incorporates by reference the above allegations as if hereinafter set forth in full.

72

142.    This is a claim for treble damages and penalties under the False Claims
Act, 31 U.S.C. §§ 3729, *et seq*.

143.    By virtue of the acts described above, defendants conspired to commit
violations of the False Claims Act, 31 U.S.C. §§ 3729(a)(1)(A), (B), (D), (E), (F), or (G),
all in violation of the FCA, 31 U.S.C. § 3729(a)(1)(C).

144.    The United States Government, unaware of the defendants' conspiracy to
commit violations of the False Claims Act, paid and continues to pay claims in amounts
in excess of what would be paid had there been no conspiracy to commit violations of the
False Claims Act.

145.    By reasons of these payments, the United States Government has been
damaged, and continues to be damaged, in substantial amount.

## COUNT IV

All Defendants

(Massachusetts Statutory Violation)

Massachusetts False Claims Act, Mass. Gen. L. ch. 12, § 5B(a)(1)

146.    Relator repeats, re-alleges and incorporates by reference the above
allegations as if hereinafter set forth in full.

147.    This is a claim for treble damages and penalties under the Massachusetts
False Claims Act, Mass. Gen. L. ch. 12, §§ 5A, *et seq*.

73

148.    Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the Commonwealth, all in violation of the MFCA, Mass. Gen. L. ch. 12, § 5B(a)(1).

149.    The Commonwealth, unaware of the falsity of the claims, and in reliance on the accuracy thereof, paid and continues to pay claims in amounts in excess of what would be paid had the claims not been false.

150.    By reasons of these payments, the Commonwealth has been damaged, and continues to be damaged, in substantial amount.

## COUNT V

### All Defendants

### (Massachusetts Statutory Violation)

### Massachusetts False Claims Act, Mass. Gen. L. ch. 12, § 5B(a)(2)

151.    Relator repeats, re-alleges and incorporates by reference the above allegations as if hereinafter set forth in full.

152.    This is a claim for treble damages and penalties under the Massachusetts False Claims Act, Mass. Gen. L. ch. 12, §§ 5A, *et seq*.

153.    Defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims to the Commonwealth for payment or approval, all in violation of MFCA, Mass. Gen. L. ch. 12, § 5B(a)(2).

154.    The Commonwealth, unaware of the falsity of the records and statements, and in reliance on the accuracy thereof, paid and continues to pay claims in amounts of excess of what would be paid had the records and statements not been false.

155.    By reasons of these payments, the Commonwealth has been damaged, and continues to be damaged, in substantial amount.

## COUNT VI

### All Defendants

### (Massachusetts Statutory Violation)

Massachusetts False Claims Act, Mass. Gen. L. ch. 12, § 5B(a)(3)

156.    Relator repeats, re-alleges and incorporates by reference the above allegations as if hereinafter set forth in full.

157.    This is a claim for treble damages and penalties under the Massachusetts False Claims Act, Mass. Gen. L. ch. 12, §§ 5A, *et seq*.

158.    By virtue of the acts described above, defendants conspired to commit violations of the Massachusetts False Claims Act, Mass. Gen. L. ch. 12, §§ 5B(a)(1), *et seq.*, all in violation of the MFCA, Mass. Gen. L. ch. 12, §§ 5B(a)(3).

159.    The Commonwealth, unaware of the defendants' conspiracy to commit violations of the Massachusetts False Claims Act, paid and continues to pay claims in amounts in excess of what would be paid had there been no conspiracy to commit violations of the Massachusetts False Claims Act.

75

160.    By reasons of these payments, the Commonwealth has been damaged, and continues to be damaged, in substantial amount.

## **PRAYERS FOR RELIEF**

WHEREFORE, the Relator, on behalf of his own and on behalf of the United States and the Commonwealth of Massachusetts, respectfully requests and prays that this Honorable Court enter judgment on each and every count of this Complaint against the defendants in favor of the plaintiffs, as follows:

1. Order MassDOT to withhold or withdraw the unexpended balance of any funds assigned to Hingham under the provisions of Mass. Gen. L. ch. 90, § 34, and in accordance with the provisions of Mass. Gen. L. ch. 85, § 2, until the speed control signs and traffic control devices at issue comply with the provisions of either: Mass. Gen. L. ch. 90, § 18; or,  MassDOT's current manual on uniform traffic control devices; or, are approved in writing by MassDOT, or all of these;

2. Ordering defendants to pay an amount equal to three times the amount of damages the United States has sustained because of defendants' actions, plus a statutory civil penalty for each action in violation of 31 U.S.C. §§ 3729, *et seq.*, with interest, including the costs, expenses, and attorney's fees of this action to the United States;

3. Ordering defendants to pay an amount equal to three times the amount of damages the Commonwealth has sustained because of defendants' actions, plus a statutory civil penalty for each action in violation of Mass. Gen. L. ch. 12, §§ 5A,

*et seq.*, with interest, including the costs, expenses, and attorney's fees of this action to the Commonwealth;

