IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

|                                                    |     |                           |
|----------------------------------------------------|-----|---------------------------|
| FREDERIC P. ZOTOS,                                 | )   |                           |
|                                                    | )   |                           |
| Plaintiff,                                         | )   |                           |
| v.                                                 | )   | CIVIL ACTION NO.          |
|                                                    | )   | 1:13-cv-13065-DJC         |
| TOWN OF HINGHAM,                                   | )   |                           |
|                                                    | )   |                           |
| JOHN A. RILEY, individually,                       | )   |                           |
| and as a former member of the                      | )   |                           |
| Town of Hingham Board of Selectmen                 | )   |                           |
| and as former acting Police Commissioner,          | )   |                           |
| Town of Hingham,                                   | )   |                           |
|                                                    | )   |                           |
| LAURA M. BURNS, individually,                      | )   |                           |
| and as a former member of the                      | )   |                           |
| Town of Hingham Board of Selectmen                 | )   |                           |
| and as former acting Police Commissioner,          | )   |                           |
| Town of Hingham,                                   | )   |                           |
|                                                    | )   |                           |
| L. BRUCE  RABUFFO, individually,                   | )   |                           |
| and as a former member of the                      | )   |                           |
| Town of Hingham Board of Selectmen                 | )   |                           |
| and as acting Police Commissioner,                 | )   |                           |
| Town of Hingham,                                   | )   |                           |
|                                                    | )   |                           |
| TED C. ALEXIADES, individually,                    | )   |                           |
| and as Town Administrator,                         | )   |                           |
| Town of Hingham,                                   | )   |                           |
|                                                    | )   |                           |
| HARRY SYLVESTER, individually,                     | )   |                           |
| and as Superintendent, Town of Hingham,            | )   |                           |
| Department of Public Works,                        | )   |                           |
| member of the Traffic Committee,                   | )   |                           |
| Town of Hingham Board of Selectmen,                | )   |                           |
|                                                    | )   |                           |
| TAYLOR A.B. MILLS, individually,                   | )   |                           |
| and as former Chief of Police,                     | )   |                           |
| Town of Hingham, Police Department,                | )   |                           |
| former Chairman of the Traffic Committee,          | )   |                           |
| Town of Hingham Board of Selectmen,                | )   |                           |
|                                                    | )   |                           |

```
                                           )
DAVID HORTE, individually,                 )
and as Sergeant,                           )
Town of Hingham, Police Department,        )
former Sergeant, Traffic Safety Division,  )
Town of Hingham, Police Department,        )
former member of the Traffic Committee,    )
Town of Hingham Board of Selectmen,        )
                                           )
STEVEN J. DEARTH, individually,            )
and as Sergeant, Traffic Safety Division,  )
Town of Hingham, Police Department,        )
member of the Traffic Committee,           )
Town of Hingham Board of Selectmen, and    )
                                           )
ERIC S. CHESSLER, individually,            )
and as Officer and Patrolman,              )
Town of Hingham, Police Department,        )
                                           )
               Defendants                  )
_____    )
```

## FIRST AMENDED COMPLAINT

Plaintiff Frederic P. Zotos brings this action for legal relief pursuant to 42 U.S.C. § 1983, the Fourteenth Amendment to the United States Constitution, and under the common law and statutes of the Commonwealth of Massachusetts, against the Town of Hingham, its officials and employees.

## INTRODUCTION

1.       This is a cautionary story of just how easily human deceit can undermine the rule of law, defraud the courts and wreak havoc upon an unsuspecting public.  It begins with residents who adopt a parochial not-in-my-backyard view of speed limits.  They complain incessantly to their elected selectmen that, in their view, motor vehicles travel too fast on their local streets, and they demand action.

2.      Political pandering being what it is, the selectmen look to their civil servants in the DPW and police to satisfy their constituents' demands.  As they see it, the problem is that the statutory speed limit on unmarked local roads is either set too high or generally ignored by motorists (ironically many of which are also residents).  Together, they decide that the DPW should post lower speed limits, which in turn the police should strictly enforce.   This plan of action placates the constituents, but there's a roadblock.

3.      Simply put, neither the selectmen nor their civil servants have the statutory authority to post a regulatory speed limit sign by executive fiat, without a thorough traffic engineering study and the Commonwealth's approval.  If a speed limit sign is posted without this procedure, it is considered illegal and unenforceable.   The fact of the matter is that the civil servants firmly believe, rightly or wrongly, that the Commonwealth is more likely to post a speed limit which is even higher than the default unmarked speed limit.   But this would defeat the selectmen's purpose, and therein lies the rub.   Instead, they take the easy way out of their quandary – they just ignore this nettlesome law.   Indeed, "the road to hell is paved with good intentions."

4.      Here's how the hoax unfolds.  First, the DPW illegally posts unreasonably low speed limit signs throughout the town.   Nevertheless, studies consistently show that the overwhelming majority of motorists seldom pay close attention to speed limit signs.  Instead, most motorists instinctively drive at a speed that is reasonable and proper, having regard to traffic, type of road (e.g., highway vs. thickly settled), and safety of the public.   Speeds at or below the 85th percentile are reasonable and proper by definition.   Phony low speed limits only flip the statistics, so that most motorists now appear to be speeding.

5.      Second, the police strictly enforce the phony speed limit signs, which almost every motorist now exceeds.  They dutifully issue bogus traffic citations for Speeding in excess of the phony speed limit signs.

6.      Common experience demonstrates that the payment of a traffic citation is simply a matter of expedience for the average motorist.  Moreover, failure to pay would result in the automatic suspension of their driver's license and registration.  To avoid this fate, many unsuspecting motorists are conned into paying what amounts to an illegal fine.

7.      Those motorists who decide to fight their Speeding tickets face an uphill battle. As is generally the case when a person's ability to protect his interests will ultimately depend upon a swearing contest with a police officer, the deck is already stacked heavily in the officer's favor against the motorist.  For starters, the traffic citation is considered prima facie evidence of the facts stated therein.

8.      This path of deceit though easily begun, is difficult to exit.  Those police officers who are in cahoots conceal the evidence of the phony signs to grease the skids for false testimony and gain an unfair advantage over motorists.  The police officer easily makes his prima facie case as to reasonable and proper speed when he testifies that the motorist exceeded the posted speed limit sign - even though the sign is founded on a lie.

9.      In the improbable event the motorist gets wise to this deception, he must still argue both the fact that speed limit sign is phony and the law that it is unenforceable.  Far more likely, neither the motorist nor the court suspect foul play, and they are both defrauded.  They almost certainly take the speed limit sign at face value, and never doubt it is enforceable.  The court finds the motorist responsible for Speeding, and issues a fine.

4

10.     Suffering insult to injury, the Speeding violation is recorded on the motorist's driving record for six years, and he faces automobile insurance surcharges and the potential loss of his employment if it involves driving a company commercial vehicle.

11.     The freedom to make use of one's own motor vehicle, as a means of getting about from place to place, whether in pursuit of business or pleasure, is a liberty which under the Fourteenth Amendment cannot be denied or curtailed by a state without due process of law (however important traffic enforcement is).  Losing one's driver's license is more serious for some individuals than a brief stay in jail.  Once licenses are issued, their continued possession may become essential in the pursuit of a livelihood.

12.     Traffic cases such as this raise statutory, regulatory, equitable and constitutional issues that are rarely litigated because of the small amount of money involved.  Nevertheless, these issues affect tens of thousands of persons challenging motor vehicle infractions every year. Here, the public officials have used phony speed limits as prima facie evidence to both deliberately deceive the overburdened courts of the Commonwealth, and to simultaneously con thousands of unsuspecting motorists into paying illegal fines without a second thought. Although the fines here are small, the questions of law and equity are substantial.

## **JURISDICTION**

13.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343 and 2201.  Federal question jurisdiction arises pursuant to 42 U.S.C. § 1983.  This complaint also alleges common law and statutory violations of the Commonwealth of Massachusetts.  Supplemental jurisdiction arises pursuant to 28 U.S.C. § 1367 and the principals of supplemental jurisdiction.  The federal and state law claims arise out of a common nucleus of operative facts, and the entire suit

commenced by this complaint would ordinarily be tried in one judicial proceeding.  The exercise of supplemental jurisdiction will avoid duplication and multiplicity of action, and will promote the interests of judicial economy and fairness.

## VENUE

14.     Venue is proper in this Court based upon 28 U.S.C § 1391, in that a substantial part of the events or omissions giving rise to the claims occurred in this district as alleged below. In addition, the Defendant Town of Hingham maintains its principal place of business in this district and upon information and belief all the Defendants are residents of the State in which the district is located.  Individual Defendants either are, or have been officials, officers or employees of the Defendant Town of Hingham and applied and executed its policies, practices and customs at all relevant times.

## PARTIES

15.     The Plaintiff, Frederic P. Zotos (hereinafter "Mr. Zotos"), is an individual residing at all relevant times at 28 Old Coach Road, Cohasset, Norfolk County, Massachusetts 02025.

16.     The Defendant, Town of Hingham (hereinafter "TOWN"), is a municipal corporation organized under the laws of the Commonwealth of Massachusetts, having its Town Hall at 210 Central Street, Hingham, Plymouth County, Massachusetts 02043.  As the Chief Elected and Executive Officers of the TOWN, the Board of Selectmen (hereinafter "SELECTMEN") are vested with all the municipal authority not specifically retained by the TOWN's legislative body, Town Meeting, or other elected boards.  The SELECTMEN adopt TOWN administrative policies, make special regulations as to the speed of motor vehicles, and act as Police Commissioner.  They appoint and supervise the Town Administrator, the

Superintendent of Public Works and the Chief of Police.  The Traffic Committee (hereinafter "Traffic Committee") is an advisory committee of the SELECTMEN that does not have the power to implement traffic changes or regulations but rather recommends proposals to the SELECTMEN for implementation.

17.     The Town of Hingham Department of Public Works (hereinafter "DPW"), is a Department of the TOWN, having its principal office at 25 Bare Cove Park Drive, Hingham, Plymouth County, Massachusetts 02043.  The DPW is responsible for the care and upkeep of the TOWN's public roads and unaccepted subdivisions, and installs, repairs, and maintains the TOWN's traffic and speed limit signs.

18.     The Town of Hingham Police Department (hereinafter "Police Department"), is a Department of the TOWN, having its principal office at 210 Central Street, Hingham, Plymouth County, Massachusetts 02043.  The Police Department is responsible for law enforcement and maintaining public safety, and enforces the TOWN By-Laws and regulations, including motor vehicle speed limits.

19.     The Defendant, John A. Riley (hereinafter "SELECTMAN RILEY"), was a former member of the SELECTMEN of the TOWN at all relevant times.  Upon information and belief, SELECTMAN RILEY is a resident of 269 North Street, Hingham, Plymouth County, Massachusetts 02043.  Upon information and belief, SELECTMAN RILEY was acting in the course and scope of his official capacity, and under the color of state law at all relevant times. SELECTMAN RILEY is hereby sued in his official, individual and personal capacity for damages and other relief.

7

20.     The Defendant, Laura M. Burns (hereinafter "SELECTWOMAN BURNS"), was a former member of the SELECTMEN of the TOWN at all relevant times.   Upon information and belief, SELECTWOMAN BURNS is a resident of 96 Hershey Street, Hingham, Plymouth County, Massachusetts 02043.   Upon information and belief, SELECTWOMAN BURNS was acting in the course and scope of her official capacity, and under the color of state law at all relevant times.   SELECTWOMAN BURNS is hereby sued in her official, individual and personal capacity for damages and other relief.