4. Award Relator the maximum amounts allowable pursuant to 31 U.S.C. § 3730(d) and Mass. Gen. L. ch. 12, § 5F;

5. Award Relator all fees, costs, and expenses incurred in initiating and sustaining this action, including reasonable attorney's fees pursuant to 31 U.S.C. § 3730(d) and Mass. Gen. L. ch. 12, § 5F;

6. Grant such further relief as this Honorable Court may deem equitable, just and appropriate.

Respectfully submitted,

By Plaintiff/Attorney-Relator

FREDERIC P. ZOTOS

By */s/ Frederic P. Zotos*

    Frederic P. Zotos, Esq.
    BBO#565308
    28 Old Coach Road
    Cohasset, MA 02025
    Tel: (781) 836-4295
    E-Mail: fzotos@gmail.com

Dated: September 24, 2019

77

## TABLE OF EXHIBITS

1. FHWA Form PR-20, "Voucher for Work Performed Under Provisions of the Federal Aid and Federal Highways Acts, as Amended" (Rev. 4-14)

2. MassDOT/Federal-Aid Project No. 600518, "Hingham – Intersection Improvements at Derby Street, Whiting Street (Route 53) and Gardner Street"

3. MassDOT, "State Transportation Improvement Program (2017-2021)"

4. RASPS LF02D41A Report for MassDOT/Federal-Aid Project No. 600518 (8-29-2019)

5. MassDOT/Federal-Aid Project No. 607309, "Hingham – Reconstruction & Related Work on Derby Street, from Pond Park Road to Cushing Street"

6. RASPS LF02D41A Report for MassDOT/Federal-Aid Project No. 607309 (9-13-2019)

7. MassDOT's 10-Year Chapter 90 Contract with Hingham (5-16-07)

8. MassDOT's 10-Year Chapter 90 Contract (Amendment) with Hingham (5-16-07)

9. Ltrs, Gov. of Commonwealth to Hingham re: Chapter 90 apportionments (FY2009 to FY2020)

10. Hingham's Chapter 90 Reimbursement Requests (11-09 to 7-18)

11. Hingham's Chapter 90 Final Reports (5-11 to 7-18)

12. MassDOT Spreadsheet, Hingham's "Chapter 90 Balances/Payments" (2-12-18)

13. Hingham Traffic Cmte Mins (2008 to Present)

14. Special Speed Regulations Nos. 824, 824A, 824-B, 7440, and 824-C (1973 to 2008)

15. Ltr, R. McDonagh, Mass DPW re: Speed Zoning on Municipal Ways (12-13-83)

16. Ltr, Sgt. Myers, HPD to Hingham residents re: Non-posted Roadways (6-21-89)

17. Ltr, C. Cristello, Hingham to MassHwy re: Petition to amend Spec Spd Reg (6-3-08)

18. GPS Survey of Posted Speed Limits Town of Hingham, by Frederic P. Zotos (6-25-12)

i

19.  Vanasse & Assoc., Inc., "Beal-West-Ft. Hill St Corridor Study" (July 2006)

20.  Hingham Bd of Selectmen Mins re: Reasonableness of Beal St speed limits (5-18-10)

21.  Howard/Stein-Hudson Assoc., "Road Safety Audit: Cushing St." (June 2011)

22.  Massachusetts Uniform Citations issued to Frederic P. Zotos (2002 to 2010)

23.  Ltr, F. Zotos to R. Davey, MassDOT re: Regulatory Investigation and Enforcement Request (7-12-12)

24.  Ltr, F. Zotos to R. Davey, MassDOT re: Denial of Regulatory Investigation and Enforcement Request (7-22-12)

25.  GPS Survey of Posted Speed Limits Town of Hingham, by Frederic P. Zotos (8-8-19)

26.  Ltr, N. Boudreau, MassDOT to Hingham Selectmen (8-24-12)

## TABLE OF FIGURES

1.    30 m.p.h., 20 m.p.h., and 15 m.p.h. Speed Limit signs (R2-1) in Hingham, MA

2.    25 m.p.h., 20 m.p.h., and 15 m.p.h. Advisory Speed plaques (W13-1P) installed as separate sign installations in Hingham, MA

3.    Two (2), 20 m.p.h. Advisory Speed plaques (W13-1P), Bare Cove Park Drive

4.    Three (3), 15 m.p.h. Advisory Speed plaques (W13-1P), Charles Everett Way, Franklin Rogers Rd, and John Hazlitt Ln

5.    Two (2), 30 m.p.h. Advisory Speed plaques (W13-1P) on Beal Street

6.    Four (4), 30 m.p.h. Speed Limit signs (R2-1) on Fort Hill Street

7.    Five (5), 30 m.p.h. Speed Limit signs (R2-1) on Cushing Street

8.    Two (2), 30 m.p.h. Speed Limit signs (R2-1) on Gardner Street (upper)

9.    Three (3), 25 m.p.h. Advisory Speed plaques (W13-1P), Gardner Street (lower)

10.   Two (2), 25 m.p.h. Advisory Speed plaques (W13-1P), Gardner Street (lower)