21.     The Defendant, L. Bruce Rabuffo (hereinafter "SELECTMAN RABUFFO"), was a former member of the SELECTMEN of the TOWN at all relevant times.   Upon information and belief, SELECTMAN RABUFFO is a resident of 1 Dwiggens Path, Hingham, Plymouth County, Massachusetts 02043.   Upon information and belief, SELECTMAN RABUFFO was acting in the course and scope of his official capacity, and under the color of state law at all relevant times.   SELECTMAN RABUFFO is hereby sued in his official, individual and personal capacity for damages and other relief.

22.     The   Defendant,   Ted   C.   Alexiades   (hereinafter   "ADMINISTRATOR ALEXIADES"), is the Town Administrator (hereinafter "TOWN ADMINISTRATOR") of the TOWN at relevant times.   As such, ADMINISTRATOR ALEXIADES is responsible for the daily management of the TOWN.     Upon information and belief, ADMINISTRATOR ALEXIADES is a resident of 42 West Street, Kingston, Plymouth County, Massachusetts 02364. Upon information and belief, ADMINISTRATOR ALEXIADES was acting in the course and scope of his official capacity, and under the color of state law at all relevant times. ADMINISTRATOR ALEXIADES is hereby sued in his official, individual and personal capacity for damages and other relief.

8

23.     The Defendant, Harry Sylvester (hereinafter "SUPERINTENDENT SYLVESTER"), is the Superintendent of the DPW of the TOWN at all relevant times.  As such, SUPERINTENDENT SYLVESTER is responsible for the daily management of the DPW, and served as a member of the Traffic Committee.   Upon information and belief, SUPERINTENDENT SYLVESTER is a resident of Beals Cove Road, Hingham, Plymouth County, Massachusetts 02043.   Upon information and belief, SUPERINTENDENT SYLVESTER was acting in the course and scope of his official capacity, and under the color of state law at all relevant times.  SUPERINTENDENT SYLVESTER is hereby sued in his official, individual and personal capacity for damages and other relief.

24.     The Defendant, Taylor A. B. Mills (hereinafter "CHIEF MILLS"), is the former Chief of Police (hereinafter "Chief of Police") of the TOWN at all relevant times.  As such, CHIEF MILLS was responsible for the daily management of the Police Department, and was former Chairman of the Traffic Committee.  Upon information and belief, CHIEF MILLS is a resident of Gorham Road, Harwich Port, Barnstable County, Massachusetts 02646.   Upon information and belief, CHIEF MILLS was acting in the course and scope of his official capacity, and under the color of state law at all relevant times.  CHIEF MILLS is hereby sued in his official, individual and personal capacity for damages and other relief.

25.     The Defendant, David Horte (hereinafter "SERGEANT HORTE") is a Sergeant of Police of the TOWN at all relevant times.  As such, SERGEANT HORTE was formerly responsible for the Traffic Safety Division (hereinafter "Traffic Safety Division") of the Police Department, and was formerly a representative of the Chief of Police on the Traffic Committee. Upon information and belief, SERGEANT HORTE is a resident of Gardner Street, Hingham, Plymouth County, Massachusetts 02043.  Upon information and belief, SERGEANT HORTE

was acting in the course and scope of his official capacity, and under the color of state law at all relevant times.  SERGEANT HORTE is hereby sued in his official, individual and personal capacity for damages and other relief.

26.     The Defendant, Steven J. Dearth (hereinafter "SERGEANT DEARTH") is a Sergeant of Police of the TOWN at relevant times.  As such, SERGEANT DEARTH is responsible for the Traffic Safety Division of the Police Department, and is a representative of the Chief of Police on the Traffic Committee.  Upon information and belief, SERGEANT DEARTH is a resident of 63 Hopkins Drive, Whitman, Plymouth County, Massachusetts 02382. Upon information and belief, SERGEANT DEARTH was acting in the course and scope of his official capacity, and under the color of state law at all relevant times.  SERGEANT DEARTH is hereby sued in his official, individual and personal capacity for damages and other relief.

27.     The Defendant, Eric S. Chessler (hereinafter "OFFICER CHESSLER") is an Officer of Police of the TOWN at all relevant times.  As such, OFFICER CHESSLER patrols the TOWN and is responsible for law enforcement and maintaining public safety, and enforces the TOWN By-Laws and regulations, including motor vehicle speed limits.  Upon information and belief, OFFICER CHESSLER is a resident of 49 Wanders Drive, Hingham, Plymouth County, Massachusetts 02043.  Upon information and belief, OFFICER CHESSLER was acting in the course and scope of his official capacity, and under the color of state law at all relevant times. OFFICER CHESSLER is hereby sued in his official, individual and personal capacity for damages and other relief.

# BACKGROUND

28.     G.L. c. 90, § 18, as amended through St. 1986, c. 689, §§ 8-9, entitled "Special regulations, speed and use of vehicles," is an enabling statute that authorizes the Board of Selectmen to "make special regulations as to the speed of motor vehicles" on ways within their control, i.e., speed limits.  It provides in pertinent part:

> The city council, the transportation commission of the city of Boston, the board of selectmen, park commissioners, a traffic commission or traffic director, or the department, on ways within their control, may make special regulations as to the speed of motor vehicles ....  G.L. c. 90, § 18.

29.     G.L. c. 90, § 18 is a statute of long-standing, having been enacted shortly after motor vehicles had begun to come into use, and at a time when they were frowned upon in many localities.  The statute has always contained provisions subjecting action taken under it to some degree of control by a State board.  It provides in pertinent part:

> *[n]o such special regulation shall be effective* ... *until after*, and in the case of a special speed regulation the department and the registrar, acting jointly, shall have *certified in writing that such regulation is consistent with the public interests* ....  G.L. c. 90, § 18 (emphasis added).

> ... *No such regulation shall be effective until there shall have been erected*, upon the ways affected thereby and at such points as the department and the registrar, acting jointly, may designate, *signs*, conforming to standards adopted by the department, *setting forth the speed or other restrictions established by the regulation*, and then only during the time such signs are in place. Id. (emphasis added).

30.     The Commonwealth of Massachusetts Department of Transportation (hereinafter "MassDOT") has a Policy on Speed Zoning that states what "is consistent with the public interests" in accordance with the provisions of G.L. c. 90, § 18:

> The goal of our Speed Limit Traffic Control Program has always been to provide appropriate and enforceable speed limits on all paved streets and highways within the

Commonwealth *in the best interest of the motoring public's right to use a roadway in a reasonable and proper manner*.  The ideal speed limit is both acceptable to the prudent driver and enforceable by our police departments.  MassDOT Highway Division, Speed Limit Regulations (2009).  (emphasis added)

31.     In accordance with the authority granted by G.L. c. 90, § 18 and related statutes (e.g., G.L. c. 85, § 2), MassHwy promulgated the "Procedures for Speed Zoning on State and Municipal Roads" (2005) to regulate the posting of speed limits for motor vehicles in the Commonwealth.  It plainly states the regulatory procedure to be followed, and succinctly provides in pertinent part:

Chapter 90, Section 18 authorizes the posting of numerical speed limits on all roadways in Massachusetts.  The foundation for the actual posting of a speed limit is a thorough traffic engineering study.  After a study has been completed, a Special Speed Regulation is drafted and approved by the governing authority of the roadway, the Registry of Motor Vehicles and MassHighway.  All posted regulatory speed limit signs must adhere to this approval process.  *If a speed limit is posted without this procedure, it is in violation of Chapter 90, Section 18, and is therefore considered illegal and unenforceable*.  Massachusetts Highway Department Procedures for Speed Zoning on State and Municipal Roads, 3 (2005) (emphasis added).

The **85th percentile** speed of vehicles passing a given point is the speed at or below which 85 percent of the vehicles passing the point are travelling.  This is the principle value used for establishing speed controls.  *This method assumes that the majority of motorists are prudent and capable of selecting safe speeds*; therefore, speeds established in this manner meet the legal requirement that they be "reasonable and proper."  Id. at 14 (emphasis added).

Studies have shown that speed zoning has very little permanent effect on average vehicular speeds.  ... The principle benefit of properly established speed zoning is to provide a means for police officers to apply enforcement to those who do not conform to speeds considered reasonable and proper by the majority of the motoring public.  Public opinion will be on the side of the police who are enforcing a reasonable maximum speed. *The former federally mandated 55 miles per hour national speed limit* on the Interstate System clearly *shows that an unreasonable low speed limit is neither enforceable nor has the long term support of the general public*.  Id. at 29-30 (emphasis added).

32.     In accordance with the authority granted by G.L. c. 85, § 2, the Highway Division of MassDOT (hereinafter "MassHwy") promulgated the "The Massachusetts Amendments to the 2009 Manual on Uniform Traffic Control Devices," § 10A-8 (January 2012) to regulate the posting of speed limits for motor vehicles in the Commonwealth.   It plainly states the regulatory procedure to be followed, and succinctly provides in pertinent part:

**<u>Section 10A-8</u> Speed Control**: Of the special regulations adopted by municipalities under the provisions of Chapter 90, Section 18 of the General Laws, the most commonly used is the special regulation of the speed of motor vehicles. Considerable data including speed observations and trial runs must be obtained by municipal officials, usually the Police Department. The final determination is based upon the 85-percentile method, which is that speed at or below which 85% of the vehicles observed were actually traveling. Department representatives are available to demonstrate the proper method for conducting the necessary studies and drafting the covering regulation, upon written request of local officials.

Procedure for Establishment of Legal Speed Zones

(1) The municipality is to conduct proper studies and submit data to the Department. (Municipalities usually accept the available services of the Department in conducting studies and assembling the data).

(2) After the speed zones, proposed by the local authorities, are reviewed by the Department, they are returned to the municipality for formal adoption by the rule-making body.  During this time, the municipality is responsible for any and all hearings required for adoption.

(3) Upon receipt of notice of formal adoption by the municipality, the Department, acting jointly with the Registry, will certify and approve.

(4) Certified regulation is returned to municipality.

(5) Official Speed Limit signs may then be installed in accordance with the specific provisions of the approved speed regulation.

(6) The Special Speed Regulation is then enforceable against violators.

"The Massachusetts Amendments to the 2009 Manual on Uniform Traffic Control Devices," § 10A-8, 10-11 (January 2012).

33. Federal Highway Administration research confirms MassDOT's observations regarding the "very little permanent effect" of posted speed limits on average vehicular speeds: "State or local officials often receive citizen requests for speed limit reductions because of perceived excessive speeds. However, research has repeatedly shown that changes in posted speeds have little effect on operating speeds." Parker, M.R., "Synthesis of Speed Zoning Practices," Report No. FHWA/RD-85/096 (1985).

34. The Federal Highway Administration also observes that there exists no established scientific correlation between motor vehicle speed and crash rates, when it states "the relationship between speed and safety is complicated and unclear. There are very few points of consensus on the effects of [motor vehicle] speed on crash probability." U.S. Dept. of Transportation, Fed. Hwy. Admin., "Speed Concepts: Informational Guide," 1 (Sept. 2009).

35. Mass. Gen. L. ch. 90, § 17, as amended through St. 1986, c. 689, § 7, entitled "Speed Limits," (hereinafter "G.L. c. 90, § 17") defines the statutory offense of "Speeding." It provides in pertinent part::

> No person operating a motor vehicle on any way shall run it at a rate of speed greater than is reasonable and proper, having regard to traffic and the use of the way and the safety of the public. ... If a speed limit has been duly established upon any way, in accordance with the provisions of said section, operation of a motor vehicle at a rate of speed in excess of such limit shall be prima facie evidence that such speed is greater than is reasonable and proper ... . G.L. c. 90, § 17.

36. G.L. c. 90C, § 3(A)(4), as amended through St. 2009, c. 27, § 74, entitled "Issuance of citations; hearing; appeal; summons or warrant; complaint; trial; license or permit

suspension," is a sui generis procedure for the adjudication of civil motor vehicle infractions ("CMVIs").   It provides in pertinent part:

> In any such hearing before a magistrate or justice, the citation shall be admissible and shall be prima facie evidence of the facts stated therein.  ... The magistrate or justice shall enter a finding of responsible if it was shown by a preponderance of the credible evidence that the violator committed the infraction alleged ...".  G.L. c. 90C, § 3(A)(4).

37.     G.L. c. 90C, § 3(A)(6) allows for automatic suspension of an operator violator's license to operate a motor vehicle or an owner violator's registration of a motor vehicle, by operation of law and without further notice or hearing, for failure to pay the full amount of the scheduled or imposed assessment to the Registrar of Motor Vehicles (hereinafter "Registrar") for a CMVI.

## STATEMENT OF FACTS

38.     In a letter dated December 13, 1983, Robert J. McDonagh, Chief Engineer, The Commonwealth of Massachusetts, Executive Office of Transportation and Construction, Department of Public Works (hereinafter "Chief Engineer McDonagh") wrote to Mr. Robert A. Smith, District Highway Engineer.  (Exhibit No. 1).  In this letter entitled "SPEED ZONING – MUNICIPAL WAYS," Chief Engineer McDonagh outlined the procedures to be followed in response to municipal speed zoning requests, and the responsibilities of a municipality for accumulating and submitting data including: (1) Radar observations; (2) Trial runs; (3) Proposed limits and sign locations; and, the (4) Accident history for 2-years.  He went on to state that "[t]he District shall analyze the submission and make its recommendation to the Boston Office."  The letter noted that this procedure will be put into effect January 14, 1984.  A copy of this letter

was provided by the Town of Hingham DPW, SUPERINTENDENT SYLVESTER, on March 13, 2012, in compliance with a public information request by Mr. Zotos.

39.     In a letter dated June 21, 1989, Sergeant Robert F. Myers (hereinafter "Sergeant Myers") Traffic Safety Division, Hingham Police Department, Chairman, Traffic, Hingham Traffic Committee wrote to "[a]ny resident or town group seeking a reduction in an existing posted speed sign or implementation of a speed sign where one has never been recorded.". (Exhibit No. 2).   In this letter Sergeant Myers outlined "THE LAW REGARDING NON POSTED ROADWAYS" and the "PROCEDURE BY RESIDENT AND STEPS BY TOWN AND STATE" to reduce an existing posted speed sign or implement a speed sign where one has never been recorded.   The seven-step procedure required an engineering study at an estimated cost of 30 man hours (approximately $300 - $500 in 1989 plus cost of signing), and multiple approvals from the TOWN Traffic Committee, SELECTMEN and the State D.P.W. – which could take up to 1 ½ years.   Sergeant Myers noted the following:

> The State D.P.W., upon receiving the town study and reviewing the same, makes the final decisions as to the speed of the roadway.   *It is very possible the D.P.W. might possibly increase instead of lowering the posted speed of the area in question*.   (emphasis added)

In closing, Sergeant Myers stated that "[u]ntil the above steps are taken, and the speed of the roadway is legally recorded with the state, then and only then may a Police Officer issue a citation on this roadway."   A copy of this letter was provided by the Town of Hingham DPW, SUPERINTENDENT SYLVESTER, on March 13, 2012, in compliance with a public information request by Mr. Zotos.

40.     The "Hingham Master Plan," published August 2000, lists seven State-owned roadways in the TOWN.   (Exhibit No. 3, 8-4).   "All other roadways are town-owned," including

Cushing, Charles and Gardner Streets.  Id.  at 8-3.  "Residents have expressed concern about speeding traffic on their local roadways.  ... Neighborhood complaints are generally directed at the fact that cut-through traffic is speeding and not at the volume of the cut-through traffic."  Id. at 8-17.

41.     On November 9, 2002, an officer of the Town of Hingham Police Department issued to Mr. Zotos Massachusetts Uniform Citation No. K3011030, a warning for Speeding in excess of a 30 m.p.h. posted speed limit duly established under G.L. c. 90, § 18 on Cushing Street, Hingham, MA.  (Exhibit No. 4).  This citation was the first in a series of three citations for Speeding in excess of a posted speed limit issued to Mr. Zotos by an officer of the Town of Hingham Police Department.  As a warning, no additional action was required on the part of Mr. Zotos.

42.     The "Beal Street/West Street/Fort Hill Street Corridor Study," published July 2006, was commissioned by the Town of Hingham as a comprehensive study of traffic conditions.  (Exhibit No. 5).  It notes the posted speed limits along each road as 30 m.p.h., but found the 85th percentile vehicle travel speed to be 48 mph along Beal Street and 44 mph along Fort Hill Street.  Id. at 8.  The motor vehicle crash rate was below the appropriate MassHwy average.  Id. at 9.

43.     In a letter dated June 3, 2008, Mr. Charles J. Cristello, TOWN ADMINISTRATOR (hereinafter "Administrator Cristello"), the Town of Hingham wrote to Mr. Bernard McCourt (hereinafter "Director McCourt"), District 5 Highway Director, Massachusetts Highway Department ("Mass Highway").  (Exhibit No. 6).  In this letter, "RE: Main Street (Route 228) Special Speed Regulation No. 824 A,B Hingham, MA," Administrator Cristello

petitioned Mass Highway and the Registry of Motor Vehicles (hereinafter "RMV") to amend the referenced Town of Hingham Special Speed Regulation.  In doing so, Administrator Cristello professed *"[w]e understand the process and the requirements associated with establishing or amending Special Speed Regulations* . . . [w]e request your support in granting this petition . . .". (emphasis added)

44.     The Town of Hingham "Board of Selectmen – Meeting Minutes," dated July 29, 2008 note the following:

> SELECTMAN  RILEY,  SELECTWOMAN  BURNS,  SELECTMAN  RABUFFO [Present]
>
> Route 228 Speed Limit Changes: The Town had petitioned MassHighway for a slight change in regulations for Route 228 (Main Street) to drop the speed 5 mph over .4 miles in the school area.  MassHighway has not yet submitted a schedule of dates for the work.
>
> Voted – to adopt the Special Speed Regulations numbered 824 and 824-A, dated August 22, 1973 and November 5, 1973 respectively, amended as follows:  The following speed limits are established at which motor vehicles may be operated in the areas described … . (Exhibit No. 7).

45.     Town of Hingham "Minutes of the Traffic Committee Meeting – August 27, 2008," note the following:

> To:     SELECTMEN
>
> From:  CHIEF MILLS …
>
> Present:  SERGEANT HORTE … SUPERINTENDENT SYLVESTER …
>
> A resident of Abington Street has requested that a posted speed limit sign be placed on Abington Street. … The members explained to the resident that *if a study was done by the State, they could come back and post a higher speed limit than what is in place now*. (Exhibit No. 8) (emphasis added).

46.     On June 25, 2009, Officer Sullivan, the Town of Hingham Police Department issued to Mr. Zotos Massachusetts Uniform Citation No. M7680768 for the Civil Motor Vehicle Infraction ("CMVI") of Speeding in excess of a 30 m.p.h. posted speed limit duly established under G.L. c. 90, § 18 on Charles Street at Maryknoll Drive, Hingham, MA.  (Exhibit No. 9). This citation was the second in a series of three citations for Speeding in excess of a posted speed limit issued to Mr. Zotos by an officer of the Town of Hingham Police Department.  Mr. Zotos contested responsibility for the CMVI by making a signed request for a noncriminal hearing on the back of the citation, and timely mailed the citation to the RMV.

47.     On August 31, 2009, considering the strength of the Town of Hingham's prima facie case in light of the prima facie evidence of the posted speed limit induced Mr. Zotos to waive his right to a hearing on the CMVI and pay the $130 assessment and $50 Head Injury Trust Fund Surcharge.  (Exhibit No. 10).  In doing so, he saved himself the additional cost of the $25 required hearing fee, and the lost wages of taking a half-day off from work to appear at the Hingham District Court for a CMVI hearing before a clerk-magistrate scheduled for September, 30, 2009.  At the time, he reasonably assumed that the posted speed limit was duly established in accordance with the provisions of G.L. c. 90, § 18, and was therefore lawfully enforceable.  He was completely unaware of any fraud being perpetrated on him that the posted speed limit was not duly established in accordance with the provisions of G.L. c. 90, § 18, and was therefore not lawfully enforceable.  Had he any reason to suspect this possibility, he certainly would not have decided to waive his right to a hearing on the CMVI and paid the $130 assessment and $50 Head Injury Trust Fund Surcharge.  Instead, he most likely would have continued to exercise his right to a CMVI hearing, and vigorously contested his responsibility for the CMVI of Speeding in light of the fact that the posted speed limit was unenforceable.

48.     Town of Hingham "Minutes of March 24, 2010 - Traffic Committee Meeting,"
note the following:

To:     SELECTMEN

From:  CHIEF MILLS …

Present:  … SERGEANT HORTE … SUPERINTENDENT SYLVESTER

Mr. Boland suggested a reduction of the current 30 MPH posted speed limit [on Main
Street].  SERGEANT HORTE responded that this *would require a traffic study and Mass
Highway approval which would most likely result in the speed limit being raised rather
than reduced* which would not be in the best interest of public safety.  (Exhibit No. 11)
(emphasis added).


49.     The Town of Hingham "Board of Selectmen – Meeting Minutes," dated May 18,
2010 note the following:

SELECTMAN RILEY, SELECTMAN RABUFFO [Present]

Richard Leatherbee asked if the speed limit of 20 on one section of Beal Street was
reasonable to expect.  He recommended raising the speed limit to 30 mph and enforcing
it.  The Board said the question is should there be a fully functioning traffic light, a
flashing light, etc.  (Exhibit No. 12).


50.     Town of Hingham "Minutes of May 26, 2010 - Traffic Committee Meeting," note
the following:

To:     SELECTMEN

From:  CHIEF MILLS …

Present:  … SERGEANT HORTE … SUPERINTENDENT SYLVESTER

Patricia Coyle, Treasurer of Bare Cove Park Committee, revisited the issue of speed limit
signs being installed on Bare Cove Park Drive. … the Committee unanimously agreed to
recommend the installation of two 20 MPH speed limit signs to be located near the field.
*It should be noted that these speed signs cannot be enforced by Hingham Police*

20

*Department*.  SUPERINTENDENT SYLVESTER *stated that he would have the signs placed promptly*.  (Exhibit No. 13) (emphasis added).

51.     Town of Hingham "Minutes of July 28, 2010 - Traffic Committee Meeting," note the following:

To:     SELECTMEN

From:  CHIEF MILLS …

Present:  … SERGEANT HORTE … SUPERINTENDENT SYLVESTER

Thomas Kelleher of Partridge Drive requested signage of either "Slow, Children" or "Thickly Settled", citing a large number of children on his street and the increased traffic speed in recent years.  Discussion ensued with SERGEANT HORTE *stating that the Police Department enforces the speed limit*. … SUPERINTENDENT SYLVESTER also said the DPW is not inclined to put up Caution signs due to budget constraints and that in most cases signs don't work.  *The main cause of the problem is that drivers simply go too fast*. … SERGEANT HORTE stated that he would add Partridge Drive to the *Traffic Hotsheet* which results in extra patrols in that neighborhood.  (Exhibit No. 14) (emphasis added).

52.     On December 2, 2010, OFFICER CHESSLER of the Town of Hingham Police Department issued to Mr. Zotos Massachusetts Uniform Citation No. M9825472 for the CMVI of Speeding in excess of a 30 m.p.h. posted speed limit duly established under G.L. c. 90, § 18 on Gardner Street, Hingham, MA.  (Exhibit No. 15).  This citation was the third in a series of three citations for Speeding in excess of a posted speed limit issued to Mr. Zotos by an officer of the Town of Hingham Police Department.  In view of this fact, Mr. Zotos began to suspect that something wasn't right.  He finally thought it might be more than a mere innocent coincidence that – out of all the cities and towns in the Commonwealth through which he regularly drove - apparently only the officers of the Town of Hingham Police Department saw fit to repeatedly issue him citations for Speeding.  Later that day, Mr. Zotos contested responsibility for the

CMVI by making a signed request for a noncriminal hearing on the back of the citation, and timely mailed the citation to the RMV.  It was then he also began to undertake a year-long private investigation of the TOWN's traffic enforcement practices.

53.    On February 18, 2011, Mr. Zotos paid a $25 hearing fee to appear before a clerk-magistrate and a noncriminal hearing was held at Hingham District Court regarding the CMVI (12/2/10).  At the conclusion of the hearing, the clerk-magistrate found Mr. Zotos responsible for the CMVI of Speeding in excess of a 30 m.p.h. posted speed limit duly established under G.L. c. 90, § 18.  (See Exhibit No. 19, infra).  Mr. Zotos immediately thereafter made a claim of appeal to a judge from the finding and disposition entered by the clerk-magistrate.  He paid the required $50 hearing fee, and then the clerk-magistrate scheduled the hearing for April 8, 2011.

54.    In an e-mail dated March 18, 2011, Marilyn Harrington, SELECTMEN's Office, Town of Hingham wrote Mr. Zotos that she had researched her files, and could not find any documents relative to the posting of the 30 m.p.h. on Gardner Street.  (Exhibit No. 16).  She suggested that Mr. Zotos contact District 5 of the Mass. Highway Department.

55.    In an e-mail dated March 22, 2011, Charles Hale, Manager, Electrical Systems Unit, MassDOT, Highway Division (hereinafter "Manager Hale") wrote to SERGEANT DEARTH, Traffic Safety Division, Department of Police, Town of Hingham Police Department. (Exhibit No. 17).  In this e-mail, "Subject: Re: Hingham Speed Limit Sign", Manager Hale apparently responded to an inquiry by SERGEANT DEARTH regarding whether his files contained any "record of a speed study or speed regulation for Gardner Street in Hingham." Manager Hale informed SERGEANT DEARTH that "there is no record of a speed study or speed regulation for Gardner Street in Hingham."  He further noted that "there are five (5) speed

regulations, numbers 824, 824A, 824B, 824C and 7440 that I'm attaching … for your use." These Special Speed Regulations were as follows:

- 824 for Route 228 (Main, East and Hull Streets) dated August 22, 1973;

- 824A dated November 5, 1973;

- 824B dated October 6, 1976;

- 824C dated August 12, 2008; and,

- 7440 for Charles and Lazell Streets dated August 26, 1988.

56.     In a letter dated April 7, 2011, Bernard McCourt ("Director McCourt"), District Highway Director, Massachusetts Department of Transportation ("MassDOT"), Highway Division, District 5 wrote Mr. Zotos that the District's Records were searched for any Special Speed Regulation for Gardner Street and they could find no evidence that one was ever issued. (Exhibit No. 18).  He added that, "to post a numerical speed limit on a road a Special Speed Regulation is required."

57.     On April 8, 2011, Mr. Zotos appeared before the Hon. Ronald F. Moynahan, Hingham District Court, who heard the noncriminal CMVI hearing de novo without a jury in the matter of the Massachusetts Uniform Citation No. M9825472 (Exhibit No. 15, supra), Hingham Police Department v. Zotos.  OFFICER CHESSLER appeared as a witness for the Hingham Police Department, but neither an attorney, nor the town police prosecutor entered an appearance as counsel on behalf of the Hingham Police Department.  The Hingham Police Department exclusively relied on the prima facie evidence of a duly established, posted speed limit under G.L. c. 90, § 18 to assist in carrying its burden of persuasion on the issue of "reasonable and proper speed."  Mr. Zotos appeared pro se and introduced into evidence correspondence, from

officials charged with keeping public records, that they had no records that this speed limit was duly established upon the way.  (See Exhibits Nos. 16 and 18, supra).  He argued in his defense that this speed limit was ineffective for failure to comply with the provisions of G.L. c. 90, § 18, namely, that "the department and the registrar  … [never] certified in writing that such a regulation is consistent with the public interests."  G.L. c. c. 90, § 18.  Moreover, the Hingham Police Department subsequently failed to cross-examine Mr. Zotos, or offer any rebuttal evidence or argument whatsoever regarding the material issue of fact whether the posted speed limit on Gardner Street, Hingham, MA was properly installed in accordance with the provisions of G.L. c. 90, § 18.  At the conclusion of the hearing, the Hingham District Court Judge issued a ruling from the bench finding Mr. Zotos responsible of the CMVI of Speeding in excess of a posted speed limit duly established under G.L. c. 90, § 18 and ordered an assessment of $200.  (Exhibit No. 19).

58.     Mr. Zotos timely appealed the April 8, 2011 judgment  on the grounds  that the Hingham District Court judge committed an error of law when he found Mr. Zotos responsible of the civil motor vehicle infraction of Speeding based upon insufficient evidence.  This judgment has since been affirmed by the Appellate Division of the District Court on June 20, 2011, and by the Massachusetts Appeals Court on May 16, 2012.  Mr. Zotos subsequently sought a request for leave to obtain further appellate review (FAR No. 20798) from the Massachusetts Supreme Judicial Court ("SJC").  See, Police Dep't of Hingham v. Zotos, 463 Mass. 1106, 973 N.E.2d 1269 (2012) (Table).  However, on September 7, 2012, the SJC denied his application for further appellate review.  Id.

59.     The Town of Hingham "Annual Report 2010," published May 10, 2011, includes reports from the Department of Public Works and the Traffic Committee.  (Exhibit No. 20).

SUPERINTENDENT SYLVESTER reported that the DPW "[i]nstalled, repaired, and maintained 3,100 traffic and street signs."  The Traffic Committee reported the following:

> The Traffic Committee exists to assist Hingham residents and business owners with ways to alleviate traffic concerns in all areas of the Town.  The Traffic Committee does not have the power to implement changes but rather recommends proposals to the SELECTMEN.

60.     In an e-mail dated May 16, 2011, Marilyn Harrington, SELECTMEN's Office, the Town of Hingham provided Mr. Zotos a copy of Special Speed Regulation No. 7440 dated August 26, 1988 for Charles and Lazell Streets.  (Exhibit No. 21).  This regulation, however, only pertains to the northernmost 0.2 mile portion of Charles Street, which starts at the junction of South Pleasant Street, and thence northerly 0.2 miles at 30 m.p.h. ending at Lazell Street - the total distance being 0.20 miles.  This regulation does not apply to the portion of Charles Street which starts at the junction of South Pleasant Street, and thence southerly 0.2 miles ending at the junction of Maryknoll Drive, or the remaining southerly 0.6 miles therefrom ending at the junction of Prospect Street - the total unregulated distance of Charles Street being 0.8 miles.  In fact, this is the <u>singular</u> and only Special Speed Regulation on file for any Town of Hingham owned road (excepting the state-town joint ownership of the Main Street/Route 228 corridor).

61.     In a follow-up e-mail dated May 17, 2011, Ms. Harrington wrote Mr. Zotos that Regulation No. 7440 was all she could find in her files regarding the unregulated portion of Charles Street.  She further mentioned she was not sure if the fundamental speed law of 30 m.p.h. applied to this unregulated portion of Charles Street.   (See Exhibit No. 21, supra).

62.     On June 22, 2011, MassDOT conducted a Road Safety Audit ("RSA") of Cushing Street, Hingham, MA.   (Exhibit 22).   The RSA team included both SUPERINTENDANT

SYLVESTER and SERGEANT DEARTH as the TOWN's representatives, and MassDOT's report noted the following:

> Project Location Description: ... Cushing Street is a rural minor collector and falls under Town jurisdiction. ... The speed limit along Cushing Street is posted 30 miles per hour (mph) in both directions.  There is no speed regulation on file.  Id. at 3.

> Observations: RSA team members noted that vehicle travel speeds appear to be faster than the posted 30 mph regulation.  The Hingham Police Department noted that they routinely write tickets along the Cushing Street corridor.  Id. at 10.

> Enhancements:  [] Conduct a speed survey in the vicinity.  If appropriate, submit the speed study to MassDOT requesting a posted regulatory speed along Cushing Street.  Id.

63.    On September 28, 2011, a Hingham Police Officer issued Nicholas Belezos, a resident of 2 Puritan Road, Hingham, MA 02043, Massachusetts Uniform Citation No. R1461153 for the CMVI of Speeding in excess a 30 m.p.h. posted speed limit duly established under G.L. c. 90, § 18 on Gardner Street, Hingham, MA.  (Exhibit 23).

64.    Town of Hingham "Minutes of September 28, 2011 - Traffic Committee Meeting," note the following:

> To:    SELECTMEN

> From:  Chief Peraino …

> Present: … SERGEANT DEARTH … SUPERINTENDENT SYLVSTER

> SERGEANT DEARTH presented a request which was brought to him by the resident of 194 *Gardner Street*.  The resident is requesting a "Blind Drive" sign be installed near his home which is located on a curve in the road.  His teenage daughter had an accident exiting the driveway and the resident believes this would be a solution to the problem. SUPERINTENDENT SYLVSTER pointed out that the *street already has multiple signs on it* [survey indicated 8 speed limit signs in total] *including a 30 MPH speed limit sign*. SUPERINTENDENT SYLVSTER also stated that sign overload is not a solution as drivers often become desensitized to the overuse of signage.  Another issue is the cost of signs which is a major drain on the DPW budget.  (Exhibit No. 24) (emphasis added).

65.     In a letter dated February 22, 2012, Michael J. Peraino, Chief of Police, Department of Police, Town of Hingham (hereinafter "Chief Peraino") wrote Mr. Zotos that with regards to the Hingham Police Department, the "total of all speeding violations for the [1/1/09 – 12/31/11] period is 5,115." (Exhibit No. 25).

66.     On February 24, 2012, the Hingham Police Department provided Mr. Zotos with a printout of a computerized report entitled "MV Citations with Assesments," for the four-month period starting from 10/24/2011 and ending at 02/24/12. (Exhibit No. 26). This report includes all the CMVI Speeding citations issued by the TOWN'S Police Department for that period, categorized by the citation "Charge Code" (either G.L. c. 90, §§ 17 or 18), with the motorists' name redacted by the Police Department for privacy reasons. Police Department personnel also handwrote on the right-hand margin the corresponding street names where each offense occurred.

67.     Attached to this end of the "MV Citations with Assessments" report (Exhibit No. 26, supra) is a summary data table and analysis created by Mr. Zotos, based upon data extracted from the Police Department report and cross-referenced with his own survey of speed limit signs in the TOWN. (See Exhibit 32, infra). This summary tabulates a total of 132 Speeding citations issued during the four-month period, evenly distributed 50/50 between G.L. c. 90, §§ 17 or 18 charges. The shaded rows indicate roads under the TOWN's jurisdiction on which Mr. Zotos surveyed illegally posted speed limit signs for which there are no corresponding Special Speed Regulations. The number of G.L. c. 90, § 18 citations issued on roads with illegally posted speed limits are indicated in the column entitled "Flagged 90/18," and totaled twenty-two (22), representing seventeen percent (17%) of the overall total citations. The number of G.L. c. 90,

§ 17 citations issued on roads with illegally posted speed limits are indicated in the column entitled "Flagged 90/17," and totaled twelve (12), representing nine percent (9%) of the overall total citations.  Added together,  the number of G.L. c. 90, §§ 17 or 18 citations issued on roads with illegally posted speed limits are indicated in the column entitled "Flagged Total," and totaled thirty-four (34), representing twenty-six percent (26%) of the overall total citations.

68.     The incidence rates of G.L. c. 90, §§ 17 or 18 citations (9% and 17% respectively) issued on roads with illegally posted speed limits derived from the "MV Citations with Assessments" report (Exhibit No. 26, supra) may be utilized for purposes of estimation to interpolate  the number of such citations corresponding to different time periods.  Namely, applying these incidence rates to the data of 5,115 total Speeding citations reported by the Hingham Police Department for the three-year period of 1/1/09 – 12/31/11, it may be readily calculated that an estimated 460 and 870 (1,330 total) citations, respectively corresponding to G.L. c. 90, §§ 17 or 18 charges, were issued by the Hingham Police Department on roads with illegally posted speed limits during the three year period.  Reasonably assuming an average assessment cost of $200 results in an estimated total assessment cost of $266,000 to unsuspecting motorists.    If the anecdotal evidence of Mr. Zotos' personal experience is any indication, a Speeding citation will raise a motorists automobile insurance premiums $1,500 over the six-year policy experience period.  (See Exhibit 36, infra).  This results in an estimated total increased automobile insurance cost of $1,995,000 to unsuspecting motorists, and a total overall estimated cost of $2,221,000 over the three-year period from 2009 – 2011 for unsuspecting motorists issued illegal Speeding citations  as a result of the TOWN's fraudulent traffic enforcement scheme.

69.     In an e-mail dated February 28, 2012, Mr. Paul Savoy of the RMV Revenue Control Unit (hereinafter "Mr. Savoy") wrote to William E. McVey, Deputy General Counsel, MassDOT, RMV Division (hereinafter "Attorney McVey"), "Subject:   CMVI Request." (Exhibit No. 27).   Attached to this e-mail was a copy of "CMVI Monthly External Disbursement Report" February 28, 2012.   This report is compiled on a fiscal year basis and shows disbursements by the RMV to the Town of Hingham in the amount of $194,085 for the 31 month period of July 2009 – January 2012, and is based upon CMVI's issued in the TOWN.

70.     In a letter dated March 2, 2012, Attorney McVey wrote Mr. Zotos on behalf of the Registrar of Motor Vehicles (hereinafter "Registrar"), in which he "enclosed copies of Special Speed Regulations adopted by the Town of Hingham and sent to the Registrar and the State Traffic Engineer for certification by signature as being consistent with the public interests." (Exhibit No. 28).   "There are five (5) speed regulation requests [Regulations Nos. 824, 824A, 824B, 824C and 7440 were enclosed] from 1973-2008."   (See Exhibit No. 17, supra).

71.     In a letter dated March 7, 2012 (Exhibit No. 29), Attorney McVey wrote Mr. Zotos that his colleague, Ulysses Jacks, Deputy Chief Counsel, MassDOT (hereinafter "Attorney Jacks"), "caused a search to be conducted to obtain any Special Speed Regulations that may exist for those roads [certain state highways that pass through some portion of the Town of Hingham] and he has graciously provided the following" Special Speed Regulations:

- 79 (Summer St., Rockland St. & George Washington Blvd., December 1, 1953);

- 325 (Lincoln St., Broad Cove Rd. and Otis St. (Route 3A), March 18, 1966);

- 410 (Derby St., May 14, 1968);

- 678 (Route 53, January 14, 1972);

- 410A (Derby St., February 1, 1973);

- 678A (Route 53, March 30, 1973);

- 325E (Route 3A, June 6, 1986); and,

- 678E (Route 53, July 3, 1986).

72.     In a letter dated March 7, 2012, Attorney Jacks wrote Mr. Zotos that although under G.L. c. 90, § 18 and c. 85, § 2 the DOT is authorized to remove improperly erected speed limit signs on local town or city ways:

> the DOT has elected under the discretionary word may … to act upon notice (for reasons of comity with the respective city or town and the lack of available personnel) from either the local police or a citizen to enter upon a local way, inspect the sign, determine whether it complies with the required provisions, and if such sign does not comply, to notify the city or town where the sign is located to remove the sign. …
>
> [However] To date, the search of the District Five and 10 Park Plaza files has failed to uncover any records notifying the DOT of a sign out of compliance with the provision of" G.L. c. 90, § 18 and c. 85, § 2.  (Exhibit No. 30).

73.     In an e-mail dated March 15, 2012, Andrew Fanguiaire, Business Manager, Massachusetts Merit Rating Board ("MRB"), provided Mr. Zotos tabulated data showing a total of "Citations Written by All Police Departments" for the period 2006 – 2011, which shows the total of "Citations Written by All Police Departments" is tabulated therefrom to be 590,074 for the period 2009-2011.  (Exhibit No. 31).

74.     According to the 2010 United States Census records, the population of Massachusetts was 6,547,629 persons, and the population of the Town of Hingham was 22,157 persons.  Consequently, utilizing the citation data provided by the MRB, it may be readily calculated that the citation incidence rate is 9% per capita for Massachusetts vs. 23% per capita for the Town of Hingham for the period 2009-2011.  This data shows that motorists in the Town of Hingham (on a per capita basis) were roughly two-and-a-half times (2.5x), or one-hundred and

fifty percent (150%) more likely to receive a citation for speeding than the average motorist in Massachusetts for the period 2009-2011.

75.     In the period from March 2 - 23, 2012, Mr. Zotos conducted a visual and photographic GPS survey of roadways in the Town of Hingham and identified a total of one-hundred and thirty-six (136) posted speed limit signs on these streets.  (Exhibit 32).  Mr. Zotos identified seventy-four (74) speed limit signs corresponding to all the Special Speed Regulations that had been issued for roadways passing through a portion of the Town of Hingham.  Forty-two (42) of these speed limit signs were located on nine (9) roadways under the jurisdiction of the Commonwealth, and thirty-two (32) of these were located on five (5) roadways under the jurisdiction of the TOWN.  He also identified sixty (60) speed limit signs for which there was no record (either in the TOWN or the MassDOT files) of any Special Speed Regulations having been issued.   These were all located on eighteen (18) roadways all under the exclusive jurisdiction of the TOWN.  Consequently, approximately sixty-six percent (66%) of all the speed limit signs that Mr. Zotos surveyed under the jurisdiction (exclusive and joint) of the TOWN lacked a required Special Speed Regulation.

76.     The official copy of Mr. Zotos' driving record (certified by the Registrar) dated March 23, 2012, shows that he has been issued a total of two motor vehicle citations.  (Exhibit No. 33).  It shows that Mr. Zotos has been licensed by the Commonwealth of Massachusetts to operate a motor vehicle since July 12, 1982.  On November 28, 1997, more than fifteen (15) years later, Mr. Zotos received the first indicated citation for Speeding (out of state) by an officer of the State of New Hampshire.  On June 25, 2009, almost twelve (12) years later, Mr. Zotos received the second indicated citation - also for Speeding - by an officer of the Town of Hingham.  (Corresponds with Massachusetts Uniform Citation No. M7680768 - Exhibit No. 9,

supra).   Upon information and belief, a third citation for Speeding will be indicated on Mr.

Zotos' driving record since he failed to reverse the April 8, 2011 judgment of the Hingham

District Court.   (Corresponding to Massachusetts Uniform Citation No. M9825472 - Exhibit No.

15, supra).

77.     Town of Hingham "Minutes of March 28, 2012 - Traffic Committee Meeting,"

note the following:

To:     SELECTMEN

From:  Chief Michael Peraino …

Present: … SERGEANT DEARTH … SUPERINTENDENT SYLVSTER

I. Cushing Street Speed Study – SERGEANT DEARTH presented the Speed Study that
was conducted by the Massachusetts Department of Transportation at the request of the
Hingham Police Department as part of the Road Safety Audit which concentrated on the
400 block of Cushing Street.   The study was done over a 7 day period and showed that
the average speed travelling both northbound and southbound was 38 mph. The majority
of the cars (82%) were travelling at a pace speed of between 34-43 mph.   SERGEANT
DEARTH noted that the *speed was lower than he would have predicted and indicates
that speed isn't a factor on Cushing Street*.   Another reason is that enforcement is
consistent on the street and tickets are issued on a regular basis which is a deterrent.
SERGEANT DEARTH *advised against contacting the State to adjust the speed on the
street as the posted speed limit [30 mph] would most likely be posted higher 40 (mph)
which is not the desired outcome*. (Exhibit No. 34) (emphasis added).

78.     In an e-mail dated April 5, 2012, Attorney McVey wrote Mr. Zotos that although

under G.L. c. 90, § 34 the DOT "shall" withhold amounts due to the city/town from the

Commonwealth Transportation Fund ("CTF") "for failure to get prior approval to post a sign or

traffic device," neither the Budget Office of the DOT nor the six DOT district offices have any

"knowledge or history of any Chapter 90 payments being withheld."  (Exhibit No. 35).

79.     The official copy of Mr. Zotos' Merit Rating Plan Statement (based on driving records maintained by the Massachusetts MRB) dated April 23, 2012, indicates that he has a Merit Rating Code of zero ("0") as of the Statement date.  (Exhibit No. 36).  In a table entitled "Driving History Information," the Statement indicates "Speeding" under a column entitled "Description," and "06/25/09" under a column entitled "Incident Date."     (Corresponds with Massachusetts Uniform Citation No. M7680768 - Exhibit No. 9, supra).  Prior to this citation incident, Mr. Zotos had been licensed and incident-free for almost twelve (12) years, earning him Merit Rating Code of ninety-nine (99), "Excellent Driver Discount Plus," which resulted in an annual automobile insurance premium decrease (credit) of approximately $250.  This change in Mr. Zotos' Merit Rating Code from (99) to (0) has raised his automobile insurance premiums an approximate total of $750 over the last three years.  Upon information and belief, the Speeding incident (06/25/09) will continue to raise Mr. Zotos' automobile insurance premiums another $750 over the next three years – until it may eventually expire in 2016 due to the conclusion of the six-year policy experience period. Upon information and belief, a second Speeding incident (12/2/10) will eventually be indicated since Mr. Zotos failed to reverse the April 8, 2011 judgment of the Hingham District Court, and will raise his automobile insurance premiums for an additional six years.

80.     In a letter dated November 1, 2012, Rachel Kaprielian, Registrar, RMV notified Mr. Zotos that his "license/right to operate a motor vehicle will be suspended, by automatic application of law, because [he] had defaulted on the assessment [CMVI (12/2/10)] and fines [late and release fees] noted." (Exhibit 37).  She added that:

> If you fail to comply with these instructions [to pay the CMVI (12/2/10) assessment and added fees] before the effective date of the suspension, your license or right to operate all

motor vehicles within the Commonwealth of Massachusetts will be suspended and your right to renew your registration will be denied on that date without further notice.

81.     On November 20, 2012, Mr. Zotos paid the $200 assessment, plus $70 in added fees in connection with the CMVI (12/2/10), in order to avoid the RMV's threatened suspension of his license or right to operate all motor vehicles within the Commonwealth of Massachusetts, and the denial of his right to renew his registration.  (Exhibit 38).  As a result, he was also assessed a $432 automobile insurance surcharge for his 2013 policy year beginning June 22, 2013.  (Exhibits 39 and 40).

82.     Mr. Zotos is a natural born citizen of the United States of America, and a lifelong resident of the Town of Cohasset, Massachusetts.  He has been licensed by the Commonwealth of Massachusetts to operate a motor vehicle since July 12, 1982.  Over the last fifteen year period, he has owned and operated five (5) cars registered in Massachusetts.  On average, he drives approximately twenty-thousand (20,000) miles per year operating both his own and other motor vehicles.

83.     Town of Hingham "Minutes of May 28, 2014 - Traffic Committee Meeting," note the following:

To:     SELECTMEN

From:  Chief Michael Peraino …

Present: … SERGEANT HORTE … SUPERINTENDENT SYLVSTER

Sgt. Horte presented the results of the *Conservatory Park speed study* which was conducted by Sgt. Steven Dearth. Two studies were conducted: one in November, 2013 and the other in April 2014. For the first study, the speed/volume counter was placed at 19 Isaac Sprague Drive. For the second study, the speed counter was placed at John Hazlitt Drive. *Both were within the 85th percentile as measured by Mass Highway which means that they are within the proper parameters and that speed is not excessive*. Gia

Ramza of Franklin Rogers Road said that their intention was not to control speed on the road as *the speed limit is 30 MPH*. ...

*The suggested solution was to install suggested speed signs (yellow signs) which are not enforceable. This is not common knowledge, however so this would be helpful.* The residents in attendance were very happy with this suggestion. Signs will be installed at Charles Everett, Dwiggins Path and Franklin Rogers at John Hazlitt and Isaac Sprague. *There will be four 15 MPH suggested speed signs installed* as motioned by Sgt. Horte, seconded by Dan Zivkovich and unanimously voted. (Exhibit No. 41) (emphasis added).

84.     There is an actual case or controversy between Mr. Zotos on the one hand and the Defendants on the other regarding the illegality and unconstitutionality of the Defendants' executive actions, statutes and special speed regulations generally applicable to Mr. Zotos.   A real dispute exists and Mr. Zotos has a sufficient personal interest in the rights and relief at stake to meet standing requirements. There is no indication that the Defendants will either remove illegal speed limit signs or refrain from enforcing them.   There exists a continuing threat, indeed a likelihood, of continued prosecution for Speeding in violation of phony speed limit signs. Further, judicial efficiency would not be promoted by declining to act on this case, only to face the same issue again. This controversy can be resolved and uncertainty removed by declaratory judgment.

## CLAIMS FOR RELIEF

## COUNT I

Deliberate and Reckless Fabrication of False Evidence

(Civil Rights Violation of the Substantive Due Process Clause of the 14th Amendment to the

United States Constitution and 42 U.S.C. § 1983)

(Against Defendants SELECTMEN RILEY, BURNS and RABUFFO, ADMINISTRATOR

ALEXIADES, SUPERINTENDENT SYLVESTER and TOWN, in their official, individual and

personal capacities (except TOWN), jointly and severally)

85.     Plaintiff Zotos repeats, re-alleges and incorporates by reference the above allegations as if fully set forth herein.

86.     Upon information and belief, it is the policy, custom, or practice, or all of these, of the Defendants, to knowingly, recklessly, or with deliberate indifference and callous disregard of the applicable statutes, regulations and Mr. Zotos' rights, either erect and maintain, cause to be erected and maintained, or fail to remove or cause to be removed, signs that purport to duly establish a posted regulatory speed limit in accordance with the provisions of G.L. c. 90, § 18, and therefore prima facie evidence of a reasonable and proper speed limit under G.L. c. 90, § 17. Said signs in fact falsely represent a special speed regulation where none exists, are unauthorized by the regulatory authorities of the Commonwealth in violation of the aforesaid statute and regulations, are therefore considered illegal and unenforceable, and cannot be prima facie evidence of a reasonable and proper speed limit.  These actions were taken under the color of law within the meaning of the Federal Civil Rights Act, 42 U.S.C. § 1983.

87.     As a direct and proximate result of their acts as set forth above, the Defendants deprived Mr. Zotos of his property and threatened to deprive him of his liberty, without due process of law, in violation of the guarantees of the Fourteenth Amendment to the Constitution of the United States as secured by 42 U.S.C. § 1983.

88.     Pursuant to 42 U.S.C. §§ 1983 and 1988, Mr. Zotos claims all damages, costs and attorney's fees that he is entitled by law to recover from the Defendants for legal deprivations, injuries and losses set forth herein, which deprivations, injuries and losses were caused by said Defendants under the color of law in violation of Mr. Zotos' federal constitutional rights.

## COUNT II

Failure to Adequately Train, Supervise and Discipline

(Civil Rights Violation of the Substantive Due Process Clause of the 14th Amendment to the United States Constitution and 42 U.S.C. § 1983)

(Against Defendants SELECTMEN RILEY, BURNS and RABUFFO, ADMINISTRATOR ALEXIADES, and TOWN, in their official, individual and personal capacities (except TOWN), jointly and severally)

89.     Plaintiff Zotos repeats, re-alleges and incorporates by reference the above allegations as if fully set forth herein.

90.     Upon information and belief, it is the policy, custom, or practice, or all of these, of the Defendants, to knowingly, recklessly, or with deliberate indifference and callous disregard of the applicable statutes, regulations and Mr. Zotos' rights, fail to instruct, supervise, control and discipline on a continuing basis personnel under their control in their duties to refrain from unlawfully and maliciously either erecting and maintaining, causing to be erected and

maintained, or failing to remove or causing to be removed signs that purport to duly establish a posted regulatory speed limit in accordance with the provisions of G.L. c. 90, § 18, and therefore prima facie evidence of a reasonable and proper speed limit under G.L. c. 90, § 17.  Said signs in fact falsely represent a special speed regulation where none exists, are unauthorized by the regulatory authorities of the Commonwealth in violation of G.L. c. 90, § 18, are therefore considered illegal and unenforceable, and cannot be prima facie evidence of a reasonable and proper speed limit.

91.     Upon information and belief, the Defendants had actual or constructive knowledge or, had they diligently exercised their duties to instruct, supervise, control, and discipline on a continuing basis, should have had knowledge that the wrongs conspired to be done, as heretofore alleged, were about to be committed.

92.     Upon information and belief, the Defendants had power to prevent or aid in preventing the commission of said wrongs, could have done so by reasonable diligence, and knowingly, recklessly, or with deliberate indifference and callous disregard of Mr. Zotos' rights failed or refused to do so.

93.     Upon information and belief, the Defendants directly or indirectly, under color of law, approved or ratified the unlawful, deliberate, malicious, reckless, and wanton conduct of personnel under their control heretofore described.

94.     As a direct and proximate result of their acts as set forth above, the Defendants deprived Mr. Zotos of his property and threatened to deprive him of his liberty, without due process of law, in violation of the guarantees of the Fourteenth Amendment to the Constitution of the United States as secured by 42 U.S.C. § 1983.

95.     Pursuant to 42 U.S.C. §§ 1983 and 1988, Mr. Zotos claims all damages, costs and attorney's fees that he is entitled by law to recover from the Defendants for legal deprivations, injuries and losses set forth herein, which deprivations, injuries and losses were caused by said Defendants under the color of law in violation of Mr. Zotos' federal constitutional rights.

## COUNT III

Deliberate and Reckless Fabrication of False Evidence

(Civil Rights Violation of the Substantive Due Process Clause of the 14th Amendment to the

United States Constitution and 42 U.S.C. § 1983)

(Against Defendants SELECTMEN RILEY, BURNS and RABUFFO, CHIEF MILLS,

SERGEANTs HORTE and DEARTH, OFFICER CHESSLER, and TOWN, in their official,

individual and personal capacities (except TOWN), jointly and severally)

96.     Plaintiff Zotos repeats, re-alleges and incorporates by reference the above allegations as if fully set forth herein.

97.     Upon information and belief, it is the policy, custom, or practice, or all of these, of the Defendants, to knowingly, recklessly, or with deliberate indifference and callous disregard of the applicable statutes, regulations and Mr. Zotos' rights, issue, cause to be issued, or fail to cause not to be issued Mr. Zotos a citation charging him with Speeding in excess of an illegal and unenforceable posted speed limit, and therefore prima facie evidence of the facts stated therein under G.L. c. 90C, § 3(A)(4).  Said citation in fact falsely represents a special speed regulation where none exists, and therefore cannot be prima facie evidence of the fact of the posted speed limit stated therein.  These actions were taken under the color of law within the meaning of the Federal Civil Rights Act, 42 U.S.C. § 1983.

98.     As a direct and proximate result of their acts as set forth above, the Defendants deprived Mr. Zotos of his property and threatened to deprive him of his liberty, without due process of law, in violation of the guarantees of the Fourteenth Amendment to the Constitution of the United States as secured by 42 U.S.C. § 1983.

99.     Pursuant to 42 U.S.C. §§ 1983 and 1988, Mr. Zotos claims all damages, costs and attorney's fees that he is entitled by law to recover from the Defendants for legal deprivations, injuries and losses set forth herein, which deprivations, injuries and losses were caused by said Defendants under the color of law in violation of Mr. Zotos' federal constitutional rights.

## COUNT IV

### Failure to Adequately Train, Supervise and Discipline

(Civil Rights Violation of the Substantive Due Process Clause of the 14th Amendment to the United States Constitution and 42 U.S.C. § 1983)

(Against Defendants SELECTMEN RILEY, BURNS and RABUFFO, and TOWN, in their official, individual and personal capacities (except TOWN), jointly and severally)

100.    Plaintiff Zotos repeats, re-alleges and incorporates by reference the above allegations as if fully set forth herein.

101.    Upon information and belief, it is the policy, custom, or practice, or all of these, of the Defendants, to knowingly, recklessly, or with deliberate indifference and callous disregard of the applicable statutes, regulations and Mr. Zotos' rights, fail to instruct, supervise, control and discipline on a continuing basis personnel under their control in their duties to refrain from unlawfully and maliciously issuing Mr. Zotos a citation charging him with Speeding in excess of

an illegal and unenforceable posted speed limit, and therefore prima facie evidence of the facts stated therein under G.L. c. 90C, § 3(A)(4).  Said citation in fact falsely represents a special speed regulation where none exists, and therefore cannot be prima facie evidence of the fact of the posted speed limit stated therein.

102.    Upon information and belief, the Defendants had actual or constructive knowledge or, had they diligently exercised their duties to instruct, supervise, control, and discipline on a continuing basis, should have had knowledge that the wrongs conspired to be done, as heretofore alleged, were about to be committed.

103.    Upon information and belief, the Defendants had power to prevent or aid in preventing the commission of said wrongs, could have done so by reasonable diligence, and knowingly, recklessly, or with deliberate indifference and callous disregard of Mr. Zotos' rights failed or refused to do so.

104.    Upon information and belief, the Defendants directly or indirectly, under color of law, approved or ratified the unlawful, deliberate, malicious, reckless, and wanton conduct of personnel under their control heretofore described.

105.    As a direct and proximate result of their acts as set forth above, the Defendants deprived Mr. Zotos of his property and threatened to deprive him of his liberty, without due process of law, in violation of the guarantees of the Fourteenth Amendment to the Constitution of the United States as secured by 42 U.S.C. § 1983.

106.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Mr. Zotos claims all damages, costs and attorney's fees that they are entitled by law to recover from the Defendants for legal deprivations, injuries and losses set forth herein, which deprivations, injuries and losses were

caused by said Defendants under the color of law in violation of Mr. Zotos' federal constitutional

rights.

## COUNT V

Deliberate and Reckless Withholding of Exculpatory Evidence

(Civil Rights Violation of the Substantive Due Process Clause of the 14th Amendment to the

United States Constitution and 42 U.S.C. § 1983)

(Against Defendants SELECTMEN RILEY, BURNS and RABUFFO, CHIEF MILLS,

SERGEANTs HORTE and DEARTH, OFFICER CHESSLER, and TOWN, in their official,

individual and personal capacities (except TOWN), jointly and severally)

107.    Plaintiff Zotos repeats, re-alleges and incorporates by reference the above

allegations as if hereinafter set forth in full.

108.    Upon information and belief, it is the policy, custom, or practice, or all of these,

of the Defendants, to knowingly, recklessly, or with deliberate indifference and callous disregard

of the applicable statutes, regulations and Mr. Zotos' rights, withhold, cause to be withheld, of

fail to cause not to be withheld exculpatory material evidence and maintain unfounded charges

against Mr. Zotos of Speeding in excess of illegal and unenforceable posted speed limit signs,

despite the fact that they knew or should have known that Mr. Zotos could not be found

responsible for violating illegal and unenforceable speed limit signs.  These actions were taken

under the color of law within the meaning of the Federal Civil Rights Act, 42 U.S.C. § 1983.

109.    As a direct and proximate result of their acts as set forth above, the Defendants

deprived Mr. Zotos of his property and threatened to deprive him of his liberty, without due

process of law, in violation of the guarantees of the Fourteenth Amendment to the Constitution of the United States as secured by 42 U.S.C. § 1983.

110.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Mr. Zotos claims all damages, costs and attorney's fees that he is entitled by law to recover from the Defendants for legal deprivations, injuries and losses set forth herein, which deprivations, injuries and losses were caused by said Defendants under the color of law in violation of Mr. Zotos' federal constitutional rights.

## COUNT VI

Failure to Adequately Train, Supervise and Discipline

(Civil Rights Violation of the Substantive Due Process Clause of the 14th Amendment to the

United States Constitution and 42 U.S.C. § 1983)

(Against Defendants SELECTMEN RILEY, BURNS and RABUFFO, and TOWN, in

their official, individual and personal capacities (except TOWN), jointly and severally)

111.    Plaintiff Zotos repeats, re-alleges and incorporates by reference the above allegations as if hereinafter set forth in full.

112.    Upon information and belief, it is the policy, custom, or practice, or all of these, of the Defendants, to knowingly, recklessly, or with deliberate indifference and callous disregard of the applicable statutes, regulations and Zotos' rights, fail to instruct, supervise, control and discipline on a continuing basis personnel under their control in their duties to refrain from unlawfully and maliciously withholding exculpatory material evidence and maintaining unfounded charges against Mr. Zotos of Speeding in excess of illegal and unenforceable posted speed limit signs, despite the fact that they knew or should have known that Mr. Zotos could not be found responsible for violating illegal and unenforceable speed limit signs.

113.    Upon information and belief, the Defendants had actual or constructive knowledge or, had they diligently exercised their duties to instruct, supervise, control, and discipline on a continuing basis, should have had knowledge that the wrongs conspired to be done, as heretofore alleged, were about to be committed.

114.    Upon information and belief, the Defendants had power to prevent or aid in preventing the commission of said wrongs, could have done so by reasonable diligence, and knowingly, recklessly, or with deliberate indifference and callous disregard of Mr. Zotos' rights failed or refused to do so.

115.    Upon information and belief, the Defendants directly or indirectly, under color of law, approved or ratified the unlawful, deliberate, malicious, reckless, and wanton conduct of personnel under their control heretofore described.

116.    As a direct and proximate result of their acts as set forth above, the Defendants deprived Mr. Zotos of his property and threatened to deprive him of his liberty, without due process of law, in violation of the guarantees of the Fourteenth Amendment to the Constitution of the United States as secured by 42 U.S.C. § 1983.

117.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Mr. Zotos claims all damages, costs and attorney's fees that he is entitled by law to recover from the Defendants for legal deprivations, injuries and losses set forth herein, which deprivations, injuries and losses were caused by said Defendants under the color of law in violation of Mr. Zotos' federal constitutional rights.

## COUNT VII

Unconstitutional Lack of Evidentiary Safeguard

(Civil Rights Violation of the Procedural Due Process Clause of the 14th Amendment to the

United States Constitution and 42 U.S.C. § 1983)

(Against all Defendants in their official, individual and personal capacities (except TOWN),

jointly and severally)

118.    Plaintiff Zotos repeats, re-alleges and incorporates by reference the above allegations as if fully set forth herein.

119.    At all relevant times, Mr. Zotos possessed a constitutionally protected property interest in both his money and license to operate a motor vehicle, and a constitutionally protected liberty interest in maintaining his license to operate a motor vehicle.

120.    The individual and collective actions of the Defendants were taken with "reckless or callous indifference" for Mr. Zotos' constitutional rights.

121.    Any reasonable public official would have known that the individual and collective actions of the Defendants were in violation of the Fourteenth Amendment and the procedural due process rights of Mr. Zotos.

122.    The process provided by state law to safeguard Mr. Zotos' protected property and liberty interests, which process Mr. Zotos has exhausted and lost, is not constitutionally adequate.  Specifically, the lack of any evidentiary proof requirement pertaining to whether a posted speed limit has been duly established upon any way is inadequate to ensure that the persuasive force of prima facie evidence - that operation of a motor vehicle at a rate of speed in excess of such limit is greater than shall be prima facie evidence that such speed is greater than is

reasonable and proper – is not improperly triggered under G.L. c. 90, § 17.  This lack of any evidentiary proof requirement, namely providing a duly established Special Speed Regulation, invites the deliberate or reckless fabrication of prima facie evidence in the form of illegally erected and unlawfully enforced posted speed limits.

123.    Upon information and belief, the Defendants individually and collectively, were able to seize upon this evidentiary loophole to successfully fabricate and introduce into evidence an illegal speed limit sign as false prima facie evidence of a reasonable and proper speed, to inflict harm upon Mr. Zotos, his rights and his interests that has not been redressed.

124.    As a direct and proximate result of the Defendants' individual and collective acts as set forth above, the Defendants deprived Mr. Zotos of his property and threatened to deprive him of his liberty, without due process of law, in violation of the guarantees of the Fourteenth Amendment to the Constitution of the United States and 42 U.S.C. § 1983.

125.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Mr. Zotos claims all damages, costs and attorney's fees that they are entitled by law to recover from the Defendants for legal deprivations, injuries and losses set forth herein, which deprivations, injuries and losses were caused by said Defendants under the color of law in violation of Mr. Zotos' federal constitutional rights.

## COUNT VIII

Unconstitutional Conviction Upon a Charge Not Made

(Civil Rights Violation of the Procedural Due Process Clause of the 14th Amendment to the

United States Constitution and 42 U.S.C. § 1983)

(Against all Defendants in their official, individual and personal capacities (except TOWN),

jointly and severally)

126.    Plaintiff Zotos repeats, re-alleges and incorporates by reference the above allegations as if fully set forth herein.

127.    At all relevant times, Mr. Zotos possessed a constitutionally protected property interest in both his money and license to operate a motor vehicle, and a constitutionally protected liberty interest in maintaining his license to operate a motor vehicle.

128.    The individual and collective actions of the Defendants were taken with "reckless or callous indifference" for Mr. Zotos' constitutional rights.

129.    Any reasonable public official would have known that the individual and collective actions of the Defendants were in violation of the Fourteenth Amendment and the procedural due process rights of Mr. Zotos.

130.    The process provided by state law to safeguard Mr. Zotos' protected property and liberty interests, which process Mr. Zotos has exhausted and lost, is not constitutionally adequate.  Specifically, permitting the change from a Speeding charge of exceeding a 30 m.p.h. posted speed limit duly established under G.L. c. 90, § 18, after a hearing has commenced, to an altogether different charge not made of exceeding a 30 m.p.h. unposted speed limit under G.L. c. 90, § 17(3) is a sheer denial of due process, contradicts the clear statutory language of G.L. c. 90,

§ 17, undermines the purpose of G.L. c. 90, 18, and is unconstitutional as applied.  Furthermore, it unconstitutionally after-the-fact relieves the Commonwealth of its burden of proof as to "reasonable and proper speed," and is altogether superfluous since it may otherwise establish this element of Speeding by a preponderance of ordinary evidence.  This unconstitutional  application of G.L. c. 90, §§ 17 and 18 serves only to excuse fabrication of false evidence of illegally erected and unlawfully enforced posted speed limits, invite abuse of process, reward prosecutorial bungling, and reduce CMVI hearings to mere "show trials."

131.    Upon information and belief, the Defendants individually and collectively, were able to seize upon this unconstitutional application of G.L. c. 90, 17 to successfully substitute prima facie evidence of a reasonable and proper speed, to inflict harm upon Mr. Zotos, his rights and his interests that has not been redressed.

132.    As a direct and proximate result of the Defendants' individual and collective acts as set forth above, the Defendants deprived Mr. Zotos of his property and threatened to deprive him of his liberty, without due process of law, in violation of the guarantees of the Fourteenth Amendment to the Constitution of the United States and 42 U.S.C. § 1983.

133.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Mr. Zotos claims all damages, costs and attorney's fees that they are entitled by law to recover from the Defendants for legal deprivations, injuries and losses set forth herein, which deprivations, injuries and losses were caused by said Defendants under the color of law in violation of Mr. Zotos' federal constitutional rights.

## COUNT IX

Constitutionally Defective Evidentiary Standard

(Civil Rights Violation of the Procedural Due Process Clause of the 14th Amendment to the

United States Constitution and 42 U.S.C. § 1983)

(Against all Defendants in their official, individual and personal capacities (except TOWN),

jointly and severally)

134.    Plaintiff Zotos repeats, re-alleges and incorporates by reference the above allegations as if hereinafter set forth in full.

135.    At all relevant times, Mr. Zotos possessed a constitutionally protected property interest in both his money, license to operate and register a motor vehicle, and a constitutionally protected liberty interest in maintaining his license to operate a motor vehicle.

136.    Upon information and belief, the actions of the Defendants were taken with reckless or callous indifference Mr. Zotos' constitutional rights.

137.    Any reasonable public official would have known that the actions of the Defendants were in violation of the Fourteenth Amendment and the procedural due process rights of Mr. Zotos.

138.    The process provided by state law to safeguard Mr. Zotos' protected property and liberty interests, which process Mr. Zotos has exercised and lost, is not constitutionally adequate. Specifically, CMVI hearings under G.L.c. 90C, § 3 are governed by a constitutionally defective evidentiary standard - a preponderance of the credible evidence that a violator committed the motor vehicle infraction alleged.  This level of certainty is below that which is necessary to preserve fundamental fairness in a government-initiated proceeding that threatens the individual

interests at stake in the state proceeding, which are both particularly important and more substantial than the mere loss of money - such as a significant deprivation of liberty or stigma.

139.   Upon information and belief, the Defendants are able to seize upon this constitutionally defective evidentiary standard to inflict harm upon Mr. Zotos, his rights and his interests that has not been redressed.

140.   As a direct and proximate result of their acts as set forth above, the Defendants deprived Mr. Zotos of his property and threatened to deprive him of his  liberty, without due process of law, in violation of the guarantees of the Fourteenth Amendment to the Constitution of the United States as secured by 42 U.S.C. § 1983.

141.   Pursuant to 42 U.S.C. §§ 1983 and 1988, Mr. Zotos claims all damages, costs and attorney's fees that they are entitled by law to recover from the Defendants for legal deprivations, injuries and losses set forth herein, which deprivations, injuries and losses were caused by said Defendants under the color of law in violation of Mr. Zotos' federal constitutional rights.

### **COUNT X**

Abuse of Process

(Against Defendants SELECTMEN RILEY, BURNS and RABUFFO, CHIEF MILLS, SERGEANTs HORTE and DEARTH, OFFICER CHESSLER and TOWN, in their official, individual and personal capacities (except TOWN), jointly and severally)

142.   Plaintiff Zotos repeats, re-alleges and incorporates by reference the above allegations as if fully set forth herein.

143.    The Defendants issued, or caused to be issued, a Massachusetts Uniform Citation to Mr. Zotos and thereby charged him with the CMVI of Speeding in excess of a 30 m.p.h. posted speed limit duly established under G.L. c. 90, § 18 on Gardner St, Hingham, MA, and thereby set the legal "process" in motion.   In turn, these charges brought him within the civil jurisdiction of the Hingham District Court as the named defendant in the case of Hingham Police Department v. Zotos.    Moreover, the Defendants maliciously maintained this civil lawsuit against Mr. Zotos even after they officially confirmed prior to the Hingham District Court judicial hearing that the speed limit on Gardner Street was illegally posted in violation of G.L. c. 90, § 18.  (See Exhibits Nos. 16 and 17 supra).

144.    The Defendants maliciously used the legal process to accomplish the ulterior and illegitimate purpose of unlawfully regulating unreasonably low speed limits inconsistent with the "public interest" of the motorists' right to use the roadway, in violation of G.L. c. 90, § 18. Clearly this purpose is collateral to the apparently legitimate purpose of the CMVI proceeding, i.e., to lawfully regulate "reasonable and proper," duly established speed limits deemed by the State to be consistent with the "public interest" of the motorists' right to use the roadway.   Once the Defendants officially confirmed prior to the Hingham District Court judicial hearing that the speed limit on Gardner Street was illegally posted in violation of G.L. c. 90, § 18, they ceased to have any viable legitimate purpose for maintaining the lawsuit against Mr. Zotos.

145.    As a direct and proximate result of the Defendants' individual and collective acts as set forth above, the Defendants conduct proximately caused the Plaintiff Zotos' damages. Consequently, the Plaintiff Zotos suffered the deprivation of his property in the amount of a $200 assessment, $70 Fees, and approximately $432 in increased automobile insurance premiums to date.

## COUNT XI

Unjust Enrichment

(Against Defendant TOWN)

146.    Plaintiff Zotos repeats, re-alleges and incorporates by reference the above allegations as if fully set forth herein.

147.    The above described traffic enforcement scheme by the Town, i.e., illegally erecting and enforcing posted speed limit signs without special speed regulations in violation of G.L. c. 90, §§ 17-18, the "Procedures for Speed Zoning on State and Municipal Roads" (2005), and "The Massachusetts Amendments to the 2009 Manual on Uniform Traffic Control Devices," § 10A-8 (January 2012) exceeds the authority granted to the Selectmen by the Commonwealth of Massachusetts, is therefore ultra vires, illegal and invalid, and cannot be used to prosecute Mr. Zotos.

148.    Upon information and belief, the Town receives and retains money paid by Mr. Zotos in the form of assessments, surcharges and fees remitted by him in disposition of citations for Speeding in excess of illegal and unenforceable posted speed limits.  It is unconscionable and inequitable for the Town to retain the money paid in the form of assessments surcharges and fees pursuant to that which is not an offense, namely for Speeding in excess of illegal and unenforceable posted speed limits.

149.    Equity and good conscience require that the Town be precluded from reaping the financial benefits of their hoax that resulted in the judgment against Mr. Zotos.  As a result of the above described conduct, the Town has been unjustly enriched in an amount yet to be determined.

150.    Mr. Zotos claims all legal and equitable remedies that he is entitled by law to recover from the Town, including restitution, establishing a constructive trust for Mr. Zotos' benefit, or such other compensation as is appropriate in the circumstances, for the legal deprivations, injuries and losses set forth herein.

151.    As a result of the above described conduct, the TOWN has been unjustly enriched in an amount yet to be determined but estimated at this time to be at least seventy-five dollars ($75.00).

## COUNT XII

Ultra Vires (G.L. c. 90, § 18)

(Against Defendants SELECTMEN RILEY, BURNS and RABUFFO, ADMINISTRATOR ALEXIADES, and SUPERINTENDENT SYLVESTER, in their official, individual and personal capacities, jointly and severally)

152.    Plaintiff Zotos repeats, re-alleges and incorporates by reference the above allegations as if hereinafter set forth in full.

153.    Defendants' erection of motor vehicle speed limit signs purporting to set forth a speed limit duly established by a special speed regulation without: (1) MassDOT and the Registrar, acting jointly, certifying in writing that such regulation is consistent with the public interests, and (2) erecting upon the ways affected thereby and at such points as MassDOT and the Registrar, acting jointly, may designate, signs, conforming to standards adopted by MassDOT, setting forth the speed established by the regulation, violates the provisions of  G.L. c. 90, § 18.

154.    Defendants' erection of speed limit signs in violation of G.L. c. 90, § 18 exceeds the authority granted to them by the Commonwealth of Massachusetts, is ultra vires and void, and therefore these posted speed signs are illegal and unenforceable, and the traffic citations for Speeding in excess of these speed limits are void.

## COUNT XIII

Ultra Vires (G.L. c. 90, § 17)

(Against Defendants SELECTMEN RILEY, BURNS and RABUFFO, CHIEF MILLS, SERGEANTs HORTE and DEARTH, and OFFICER CHESSLER, in their official, individual and personal capacities, jointly and severally)

155.    Plaintiff Zotos repeats, re-alleges and incorporates by reference the above allegations as if hereinafter set forth in full.

156.    Defendants' enforcement of motor vehicle speed limit signs purporting to be duly established in accordance with the provisions of said section, namely G.L. c. 90, § 18, but in fact are not duly established, violates the provisions of  G.L. c. 90, § 17.

157.    Defendants' enforcement of posted speed limit signs in violation of G.L. c. 90, § 17 exceeds the authority granted to them by the Commonwealth of Massachusetts, is ultra vires and void, and therefore traffic citations for Speeding in excess of these illegal and unenforceable posted speed limits are void.  A motorist obviously cannot be found responsible of the traffic offense charged, i.e., Speeding in excess of a posted speed limit, if the posted speed limit signs were not lawfully erected.

## COUNT XIV

Ultra Vires  ("Procedures for Speed Zoning on State and Municipal Roads" (2005))

(Against Defendants SELECTMEN RILEY, BURNS and RABUFFO, ADMINISTRATOR ALEXIADES, and SUPERINTENDENT SYLVESTER, in their official, individual and personal capacities, jointly and severally)

158.    Plaintiff Zotos repeats, re-alleges and incorporates by reference the above allegations as if hereinafter set forth in full.

159.    Defendants' erection and enforcement of motor vehicle speed limit signs purporting to set forth a speed limit duly established by a special speed regulation without: (1) completing a thorough traffic engineering study, (2) drafting a special speed regulation, and (3) approval by the governing authority, the Registrar and MassHwy, violates the "Procedures for Speed Zoning on State and Municipal Roads" (2005).

160.    Defendants' erection of speed limit signs in violation of the "Procedures for Speed Zoning on State and Municipal Roads" (2005) exceeds the authority granted to them by the Commonwealth of Massachusetts, is ultra vires and void, and therefore these posted speed signs are illegal and unenforceable, and the traffic citations for Speeding in excess of these speed limits are void.

## COUNT XV

Ultra Vires ("The Massachusetts Amendments to the 2009 Manual on Uniform Traffic Control

Devices," § 10A-8 (January 2012))

(Against Defendants SELECTMEN RILEY, BURNS and RABUFFO, ADMINISTRATOR

ALEXIADES, and SUPERINTENDENT SYLVESTER, in their official, individual and personal

capacities, jointly and severally)

161.    Plaintiff Zotos repeats, re-alleges and incorporates by reference the above allegations as if hereinafter set forth in full.

162.    Defendants' erection and enforcement of motor vehicle speed limit signs purporting to set forth a speed limit duly established by a special speed regulation without: (1) conducting proper studies and submitting data of the proposed speed zones to MassDOT, (2) conducting all hearings required for adoption drafting a special speed regulation, (3) notifying MassDOT of formal adoption by the municipality, (4) approval by MassDOT and the Registry, (5) installing official speed limit signs accordance with the specific provisions of the approved regulation, and only then (6) enforcing against violators, violates the "The Massachusetts Amendments to the 2009 Manual on Uniform Traffic Control Devices," § 10A-8 (January 2012).

163.    Defendants' erection of speed limit signs in violation of the "The Massachusetts Amendments to the 2009 Manual on Uniform Traffic Control Devices," § 10A-8 (January 2012) exceeds the authority granted to them by the Commonwealth of Massachusetts, is ultra vires and void, and therefore these posted speed signs are illegal and unenforceable, and the traffic citations for Speeding in excess of these speed limits are void.

## PRAYERS FOR RELIEF

WHEREFORE, the Plaintiff Frederic P. Zotos respectfully requests and prays that this Honorable Court enter judgment on each and every count of the Complaint in his favor and:

1. Award him compensatory damages, including nominal, actual, consequential and incidental damages according to proof against each Defendant, jointly and severally;

2. Award him punitive damages against each individual Defendant in their personal capacities, jointly and severally;

3. Award him restitution;

4. Award him pre-judgment interest;

5. Award him costs and reasonable attorney's fees;

6. Declare that failure to require evidentiary proof of a duly established Special Speed Regulation upon any way to establish that a speed limit has been duly established, in order that operation of a motor vehicle at a rate of speed in excess of such limit shall be prima facie evidence that such speed is greater than is reasonable and proper under G.L. c. 90, § 17, violates the Procedural Due Process Clause of the Fourteenth Amendment to the Constitution of the United States as secured by 42 U.S.C. § 1983;

7. Declare that changing a Speeding charge of exceeding a posted speed limit duly established under G.L. c. 90, § 18, after a hearing has commenced, to a different charge not made of exceeding an unposted speed limit under G.L. c. 90, § 17 contradicts the clear statutory language of G.L. c. 90, § 17, undermines the purpose of G.L. c. 90, 18, violates the Procedural Due Process Clause of the Fourteenth Amendment to the

Constitution of the United States and 42 U.S.C. § 1983, and is unconstitutional as applied;

8. Declare that the preponderance of credible evidence standard governing CMVI hearings under G.L.c. 90C, § 3 is below that which is necessary to preserve fundamental fairness in a government-initiated proceeding that threatens protected property and liberty interests, and violates the Procedural Due Process Clause of the Fourteenth Amendment to the Constitution of the United States as secured by 42 U.S.C. § 1983;

9. Declare that the Defendants' erection of posted speed limit signs in violation of G.L. c. 90, § 18, the "Procedures for Speed Zoning on State and Municipal Roads" (2005), and "The Massachusetts Amendments to the 2009 Manual on Uniform Traffic Control Devices," § 10A-8 (January 2012) exceeds the authority granted to them by the Commonwealth of Massachusetts, is ultra vires and void, and therefore these posted speed signs are illegal and unenforceable, and the traffic citations for Speeding in excess of these speed limits are void;

10. Declare that the Defendants' enforcement of posted speed limit signs in violation of G.L. c. 90, §17 exceeds the authority granted to them by the Commonwealth of Massachusetts, is ultra vires and void, and therefore that traffic citations for Speeding in excess of these illegal and unenforceable posted speed limits are void;

11. Order the Defendants to identify and remove all illegal speed limit signs erected or maintained on ways within their control;

12. Grant such further relief as this Honorable Court may deem equitable, just and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff hereby requests and demands a jury trial on all issues and claims raised in this complaint.

Respectfully submitted,

FREDERIC P. ZOTOS, pro se

By */s/ Frederic P. Zotos*

Frederic P. Zotos, Esq.
BBO#565308
28 Old Coach Road
Cohasset, MA 02025
Tel: (781) 836-4295
E-Mail: fzotos@gmail.com

Dated: August 3, 2015

## CERTIFICATE OF SERVICE

I, Frederic P. Zotos, counsel for the plaintiff, on August 3, 2015, hereby certify that I have served a true copy of this document upon counsel for the defendants, Joseph A. Padolsky, 101 Summer Street, Boston, MA 02110 by electronic filing through the United States District Court, District of Massachusetts' CM/ECF system.

*/s/ Frederic P. Zotos*
Frederic P. Zotos

Dated: August 3, 2015