# COMMONWEALTH OF MASSACHUSETTS

PLYMOUTH, ss.

SUPERIOR COURT
Civil Action No. PLCV2014-01018B

_____

| | |
|---|---|
| NICHOLAS G. BELEZOS, on behalf of himself and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BOARD OF SELECTMEN of the Town of Hingham in their official capacity, on behalf of themselves and all others similarly situated,<br><br>Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**FIRST AMENDED COMPLAINT**

**(CLASS ACTION)**

**DEMAND FOR JURY TRIAL**

_____

## INTRODUCTION

1.       Plaintiff Nicholas G. Belezos, individually and on behalf of himself and a class of all other persons similarly situated, brings this civil class action for declaratory, legal, equitable and other relief pursuant to the Fourteenth Amendment to the United States Constitution as secured by 42 U.S.C. § 1983, and under the statutes, regulations and common law of the Commonwealth of Massachusetts – including G.L. c. 90 §§ 17-18, "Procedures for Speed Zoning on State and Municipal Roads" (Massachusetts Highway Department, 2005), "The Massachusetts Amendments to the 2009 Manual on Uniform Traffic Control Devices," § 10A-8 (January 2012), fraud on the Court, unjust enrichment and conversion - against the Board of Selectmen of the Town of Hingham in their official capacity, on behalf of themselves and a class of all others similarly situated.

2.      This is a cautionary story of just how easily human deceit can undermine the rule of law, defraud the courts and wreak havoc upon an unsuspecting public.  It begins with residents who adopt a parochial not-in-my-backyard view of speed limits.  They complain incessantly to their elected selectmen that, in their view, motor vehicles travel too fast on their local streets, and they demand action.

3.      Political pandering being what it is, the selectmen look to their civil servants in the DPW and police to satisfy their constituents' demands.  As they see it, the problem is that the statutory speed limit on unmarked local roads is either set too high or generally ignored by motorists (ironically many of which are also residents).  Together, they decide that the DPW should post lower speed limits, which in turn the police should strictly enforce.   This plan of action placates the constituents, but there's a roadblock.

4.      Simply put, neither the selectmen nor their civil servants have the statutory authority to post a regulatory speed limit sign by executive fiat, without a thorough traffic engineering study and the Commonwealth's approval.  If a speed limit sign is posted without this procedure, it is considered illegal and unenforceable.  The fact of the matter is that the civil servants firmly believe, rightly or wrongly, that the Commonwealth is more likely to post a speed limit which is even higher than the default unmarked speed limit.  But this would defeat the selectmen's purpose, and therein lies the rub.  Instead, they take the easy way out of their quandary – they just ignore this nettlesome law.  Indeed, "the road to hell is paved with good intentions."

5.      Here's how the hoax unfolds.  First, the DPW illegally posts unreasonably low speed limit signs throughout the town.  Nevertheless, studies consistently show that

the overwhelming majority of motorists seldom pay close attention to speed limit signs. Instead, most motorists instinctively drive at a speed that is reasonable and proper, having regard to traffic, type of road (e.g., highway vs. thickly settled), and safety of the public. Speeds at or below the 85th percentile are reasonable and proper by definition. Phony low speed limits only flip the statistics, so that most motorists now appear to be speeding.

6.      Second, the police strictly enforce the phony speed limit signs, which almost every motorist now exceeds. They dutifully issue bogus traffic citations for Speeding in excess of the phony speed limit signs.

7.      Common experience demonstrates that the payment of a traffic citation is simply a matter of expedience for the average motorist. Moreover, failure to pay would result in the automatic suspension of their driver's license and registration. To avoid this fate, many unsuspecting motorists are conned into paying what amounts to an illegal fine.

8.      Those motorists who decide to fight their Speeding tickets face an uphill battle. As is generally the case when a person's ability to protect his interests will ultimately depend upon a swearing contest with a police officer, the deck is already stacked heavily in the officer's favor against the motorist. For starters, the traffic citation is considered prima facie evidence of the facts stated therein.

9.      This path of deceit though easily begun, is difficult to exit. Those police officers who are in cahoots conceal the evidence of the phony signs to grease the skids for false testimony and gain an unfair advantage over motorists. The police officer easily makes his prima facie case as to reasonable and proper speed when he testifies that the motorist exceeded the posted speed limit sign - even though the sign is founded on a lie.

10.     In the improbable event the motorist gets wise to this deception, he must still argue both the fact that speed limit sign is phony and the law that it is unenforceable. Far more likely, neither the motorist nor the court suspect foul play, and they are both defrauded. They almost certainly take the speed limit sign at face value, and never doubt it is enforceable. The court finds the motorist responsible for Speeding, and issues a fine.

11.     Suffering insult to injury, the Speeding violation is recorded on the motorist's driving record for six years, and he faces automobile insurance surcharges and the potential loss of his employment if it involves driving a company commercial vehicle.

12.     The freedom to make use of one's own motor vehicle, as a means of getting about from place to place, whether in pursuit of business or pleasure, is a liberty which under the Fourteenth Amendment cannot be denied or curtailed by a state without due process of law (however important traffic enforcement is). Losing one's driver's license is more serious for some individuals than a brief stay in jail. Once licenses are issued, their continued possession may become essential in the pursuit of a livelihood.

13.     Traffic cases such as this raise statutory, regulatory, equitable and constitutional issues that are rarely litigated because of the small amount of money involved. Nevertheless, these issues affect tens of thousands of persons challenging motor vehicle infractions every year. Here, the public officials have used phony speed limits as prima facie evidence to both deliberately deceive the overburdened courts of the Commonwealth, and to simultaneously con thousands of unsuspecting motorists into paying illegal fines without a second thought. Although the fines here are small, the questions of law and equity are substantial.

## JURISDICTION

14.     This Court has jurisdiction to hear and adjudicate this matter pursuant to G.L. c. 85, § 2, which gives the Superior Court jurisdiction in equity to enforce the provisions of this section and any rule or regulation made thereunder or to enjoin the violation thereof; G.L. c. 212, § 4, which gives the Superior Court original jurisdiction of all civil actions; G.L. c. 214, § 1, which gives the Superior Court general equity jurisdiction; G.L. c. 231A, § 1, which gives the Superior Court jurisdiction to make declaratory judgments; and, G.L. c. 249, § 5, which gives the Superior Court jurisdiction to issue relief in the nature of mandamus. This complaint alleges violation of the Fourteenth Amendment to the United States Constitution, as secured under 42 U.S.C. § 1983, and under the statutes, regulations and common law of the Commonwealth of Massachusetts. Concurrent jurisdiction arises pursuant to the principals of concurrent jurisdiction. The federal and state law claims arise out of a common nucleus of operative facts, and the entire suit commenced by this complaint would ordinarily be tried in one judicial proceeding. The exercise of concurrent jurisdiction will avoid duplication and multiplicity of action, and will promote the interests of judicial economy and fairness.

## VENUE

15.     Venue is proper in this Court in that the Plaintiff, Nicholas G. Belezos, is an individual residing at all relevant times at 2 Puritan Road, Hingham, Plymouth County, Massachusetts 02043.

## PARTIES

16.     Plaintiff Nicholas G. Belezos (hereinafter "Mr. Belezos"), is an individual residing at all relevant times at 2 Puritan Road, Hingham, Plymouth County, Massachusetts 02043.

17.     Defendant Board of Selectmen (hereinafter "Selectmen") of the Town of Hingham (hereinafter "Town") are the Chief Elected and Executive Officers of the Town, having their principal office at 210 Central Street, Hingham, Plymouth County, Massachusetts 02043.  The Town is a municipal corporation organized under the laws of the Commonwealth of Massachusetts.  The Selectmen are vested with all the municipal authority not specifically retained by the Town's legislative body, Town Meeting, or other elected boards.  The Selectmen adopt Town administrative policies, make special regulations as to the speed of motor vehicles, and act as Police Commissioner.  They appoint and supervise the Town Administrator, the Superintendent of Public Works and the Chief of Police.  The Selectmen are hereby sued in their official capacity for declaratory, legal, equitable and other relief.

18.     The Town of Hingham Department of Public Works ("DPW") is a department of the Town, and is responsible for the care and upkeep of the Town's public roads and unaccepted subdivisions, and installs, repairs, and maintains the Town's traffic and speed limit signs.

19.     Harry Sylvester (hereinafter "Supt. Sylvester") is the Superintendent of the DPW of the Town at all relevant times.  As such, Supt. Sylvester is responsible for the

daily management of the DPW, and serves on the Traffic Committee of the Board of Selectmen.

20.     The Town of Hingham Police Department ("Police Department") is a department of the Town, and is responsible for law enforcement and maintaining public safety, and enforces the Town By-Laws and regulations, including motor vehicle speed limits.

21.     Steven J. Dearth (hereinafter "Sgt. Dearth") is a Sergeant of Police of the Town at relevant times.  As such, Sgt. Dearth is responsible for the Traffic Safety Division of the Police Department, and is a representative of the Chief of Police on the Traffic Committee of the Board of Selectmen.

22.     John Doe (hereinafter "Officer Doe") is an Officer of Police of the Town at all relevant times.  As such, Officer Doe patrols the Town and is responsible for law enforcement and maintaining public safety, and enforces the Town By-Laws and regulations, including motor vehicle speed limits.  Mr. Belezos is unaware of the true name of Officer Doe, but prays for leave to amend such fictitious name once his name becomes known.

## BACKGROUND

23.     G.L. c. 90, § 18, as amended through St. 1986, c. 689, §§ 8-9, entitled "Special regulations, speed and use of vehicles," is an enabling statute that authorizes the Board of Selectmen to "make special regulations as to the speed of motor vehicles" on ways within their control, i.e., speed limits.  It provides in pertinent part:

The city council, the transportation commission of the city of Boston, the board of selectmen, park commissioners, a traffic commission or traffic director, or the department, on ways within their control, may make special regulations as to the speed of motor vehicles ....  G.L. c. 90, § 18.

24.     G.L. c. 90, § 18 is a statute of long-standing, having been enacted shortly after motor vehicles had begun to come into use, and at a time when they were frowned upon in many localities.  The statute has always contained provisions subjecting action taken under it to some degree of control by a State board.  It provides in pertinent part:

> *[n]o such special regulation shall be effective* ... *until after*, and in the case of a special speed regulation the department and the registrar, acting jointly, shall have *certified in writing that such regulation is consistent with the public interests* .... G.L. c. 90, § 18 (emphasis added).

> ... *No such regulation shall be effective until there shall have been erected*, upon the ways affected thereby and at such points as the department and the registrar, acting jointly, may designate, *signs*, conforming to standards adopted by the department, *setting forth the speed or other restrictions established by the regulation*, and then only during the time such signs are in place. Id. (emphasis added).

25.     The Commonwealth of Massachusetts Department of Transportation (hereinafter "MassDOT") has a Policy on Speed Zoning that states what "is consistent with the public interests" in accordance with the provisions of G.L. c. 90, § 18:

> The goal of our Speed Limit Traffic Control Program has always been to provide appropriate and enforceable speed limits on all paved streets and highways within the Commonwealth *in the best interest of the motoring public's right to use a roadway in a reasonable and proper manner*.  The ideal speed limit is both acceptable to the prudent driver and enforceable by our police departments. MassDOT Highway Division, Speed Limit Regulations (2009) (emphasis added).

26.     In accordance with the authority granted by G.L. c. 90, § 18 and related statutes (e.g., G.L. c. 85, § 2), MassHwy promulgated the "Procedures for Speed Zoning on State and Municipal Roads" (2005) to regulate the posting of speed limits for motor vehicles in the Commonwealth.  It plainly states the regulatory procedure to be followed, and succinctly provides in pertinent part:

> Chapter 90, Section 18 authorizes the posting of numerical speed limits on all roadways in Massachusetts.  The foundation for the actual posting of a speed limit is a thorough traffic engineering study.  After a study has been completed, a Special Speed Regulation is drafted and approved by the governing authority of the roadway, the Registry of Motor Vehicles and MassHighway.  All posted regulatory speed limit signs must adhere to this approval process.  *If a speed limit is posted without this procedure, it is in violation of Chapter 90, Section 18, and is therefore considered illegal and unenforceable*.  Massachusetts Highway Department Procedures for Speed Zoning on State and Municipal Roads, 3 (2005) (emphasis added).

> The **85th percentile** speed of vehicles passing a given point is the speed at or below which 85 percent of the vehicles passing the point are travelling.  This is the principle value used for establishing speed controls.  *This method assumes that the majority of motorists are prudent and capable of selecting safe speeds*; therefore, speeds established in this manner meet the legal requirement that they be "reasonable and proper." Id. at 14 (emphasis added).

> Studies have shown that speed zoning has very little permanent effect on average vehicular speeds.  ... The principle benefit of properly established speed zoning is to provide a means for police officers to apply enforcement to those who do not conform to speeds considered reasonable and proper by the majority of the motoring public.  Public opinion will be on the side of the police who are enforcing a reasonable maximum speed.  *The former federally mandated 55 miles per hour national speed limit* on the Interstate System clearly *shows that an unreasonable low speed limit is neither enforceable nor has the long term support of the general public*.  Id. at 29-30 (emphasis added).

27.     In accordance with the authority granted by G.L. c. 85, § 2, the Highway Division of MassDOT (hereinafter "MassHwy") promulgated the "The Massachusetts Amendments to the 2009 Manual on Uniform Traffic Control Devices," § 10A-8 (January 2012) to regulate the posting of speed limits for motor vehicles in the

Commonwealth.  It plainly states the regulatory procedure to be followed, and succinctly

provides in pertinent part:

> **Section 10A-8** **Speed Control**: Of the special regulations adopted by municipalities under the provisions of Chapter 90, Section 18 of the General Laws, the most commonly used is the special regulation of the speed of motor vehicles. Considerable data including speed observations and trial runs must be obtained by municipal officials, usually the Police Department. The final determination is based upon the 85-percentile method, which is that speed at or below which 85% of the vehicles observed were actually traveling. Department representatives are available to demonstrate the proper method for conducting the necessary studies and drafting the covering regulation, upon written request of local officials.
>
> Procedure for Establishment of Legal Speed Zones
>
> (1) The municipality is to conduct proper studies and submit data to the Department. (Municipalities usually accept the available services of the Department in conducting studies and assembling the data).
>
> (2) After the speed zones, proposed by the local authorities, are reviewed by the Department, they are returned to the municipality for formal adoption by the rule-making body.  During this time, the municipality is responsible for any and all hearings required for adoption.
>
> (3) Upon receipt of notice of formal adoption by the municipality, the Department, acting jointly with the Registry, will certify and approve.
>
> (4) Certified regulation is returned to municipality.
>
> (5) Official Speed Limit signs may then be installed in accordance with the specific provisions of the approved speed regulation.
>
> (6) The Special Speed Regulation is then enforceable against violators.
>
> "The Massachusetts Amendments to the 2009 Manual on Uniform Traffic Control Devices," § 10A-8, 10-11 (January 2012).

28.    Federal Highway Administration research confirms MassHwy's

observations regarding the "very little permanent effect" of posted speed limits on

average vehicular speeds: "State or local officials often receive citizen requests for speed limit reductions because of perceived excessive speeds. However, research has repeatedly shown that changes in posted speeds have little effect on operating speeds." Parker, M.R., "Synthesis of Speed Zoning Practices," Report No. FHWA/RD-85/096 (1985).

29.     The Federal Highway Administration also observes that there exists no established scientific correlation between motor vehicle speed and crash rates, when it states "the relationship between speed and safety is complicated and unclear. There are very few points of consensus on the effects of [motor vehicle] speed on crash probability." U.S. Dept. of Transportation, Fed. Hwy. Admin., "Speed Concepts: Informational Guide," 1 (Sept. 2009).

30.     G.L. c. 90, § 17, as amended through St. 1986, c. 689, § 7, entitled "Speed Limits," defines the statutory offense of "Speeding." It provides in pertinent part:

> No person operating a motor vehicle on any way shall run it at a rate of speed greater than is reasonable and proper, having regard to traffic and the use of the way and the safety of the public. ... If a speed limit has been duly established upon any way, in accordance with the provisions of said section, operation of a motor vehicle at a rate of speed in excess of such limit shall be prima facie evidence that such speed is greater than is reasonable and proper ... . G.L. c. 90, § 17.

31.     G.L. c. 90C, § 3(A)(4), as amended through St. 2009, c. 27, § 74, entitled "Issuance of citations; hearing; appeal; summons or warrant; complaint; trial; license or permit suspension," is a sui generis procedure for the adjudication of civil motor vehicle infractions ("CMVIs"). It provides in pertinent part:

In any such hearing before a magistrate or justice, the citation shall be admissible and shall be prima facie evidence of the facts stated therein. ... The magistrate or justice shall enter a finding of responsible if it was shown by a preponderance of the credible evidence that the violator committed the infraction alleged ...".  G.L. c. 90C, § 3(A)(4).

32.      G.L. c. 90C, § 3(A)(6) allows for automatic suspension of an operator violator's license to operate a motor vehicle or an owner violator's registration of a motor vehicle, by operation of law and without further notice or hearing, for failure to pay the full amount of the scheduled or imposed assessment to the Registrar of Motor Vehicles (hereinafter "Registrar") for a CMVI.

## STATEMENT OF FACTS

33.      Upon information and belief, the Selectmen deliberately erect and maintain phony signs purporting to establish a special regulation as to the speed of motor vehicles on ways within their control, i.e. a speed limit, which have not been erected in accordance with either the provisions of G.L. c. 90, § 18, the "Procedures for Speed Zoning on State and Municipal Roads" (2005), or "The Massachusetts Amendments to the 2009 Manual on Uniform Traffic Control Devices," § 10A-8 (January 2012).

34.      Upon information and belief, there are sixty (60) speed limit signs on the public roadways in the Town of Hingham for which there is no record  of any special speed regulations (either in the Town or the MassDOT files) having been formally adopted in accordance with the applicable statutes and procedures.  These are all located on eighteen (18) roadways all under the exclusive control of the Town, and represent

approximately ninety percent (90%) of all the speed limit signs under the exclusive control of the Town.

35.     Upon information and belief, the Selectmen have a well-established and widespread practice of routinely enforcing all motor vehicle speed limit signs, by issuing traffic citations for Speeding and offering them as prima facie evidence of reasonable and proper speed in violation of the provisions of G.L. c. 90, § 17.

36.     Upon information and belief, the Hingham Police Department issued a total of 132 Speeding citations during the four-month period starting from 10/24/2011 and ending at 02/24/12.  The number of Speeding citations issued on roads with speed limit signs (for which there is no record of any special speed regulations) totaled thirty-four (34), representing twenty-six percent (26%) of the overall total citations.  Applying this incidence rate to the period from 1/1/09 – 12/31/11, an estimated 1,330 of these Speeding citations were issued during this three year period.  This well-established and widespread practice continues unabated, therefore an estimated similar number of these Speeding citations were issued during the three years prior to the filing of the original complaint in this action.

37.     Upon information and belief, the Town of Hingham received disbursements (based upon half the CMVI assessments issued in the Town) by the Registry of Motor Vehicles (hereinafter "RMV") in the amount of $194,085 for the 31 month period of July 2009 – January 2012.  An equal amount was retained by MassDOT.  This practice continues unabated, therefore an estimated similar amount of disbursements

was received by the Town and retained by MassDOT during the three years prior to the filing of the original complaint in this action.

38.     MassDOT is authorized to remove improperly erected speed limit signs on local town or city ways under G.L. c. 90, § 18 and c. 85, § 2.  Upon information and belief, MassDOT does not remove improperly erected speed limit signs on local town or city ways.  Instead, it has elected to act upon notice from either the local police or a citizen to enter upon a local way, inspect the sign, determine whether it complies with the required provisions, and if such sign does not comply, to notify the city or town where the sign is located to remove the sign.

39.     Upon information and belief, according to the Massachusetts Merit Rating Board ("MRB"), the total number of Speeding citations written by all Police Departments in the Commonwealth was 590,074 for the period 2009-2011. This practice continues unabated, therefore an estimated similar number of Speeding citations were issued during the three years prior to the filing of the original complaint in this action.

40.     Upon information and belief, Supt. Sylvester erected and maintains a total of eight (8) speed limit signs (all for which there is no record of any special speed regulations) on Gardner St., Hingham, MA, including a 30 m.p.h. speed limit sign.

41.     Upon information and belief, the Selectmen had actual or constructive knowledge of the speed limit signs on Gardner St., Hingham, MA.

42.     On September 28, 2011, Officer Doe issued Mr. Belezos Massachusetts Uniform Citation No. R1461153 for the CMVI of Speeding in excess of a 30 m.p.h.

posted speed limit sign duly established under G.L. c. 90, § 18 on Gardner Street, Hingham, MA.

43.     Mr. Belezos paid a $25 hearing fee to appear before a clerk-magistrate, and on December 28, 2011 a noncriminal hearing was held at Hingham District Court regarding the CMVI. At the conclusion of the hearing, the clerk-magistrate found Mr. Belezos responsible for the CMVI of Speeding at a rate of speed 10 m.p.h. or less over a 30 m.p.h. posted speed limit duly established under G.L. c. 90, § 18.

44.     Upon information and belief, the Selectmen and Sgt. Dearth had actual knowledge of the speed limit signs on Gardner St., Hingham, MA, and the fact that there is no record of any special speed regulations pertaining thereto (in either the Town or the MassDOT files). Nevertheless, they allowed an officer of the Police Department to withhold this material evidence from the Hingham District Court.

45.     Upon information and belief, the strength Town of Hingham's prima facie case in light of the prima facie evidence of the 30 m.p.h. posted speed limit duly established under G.L. c. 90, § 18 induced Mr. Belezos to waive his right to a de novo hearing on the CMVI.

46.     On January 3, 2012, Mr. Belezos paid the $50 assessment and $50 Head Injury Trust Fund Surcharge in connection with the CMVI, in order to avoid the Registrar's threatened suspension of his license or right to operate all motor vehicles within the Commonwealth of Massachusetts, and the denial of his right to renew his registration.

47.     On January 24, 2012, a citation for Speeding was indicated on Mr. Belezos' driving record due to the December 28, 2011 judgment.

48.     The citation for Speeding was indicated on Mr. Belezos Safe Driver Insurance Plan ("SDIP") Statement, thereby ending his two year, three months incident-free driving record and its eligibility towards an automobile insurance premium discount.

49.     Upon information and belief, Mr. Belezos was employed as a delivery truck driver immediately prior to the disposition of his Speeding citation.  Mr. Belezos' SDIP Statement alerted his employer's commercial automobile insurance company to the Speeding incident, prompted the insurance company to remove him from the commercial policy, and thereby cost Mr. Belezos his job position as a delivery truck driver.

50.     There is an actual case or controversy between Mr. Belezos on the one hand and the Selectmen on the other regarding the illegality and unconstitutionality of the Selectmen's executive actions, statutes and special speed regulations generally applicable to Mr. Belezos.  A real dispute exists and Mr. Belezos has a sufficient personal interest in the rights and relief at stake to meet standing requirements. There is no indication that the Selectmen will either remove illegal speed limit signs or refrain from enforcing them. There exists a continuing threat, indeed a likelihood, of continued prosecution for Speeding in violation of phony speed limit signs.  Further, judicial efficiency would not be promoted by declining to act on this case, only to face the same issue again. This controversy can be resolved and uncertainty removed by declaratory judgment.

## **CLASS ACTION ALLEGATIONS**

51.     Mr. Belezos brings this action on his own behalf and as a class action on the behalf of all other similarly situated persons, pursuant to Mass. R. Civ. P. 23(a) and (b) on behalf of a Plaintiff Class defined as:

> All Massachusetts residents who received motor vehicle citations for the offense of "Speeding" in excess of an illegal and unenforceable posted speed limit sign and who, by reason thereof, suffered or experienced an adverse legal consequence, including payment of an assessment, surcharge, cost or fee in disposition of the citation, or whose admission or finding of responsibility have been or may be counted against them in the future for the purposes of restricting, suspending or revoking their driver's license or vehicle registration, or adversely affecting their driving record or automobile insurance premium, or all these things, from a period of three (3) years prior to the filing of the original complaint in this action to the date of the judgment in this action.

52.     Excluded from the Plaintiff Class are the Selectmen and members of the Defendant Class, Plaintiff's counsel, the judges to whom this case is assigned, and any family members thereof.  Mr. Belezos reserves the right to modify or amend the Plaintiff Class definition as appropriate.

53.     Mr. Belezos brings this action on his own behalf and as a class action on the behalf of all other similarly situated persons, pursuant to Mass. R. Civ. P. 23(a) and (b) against a Defendant Class defined as:

> The board of selectmen, the city council, the transportation commission of the city of Boston, park commissioners, a traffic commission or traffic director, or the secretary of the Department of Transportation or Executive Office of Public Safety of the Commonwealth of Massachusetts, or any public official or employee of all agencies, counties, cities, towns or other political subdivisions of the Commonwealth of Massachusetts, who erected or maintained illegal and unenforceable posted speed limit signs, or who enforced these posted speed limit signs by issuing motor vehicle citations for the offense of "Speeding" in excess of the illegal and unenforceable speed limit signs, or who, by reason thereof, enjoyed

or experienced a favorable legal consequence, including receipt of assessments, surcharges, costs or fees in disposition of the citations, or all these things, from a period of three (3) years prior to the filing of the original complaint in this action to the date of the judgment in this action.

54.     Certification of the Plaintiff's claims for class-wide treatment is appropriate because Mr. Belezos can prove elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

55.     Numerosity – Mass. R. Civ. P. 23(a)(1).  The Class is so numerous that individual joinder of all Class members is impracticable.  Mr. Belezos is informed and believes that there are thousands of Plaintiff Class members, and hundreds of Defendant Class members.  The precise number of Class members and their addresses are unknown to Mr. Belezos, but may be ascertained from MassDOT, RMV, highway and police department records.  Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, published notice, or all of these things.

56.     Commonality and Predominance – Mass. R. Civ. P. 23(a)(2) and 23(b). This action involves questions of law and fact common to the Classes, which predominate over any questions affecting only individual Class members.  All Plaintiff Class members were subject to the Defendant Class members same traffic enforcement of phony speed limit signs by issuance of bogus Speeding citations.  Defendant Class members have acted and refused to act on grounds of illegal and unconstitutional executive actions, statutes and special speed regulations generally applicable to the

Plaintiff Class so that final declaratory or injunctive relief would be appropriate to the Plaintiff Class as a whole. Furthermore, common questions of law and fact include, but are not limited to:

    a.  Whether Defendants' conduct of fabricating false prima facie evidence of phony speed limit signs and bogus speeding citations as alleged herein stoops to the level of fraud on the court;

    b.  Whether Defendants' conduct of erecting phony speed limit signs as alleged herein violates G.L. c. 90, § 18, the "Procedures for Speed Zoning on State and Municipal Roads" (2005), and "The Massachusetts Amendments to the 2009 Manual on Uniform Traffic Control Devices," § 10A-8 (January 2012);

    c.  Whether Defendants' conduct of enforcing phony speed limit signs as alleged herein violates G.L. c. 90, § 17;

    d.  Whether Defendants' conduct of fabricating false prima facie evidence of phony speed limit signs and bogus speeding citations as alleged herein deprives Plaintiffs of their property and liberty without due process of law;

    e.  Whether Defendants' conduct of withholding exculpatory material evidence of the lack of special speed regulations pertaining to phony speed limit signs as alleged herein deprives Plaintiffs of their property and liberty without due process of law;

    f.  Whether the lack of any evidentiary proof requirement under G.L. c. 90, § 17 pertaining to whether a posted speed limit has been duly established upon any way deprives Plaintiffs of their property and liberty without due process of law;

    g.  Whether CMVI hearings under G.L.c. 90C, § 3 are governed by a constitutionally defective evidentiary standard that deprives Plaintiffs of their property and liberty without due process of law;

    h.  Whether Defendants are unjustly enriched by retaining Plaintiffs' money paid in the form of assessments surcharges and fees pursuant to that which is not an offense, namely for Speeding in excess of illegal and unenforceable posted speed limit signs; and,

i. Whether Defendants have acted and failed to act in a manner that is inconsistent with and willfully indifferent to Plaintiffs' use, possession and ownership of said property and the Defendants have also acted or failed to act in a manner that is willfully indifferent to the foreseeable impact that an erroneous driving record can and will have on Plaintiffs' property right driving privileges and on Plaintiffs' automobile liability insurance rates.

57.    Typicality – Mass. R. Civ. P. 23(a)(3).  Mr. Belezos' claims are typical of the claims of the other members of the Plaintiff Class because, among other things, all Plaintiff Class members were similarly injured through the uniform misconduct of Defendant Class members described herein.  Namely, all Plaintiff Class members have the same claims, i.e., that Defendants' illegal and unconstitutional executive actions, statutes and special speed regulations deprived them of their property and liberty without due process of law, and that the Defendant Class members acted ultra vires, perpetrated fraud on the court, were unjustly enriched and converted Plaintiff Class members' property.  Moreover, Defendant Class members are juridically linked through their common relationship as public officials to the Commonwealth of Massachusetts.  This information is sufficient to support a determination that both Mr. Belezos and the Selectmen satisfy the typicality requirement.

58.    Adequacy of Representation – Mass. R. Civ. P. 23(a)(4).  Mr. Belezos is an adequate Class representative because his interests do not conflict with the interests of the other members of the Class he seeks to represent; he has retained counsel competent and experienced in complex litigation, and the specific claims herein; and Mr. Belezos intends to prosecute this action vigorously.  The Plaintiff Class members' interests will be fairly and adequately protected by Mr. Belezos and his counsel.  Likewise, the Selectmen are adequate Class representatives because their interests do not conflict with the interests

of the other members of the Class they seek to represent; and they have every incentive to defend this action vigorously. Defendant Class members' interests will be fairly and adequately protected by the Board of Selectmen of the Town of Hingham.

59.     Superiority - Mass. R. Civ. P. 23(b). A class action is superior to any other available methods for fairly and efficiently adjudicating this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Mr. Belezos and other members of the Plaintiff Class are relatively small compared to the burden and expense that would be required to individually litigate their claims against the members of the Defendant Class, the pursuit of which occasionally can prove recondite. For instance, both the law of Constitutional due process and remedies against government officials are vast and complex bodies of doctrine, full of technical distinctions, fictional explanations, and contested compromises. So it would be therefore impracticable for the Plaintiff Class members to individually seek redress for Defendants' wrongful conduct. Even if the Plaintiff Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Moreover, the juridical link that exists between the Defendant Class members is a legal relationship which unites them in a way that makes a single lawsuit more efficient than separate suits against individual defendants.

## CLAIMS FOR RELIEF

(Mr. Belezos and the members of the Plaintiff Class against the Selectmen in their

official capacity and the members of the Defendant Class in their official capacity)

## COUNT I

Independent Action to Set Aside Judgment for Fraud Upon the Court

(Mass. R. Civ. P. 60(b))

60.     Plaintiff Belezos repeats, re-alleges and incorporates by reference the above allegations as if hereinafter set forth in full.

61.     Under Mass. R. Civ. P. 60(b), this Honorable Court maintains the power to entertain an independent action to set aside a judgment for fraud upon the Court.  It is elementary that the Court has the inherent power to protect the sanctity of the judicial process – to combat those who would dare to practice unmitigated fraud upon the Court itself, and thereby defile the judicial system.

62.     All of the elements necessary to vacate the judgments against Mr. Belezos by mechanism of a 60(b) independent action exist in this case, including:

   a.   fraud on the part of the Selectmen, acting both as prosecutors and litigants;

   b.   Mr. Belezos has a meritorious defense in the underlying case;

   c.   there is no fault or negligence on the part of Mr. Belezos;

   d.   the judgment in equity and good conscience ought not be enforced; and,

e.   there is no adequate remedy at law.

63.     The clear and convincing evidence is that the Selectmen sentiently set in motion an unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier of fact (the clerk-magistrate) and unfairly hampering the presentation of the opposing party's (Mr. Belezos') defense.

64.     The Selectmen's bad faith is manifest.  The Selectmen and their civil servants perpetrated a hoax of monumental magnitude upon, not only Mr. Belezos and the motoring public at large, but also upon the unsuspecting Court.

65.     In perpetrating such hoax, the Selectmen caused Supt. Sylvester to erect signs that purport to duly establish a posted regulatory speed limit in accordance with the provisions of G.L. c. 90, § 18, and therefore prima facie evidence of a reasonable and proper speed limit under G.L. c. 90, § 17.  Said signs in fact falsely represent a special speed regulation where none exists, are unauthorized by the regulatory authorities of the Commonwealth in violation of the aforesaid statute and regulations, are therefore considered illegal and unenforceable, and cannot be prima facie evidence of a reasonable and proper speed limit.  This deception lies at the center of the case.

66.     In perpetrating such hoax, the Selectmen also caused Officer Doe to issue Mr. Belezos a citation charging him with Speeding in excess of an illegal and unenforceable posted speed limit, and therefore prima facie evidence of the facts stated therein under G.L. c. 90C, § 3(A)(4).  Said citation in fact falsely represents a special

speed regulation where none exists, and therefore cannot be prima facie evidence of the fact of the posted speed limit stated therein.

67.     Nonetheless, the Selectmen continued the charade when they and Sgt. Dearth allowed an officer from the Police Department to proffer the phony speed limit sign as prima facie evidence of a reasonable and proper speed limit and the bogus Speeding citation as prima facie evidence of the fact of the posted speed limit stated therein, and Mr. Belezos was found responsible for the CMVI of Speeding at a rate of speed 10 m.p.h. or less over a 30 m.p.h. posted speed limit duly established under G.L. c. 90, § 18.

68.     The only conceivable reason for the Selectmen's and their civil servants' elaborate duplicity was to gain unfair advantage by either (1) tricking motorists to abide by phony speed limit signs, (2) conning motorists to simply pay fines to settle bogus Speeding citations and thereby keeping them out of court altogether, or (3) proffering fabricated prima facie evidence of Speeding to the Court during the CMVI hearing.

69.     These tactics plainly hindered Mr. Belezos' ability to prepare and present his defense, while simultaneously throwing a large monkey wrench into the judicial machinery so that it could not perform in the usual manner its impartial task of adjudging cases that are presented for adjudication.

70.     Although fraud on the court typically involves officers of the court, pro se litigants are generally required to comply with the same rules as represented parties and their attorneys.  The procedure specified in G.L. c. 90C for the handling CMVI's is essentially sui generis, and determining responsibility involves a proceeding between the

State and the motor vehicle operator. In the administration of the law concerning CMVI's, the police act as prosecutors as a practical matter in presenting such infractions to clerk-magistrates and to judges, such as an officer of the Police Department did in this case. There is no reason to immunize the Selectmen from the consequences of the most egregious form of misconduct – an entire case buttressed by falsehoods.

71. Mr. Belezos has a meritorious defense in the underlying case. It is axiomatic that Mr. Belezos cannot be found responsible of the traffic offense charged, i.e., Speeding in excess of a posted speed limit, if the posted speed limit sign was not lawfully erected.

72. The phony speed limit sign clearly had the capacity to influence the adjudication. Indeed, had the fact of the hoax been known, at or after the inception of the underlying lawsuit, the Selectmen would have been unable to sustain their burden of proof, as a matter of law, and their claims against Mr. Belezos would have been dismissed. Once the Selectmen chose to practice fraud, that misconduct infected their CMVI cause of action, in whatever guise it may subsequently appear.

73. There is neither any fault nor negligence on the part of Mr. Belezos for simply falling victim to the Selectmen's clever hoax. At all times relevant hereto, Mr. Belezos has acted ethically and comes to this Court with clean hands.

74. Where the Selectmen have stooped to the level of fraud on the Court, equity and good conscience mandate that the Selectmen's fraud on the Court not receive the endorsement of our legal system. To permit a sentence to stand for that which is not illegal would shock the judicial conscience and result in a palpable miscarriage of justice.

75.     Fraud on the Court is an insult to the legal process, the failure to correct which, the Court should regard as a reproach to our law. The Selectmen and their civil servants' chose to play fast and loose with Mr. Belezos and the Court.  They were caught out.  The Court, jealous of its integrity and concerned about deterrence, is entitled to send a message loud and clear.  Such brazen misconduct merits extreme sanction.  If this judgment is otherwise permitted to stand, irreparable and grave harm will come to the integrity of the judicial system.

76.     The Selectmen's misconduct also undermines the integrity of speed limit signs, thereby eroding the motoring public's trust in traffic safety regulations.   In particular, faced with unreasonably low phony speed limit signs, motorists may no longer trust the veracity of legitimate speed limit signs.  If this judgment is otherwise permitted to stand, irreparable and grave harm will come to the integrity of speed limit signs.

77.     Should this Court allow this judgment to stand it would embolden public officials to further deceive unsuspecting motorists.  Similarly, it would embolden public officials to altogether ignore enabling statutes and regulations, and further perpetuate the reprehensible practice of fabricating and proffering false evidence to the Court – a gateway drug to fabricating false evidence for even more serious matters such as crimes.

78.     Finally, Mr. Belezos has no adequate remedy at law.  If this judgment is permitted to stand, irreparable and grave harm will continue to befall Mr. Belezos, left without the opportunity to work as a commercial driver, in the wake of the Selectmen's reprehensible fraud.  Mr. Belezos' should no longer suffer the negative impact that an

erroneous driving record has on his property right driving privileges and on his automobile liability insurance rates.

79.     Mr. Belezos therefore moves this Honorable Court to exercise its equitable powers, pursuant to Mass. R. Civ. P. 60(b), to vacate the judgment entered by the trial court entered on December 28, 2011.

## COUNT II

Independent Action for Relief from Judgment for Fraud Upon the Court

(Mass. R. Civ. P. 60(b)(6))

80.     Plaintiff Belezos repeats, re-alleges and incorporates by reference the above allegations as if hereinafter set forth in full.

81.     Under Mass. R. Civ. P. 60(b)(6), this Honorable Court maintains the power to entertain an independent action to relieve a party from a final judgment, order, or proceeding.  This action sounds in equity, and is designed to provide the Court with the flexibility to be certain that justice is done in light of all of the facts.  Relief is warranted in this case under 60(b)(6) since Mr. Belezos has (1) a meritorious claim or defense, (2) extraordinary circumstances warrant relief, and (3) the substantial rights of the parties in the matter will be affected by granting relief.

82.     Mr. Belezos has a meritorious defense in the underlying case.  It is axiomatic that Mr. Belezos cannot be found responsible of the traffic offense charged, i.e., Speeding in excess of a posted speed limit, if the posted speed limit sign was not lawfully erected.

83.     Moreover, equitable principles warrant relief hereunder.  To allow a finding of responsible to stand for that which is not illegal would be against the notion of judicial fairness, and would offend the ethical conscience of not only the Court, but our society as a whole.

84.     The facts and circumstances surrounding this hoax, perpetrated by the Selectmen and their civil servants, constitute extraordinary circumstances upon which relief is required under the law.  Specifically, their egregious conduct impacted not only Mr. Belezos, but tainted the judicial process, such that a fraud on the Court occurred.  An independent action is proper in this case to prevent a grave miscarriage of justice, and the manifestly unconscionable retention of the judgment against Mr. Belezos.

85.     The Selectmen and their civil servants perpetrated fraud upon Mr. Belezos, the Court, and the Commonwealth's motorists.  To allow the Court to sanction or place its imprimatur upon the actions of the Selectmen in this regard would be to allow a great injustice to stand.

86.     Moreover, should the Court give its blessing to the Selectmen's illegally posting and enforcing unreasonably low speed limit signs, it would have the unwelcome effect of undermining public confidence in the veracity of legally posted speed limit signs, diminish motorists' respect for legitimate posted speed limit signs, breed scofflaws, and thereby reduce public traffic safety.

87.     Equity requires that not only should the Selectmen be precluded from reaping financial benefits of their hoax upon Mr. Belezos, but also from the benefits of

their fabricated cases against numerous other motorists, that resulted in thousands of dollars of judgments.

88.     It is implausible to suggest that the fact of the phony speed limit sign, if presented to the fact-finder (clerk-magistrate), would not have affected the substantial rights of the parties in the matter.

89.     There is neither any fault nor negligence on the part of Mr. Belezos for simply falling victim to the Selectmen's clever hoax.  At all times relevant hereto, Mr. Belezos has acted ethically and comes to this Court with clean hands.

90.     Mr. Belezos therefore moves this Honorable Court to exercise its equitable powers, pursuant to Mass. R. Civ. P. 60(b)(6), to vacate the judgment entered by the trial court entered on December 28, 2011.

## COUNT III

### Ultra Vires (G.L. c. 90, § 18)

91.     Mr. Belezos repeats, re-alleges and incorporates by reference the above allegations as if hereinafter set forth in full.

92.     Selectmen's erection of motor vehicle speed limit signs purporting to set forth a speed limit duly established by a special speed regulation without: (1) MassDOT and the Registrar, acting jointly, certifying in writing that such regulation is consistent with the public interests, and (2) erecting upon the ways affected thereby and at such points as MassDOT and the Registrar, acting jointly, may designate, signs, conforming to

standards adopted by MassDOT, setting forth the speed established by the regulation, violates the provisions of G.L. c. 90, § 18.

93. Selectmen's erection of speed limit signs in violation of G.L. c. 90, § 18 exceeds the authority granted to them by the Commonwealth of Massachusetts, is ultra vires and void, and therefore these posted speed signs are illegal and unenforceable, and the traffic citations for Speeding in excess of these speed limits are void.

## **COUNT IV**

### Ultra Vires (G.L. c. 90, § 17)

94. Mr. Belezos repeats, re-alleges and incorporates by reference the above allegations as if hereinafter set forth in full.

95. Selectmen's enforcement of motor vehicle speed limit signs purporting to be duly established in accordance with the provisions of said section, namely G.L. c. 90, § 18, but in fact are not duly established, violates the provisions of G.L. c. 90, § 17.

96. Selectmen's enforcement of posted speed limit signs in violation of G.L. c. 90, § 17 exceeds the authority granted to them by the Commonwealth of Massachusetts, is ultra vires and void, and therefore traffic citations for Speeding in excess of these illegal and unenforceable posted speed limits are void. A motorist obviously cannot be found responsible of the traffic offense charged, i.e., Speeding in excess of a posted speed limit, if the posted speed limit signs were not lawfully erected.

## COUNT V

Ultra Vires  ("Procedures for Speed Zoning on State and Municipal Roads" (2005))

97.     Mr. Belezos repeats, re-alleges and incorporates by reference the above allegations as if hereinafter set forth in full.

98.     Selectmen's erection and enforcement of motor vehicle speed limit signs purporting to set forth a speed limit duly established by a special speed regulation without: (1) completing a thorough traffic engineering study, (2) drafting a special speed regulation, and (3) approval by the governing authority, the Registrar and MassHwy, violates the "Procedures for Speed Zoning on State and Municipal Roads" (2005).

99.     Selectmen's erection of speed limit signs in violation of the "Procedures for Speed Zoning on State and Municipal Roads" (2005) exceeds the authority granted to them by the Commonwealth of Massachusetts, is ultra vires and void, and therefore these posted speed signs are illegal and unenforceable, and the traffic citations for Speeding in excess of these speed limits are void.

## COUNT VI

Ultra Vires ("The Massachusetts Amendments to the 2009 Manual on Uniform Traffic Control Devices," § 10A-8 (January 2012))

100.     Mr. Belezos repeats, re-alleges and incorporates by reference the above allegations as if hereinafter set forth in full.

101.    Selectmen's erection and enforcement of motor vehicle speed limit signs purporting to set forth a speed limit duly established by a special speed regulation without: (1) conducting proper studies and submitting data of the proposed speed zones to MassDOT, (2) conducting all hearings required for adoption drafting a special speed regulation, (3) notifying MassDOT of formal adoption by the municipality, (4) approval by MassDOT and the Registry, (5) installing official speed limit signs accordance with the specific provisions of the approved regulation, and only then (6) enforcing against violators, violates the "The Massachusetts Amendments to the 2009 Manual on Uniform Traffic Control Devices," § 10A-8 (January 2012).

102.    Selectmen's erection of speed limit signs in violation of the "The Massachusetts Amendments to the 2009 Manual on Uniform Traffic Control Devices," § 10A-8 (January 2012) exceeds the authority granted to them by the Commonwealth of Massachusetts, is ultra vires and void, and therefore these posted speed signs are illegal and unenforceable, and the traffic citations for Speeding in excess of these speed limits are void.

## COUNT VII

Deliberate and Reckless Fabrication of False Evidence

(Civil Rights Violation of the Substantive Due Process Clause of the 14th Amendment to the United States Constitution as secured by 42 U.S.C. § 1983)

103.    Mr. Belezos repeats, re-alleges and incorporates by reference the above allegations as if hereinafter set forth in full.

104.    Upon information and belief, it is the policy, custom, or practice, or all of these, of the Selectmen, to knowingly, recklessly, or with deliberate indifference and callous disregard of the applicable statutes, regulations and Mr. Belezos' rights, either erect and maintain, cause to be erected and maintained, or fail to remove or cause to be removed, signs that purport to duly establish a posted regulatory speed limit in accordance with the provisions of G.L. c. 90, § 18, and therefore prima facie evidence of a reasonable and proper speed limit under G.L. c. 90, § 17.   Said signs in fact falsely represent a special speed regulation where none exists, are unauthorized by the regulatory authorities of the Commonwealth in violation of the aforesaid statute and regulations, are therefore considered illegal and unenforceable, and cannot be prima facie evidence of a reasonable and proper speed limit.   These actions were taken under the color of law within the meaning of the Federal Civil Rights Act, 42 U.S.C. § 1983.

105.    As a direct and proximate result of their acts as set forth above, the Selectmen deprived Mr. Belezos of his property and threatened to deprive him of his liberty, without due process of law, in violation of the guarantees of the Fourteenth Amendment to the Constitution of the United States as secured by 42 U.S.C. § 1983.

106.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Mr. Belezos claims all damages, costs and attorney's fees that he is entitled by law to recover from the Selectmen for legal deprivations, injuries and losses set forth herein, which deprivations, injuries and losses were caused by said Selectmen under the color of law in violation of Mr. Belezos' federal constitutional rights.

# COUNT VIII

Failure to Adequately Train, Supervise and Discipline

(Civil Rights Violation of the Substantive Due Process Clause of the 14th Amendment to the United States Constitution as secured by 42 U.S.C. § 1983)

107.    Mr. Belezos repeats, re-alleges and incorporates by reference the above allegations as if hereinafter set forth in full.

108.    Upon information and belief, it is the policy, custom, or practice, or all of these, of the Selectmen, to knowingly, recklessly, or with deliberate indifference and callous disregard of the applicable statutes, regulations and Mr. Belezos' rights, fail to instruct, supervise, control and discipline on a continuing basis personnel under their control in their duties to refrain from unlawfully and maliciously either erecting and maintaining, causing to be erected and maintained, or failing to remove or causing to be removed signs that purport to duly establish a posted regulatory speed limit in accordance with the provisions of G.L. c. 90, § 18, and therefore prima facie evidence of a reasonable and proper speed limit under G.L. c. 90, § 17.    Said signs in fact falsely represent a special speed regulation where none exists, are unauthorized by the regulatory authorities of the Commonwealth in violation of G.L. c. 90, § 18, are therefore considered illegal and unenforceable, and cannot be prima facie evidence of a reasonable and proper speed limit.

109.    Upon information and belief, the Selectmen had actual or constructive knowledge or, had they diligently exercised their duties to instruct, supervise, control,

and discipline on a continuing basis, should have had knowledge that the wrongs conspired to be done, as heretofore alleged, were about to be committed.

110.    Upon information and belief, the Selectmen had power to prevent or aid in preventing the commission of said wrongs, could have done so by reasonable diligence, and knowingly, recklessly, or with deliberate indifference and callous disregard of Mr. Belezos' rights failed or refused to do so.

111.    Upon information and belief, the Selectmen directly or indirectly, under color of law, approved or ratified the unlawful, deliberate, malicious, reckless, and wanton conduct of personnel under their control heretofore described.

112.    As a direct and proximate result of their acts as set forth above, the Selectmen deprived Mr. Belezos of his property and threatened to deprive him of his liberty, without due process of law, in violation of the guarantees of the Fourteenth Amendment to the Constitution of the United States as secured by 42 U.S.C. § 1983.

113.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Mr. Belezos claims all damages, costs and attorney's fees that he is entitled by law to recover from the Selectmen for legal deprivations, injuries and losses set forth herein, which deprivations, injuries and losses were caused by said Selectmen under the color of law in violation of Mr. Belezos' federal constitutional rights.

## COUNT IX

Deliberate and Reckless Fabrication of False Evidence

(Civil Rights Violation of the Substantive Due Process Clause of the 14th Amendment to the United States Constitution as secured by 42 U.S.C. § 1983)

114.    Mr. Belezos repeats, re-alleges and incorporates by reference the above allegations as if hereinafter set forth in full.

115.    Upon information and belief, it is the policy, custom, or practice, or all of these, of the Selectmen, to knowingly, recklessly, or with deliberate indifference and callous disregard of the applicable statutes, regulations and Mr. Belezos' rights, issue, cause to be issued, or fail to cause not to be issued Mr. Belezos a citation charging him with Speeding in excess of an illegal and unenforceable posted speed limit, and therefore prima facie evidence of the facts stated therein under G.L. c. 90C, § 3(A)(4).    Said citation in fact falsely represents a special speed regulation where none exists, and therefore cannot be prima facie evidence of the fact of the posted speed limit stated therein.    These actions were taken under the color of law within the meaning of the Federal Civil Rights Act, 42 U.S.C. § 1983.

116.    As a direct and proximate result of their acts as set forth above, the Selectmen deprived Mr. Belezos of his property and threatened to deprive him of his liberty, without due process of law, in violation of the guarantees of the Fourteenth Amendment to the Constitution of the United States as secured by 42 U.S.C. § 1983.

117.     Pursuant to 42 U.S.C. §§ 1983 and 1988, Mr. Belezos claims all damages, costs and attorney's fees that he is entitled by law to recover from the Selectmen for legal deprivations, injuries and losses set forth herein, which deprivations, injuries and losses were caused by said Selectmen under the color of law in violation of Mr. Belezos' federal constitutional rights.

## COUNT X

Failure to Adequately Train, Supervise and Discipline

(Civil Rights Violation of the Substantive Due Process Clause of the 14th Amendment to the United States Constitution as secured by 42 U.S.C. § 1983)

118.     Mr. Belezos repeats, re-alleges and incorporates by reference the above allegations as if hereinafter set forth in full.

119.     Upon information and belief, it is the policy, custom, or practice, or all of these, of the Selectmen, to knowingly, recklessly, or with deliberate indifference and callous disregard of the applicable statutes, regulations and Mr. Belezos' rights, fail to instruct, supervise, control and discipline on a continuing basis personnel under their control in their duties to refrain from unlawfully and maliciously issuing Mr. Belezos a citation charging him with Speeding in excess of an illegal and unenforceable posted speed limit, and therefore prima facie evidence of the facts stated therein under G.L. c. 90C, § 3(A)(4).  Said citation in fact falsely represents a special speed regulation where none exists, and therefore cannot be prima facie evidence of the fact of the posted speed limit stated therein.

120.     Upon information and belief, the Selectmen had actual or constructive knowledge or, had they diligently exercised their duties to instruct, supervise, control, and discipline on a continuing basis, should have had knowledge that the wrongs conspired to be done, as heretofore alleged, were about to be committed.

121.     Upon information and belief, the Selectmen had power to prevent or aid in preventing the commission of said wrongs, could have done so by reasonable diligence, and knowingly, recklessly, or with deliberate indifference and callous disregard of Mr. Belezos' rights failed or refused to do so.

122.     Upon information and belief, the Selectmen directly or indirectly, under color of law, approved or ratified the unlawful, deliberate, malicious, reckless, and wanton conduct of personnel under their control heretofore described.

123.     As a direct and proximate result of their acts as set forth above, the Selectmen deprived Mr. Belezos of his property and threatened to deprive him of his liberty, without due process of law, in violation of the guarantees of the Fourteenth Amendment to the Constitution of the United States as secured by 42 U.S.C. § 1983.

124.     Pursuant to 42 U.S.C. §§ 1983 and 1988, Mr. Belezos claims all damages, costs and attorney's fees that they are entitled by law to recover from the Selectmen for legal deprivations, injuries and losses set forth herein, which deprivations, injuries and losses were caused by said Selectmen under the color of law in violation of Mr. Belezos' federal constitutional rights.

## COUNT XI

Deliberate and Reckless Withholding of Exculpatory Evidence

(Civil Rights Violation of the Substantive Due Process Clause of the 14th Amendment to the United States Constitution as secured by 42 U.S.C. § 1983)

125.     Mr. Belezos repeats, re-alleges and incorporates by reference the above allegations as if hereinafter set forth in full.

126.     Upon information and belief, it is the policy, custom, or practice, or all of these, of the Selectmen, to knowingly, recklessly, or with deliberate indifference and callous disregard of the applicable statutes, regulations and Mr. Belezos' rights, withhold, cause to be withheld, of fail to cause not to be withheld exculpatory material evidence and maintain unfounded charges against Mr. Belezos of Speeding in excess of illegal and unenforceable posted speed limit signs, despite the fact that they knew or should have known that Mr. Belezos could not be found responsible for violating illegal and unenforceable speed limit signs.  These actions were taken under the color of law within the meaning of the Federal Civil Rights Act, 42 U.S.C. § 1983.

127.     As a direct and proximate result of their acts as set forth above, the Selectmen deprived Mr. Belezos of his property and threatened to deprive him of his liberty, without due process of law, in violation of the guarantees of the Fourteenth Amendment to the Constitution of the United States as secured by 42 U.S.C. § 1983.

128.     Pursuant to 42 U.S.C. §§ 1983 and 1988, Mr. Belezos claims all damages, costs and attorney's fees that he is entitled by law to recover from the Selectmen for legal

deprivations, injuries and losses set forth herein, which deprivations, injuries and losses were caused by said Selectmen under the color of law in violation of Mr. Belezos' federal constitutional rights.

**COUNT XII**

Failure to Adequately Train, Supervise and Discipline

(Civil Rights Violation of the Substantive Due Process Clause of the 14th Amendment to the United States Constitution as secured by 42 U.S.C. § 1983)

129.     Mr. Belezos repeats, re-alleges and incorporates by reference the above allegations as if hereinafter set forth in full.

130.     Upon information and belief, it is the policy, custom, or practice, or all of these, of the Selectmen, to knowingly, recklessly, or with deliberate indifference and callous disregard of the applicable statutes, regulations and Selectmen' rights, fail to instruct, supervise, control and discipline on a continuing basis personnel under their control in their duties to refrain from unlawfully and maliciously withholding exculpatory material evidence and maintaining unfounded charges against Mr. Belezos of Speeding in excess of illegal and unenforceable posted speed limit signs, despite the fact that they knew or should have known that Mr. Belezos could not be found responsible for violating illegal and unenforceable speed limit signs.

131.     Upon information and belief, the Selectmen had actual or constructive knowledge or, had they diligently exercised their duties to instruct, supervise, control,

40

and discipline on a continuing basis, should have had knowledge that the wrongs conspired to be done, as heretofore alleged, were about to be committed.

132.     Upon information and belief, the Selectmen had power to prevent or aid in preventing the commission of said wrongs, could have done so by reasonable diligence, and knowingly, recklessly, or with deliberate indifference and callous disregard of Mr. Belezos' rights failed or refused to do so.

133.     Upon information and belief, the Selectmen directly or indirectly, under color of law, approved or ratified the unlawful, deliberate, malicious, reckless, and wanton conduct of personnel under their control heretofore described.

134.     As a direct and proximate result of their acts as set forth above, the Selectmen deprived Mr. Belezos of his property and threatened to deprive him of his liberty, without due process of law, in violation of the guarantees of the Fourteenth Amendment to the Constitution of the United States as secured by 42 U.S.C. § 1983.

135.     Pursuant to 42 U.S.C. §§ 1983 and 1988, Mr. Belezos claims all damages, costs and attorney's fees that he is entitled by law to recover from the Selectmen for legal deprivations, injuries and losses set forth herein, which deprivations, injuries and losses were caused by said Selectmen under the color of law in violation of Mr. Belezos' federal constitutional rights.

## **COUNT XIII**

Unconstitutional Lack of Evidentiary Safeguard

(Civil Rights Violation of the Procedural Due Process Clause of the 14th Amendment to the United States Constitution and 42 U.S.C. § 1983)

136.     Mr. Belezos repeats, re-alleges and incorporates by reference the above allegations as if hereinafter set forth in full.

137.     At all relevant times, Mr. Belezos possessed a constitutionally protected property interest in both his money, license to operate and register a motor vehicle, and a constitutionally protected liberty interest in maintaining his license to operate a motor vehicle.

138.     Upon information and belief, the actions of the Selectmen were taken with reckless or callous indifference Mr. Belezos' constitutional rights.

139.     Any reasonable public official would have known that the actions of the Selectmen were in violation of the Fourteenth Amendment and the procedural due process rights of Mr. Belezos.

140.      The process provided by state law to safeguard Mr. Belezos' protected property and liberty interests, which process Mr. Belezos has exercised and lost, is not constitutionally adequate.  Specifically, the lack of any evidentiary proof requirement pertaining to whether a posted speed limit has been duly established upon any way is inadequate to ensure that the persuasive force of prima facie evidence - that operation of a motor vehicle at a rate of speed in excess of such limit is greater than shall be prima

facie evidence that such speed is greater than is reasonable and proper – is not improperly triggered under G.L. c. 90, § 17. This lack of any evidentiary proof requirement, namely providing a duly established special speed regulation, invites the deliberate or reckless fabrication of prima facie evidence in the form of illegally erected and unlawfully enforced posted speed limits.

141. Upon information and belief, the Selectmen are able to seize upon this evidentiary loophole to successfully fabricate and introduce into evidence illegal speed limit signs as false prima facie evidence of a reasonable and proper speed, to inflict harm upon Mr. Belezos, his rights and his interests that has not been redressed.

142. As a direct and proximate result of their acts as set forth above, the Selectmen deprived Mr. Belezos of his property and threatened to deprive him of his liberty, without due process of law, in violation of the guarantees of the Fourteenth Amendment to the Constitution of the United States as secured by 42 U.S.C. § 1983.

143. Pursuant to 42 U.S.C. §§ 1983 and 1988, Mr. Belezos claims all damages, costs and attorney's fees that they are entitled by law to recover from the Selectmen for legal deprivations, injuries and losses set forth herein, which deprivations, injuries and losses were caused by said the Selectmen under the color of law in violation of Mr. Belezos' federal constitutional rights.

## COUNT XIV

Constitutionally Defective Evidentiary Standard

(Civil Rights Violation of the Procedural Due Process Clause of the 14th Amendment to the United States Constitution and 42 U.S.C. § 1983)

144.     Mr. Belezos repeats, re-alleges and incorporates by reference the above allegations as if hereinafter set forth in full.

145.     At all relevant times, Mr. Belezos possessed a constitutionally protected property interest in both his money, license to operate and register a motor vehicle, and a constitutionally protected liberty interest in maintaining his license to operate a motor vehicle.

146.     Upon information and belief, the actions of the Selectmen were taken with reckless or callous indifference Mr. Belezos' constitutional rights.

147.     Any reasonable public official would have known that the actions of the Selectmen were in violation of the Fourteenth Amendment and the procedural due process rights of Mr. Belezos.

148.     The process provided by state law to safeguard Mr. Belezos' protected property and liberty interests, which process Mr. Belezos has exercised and lost, is not constitutionally adequate.   Specifically, CMVI hearings under G.L.c. 90C, § 3 are governed by a constitutionally defective evidentiary standard - a preponderance of the credible evidence that a violator committed the motor vehicle infraction alleged.   This level of certainty is below that which is necessary to preserve fundamental fairness in a

government-initiated proceeding that threatens the individual interests at stake in the state proceeding, which are both particularly important and more substantial than the mere loss of money - such as a significant deprivation of liberty or stigma.

149.     Upon information and belief, the Selectmen are able to seize upon this constitutionally defective evidentiary standard to inflict harm upon Mr. Belezos, his rights and his interests that has not been redressed.

150.     As a direct and proximate result of their acts as set forth above, the Selectmen deprived Mr. Belezos of his property and threatened to deprive him of his liberty, without due process of law, in violation of the guarantees of the Fourteenth Amendment to the Constitution of the United States as secured by 42 U.S.C. § 1983.

151.     Pursuant to 42 U.S.C. §§ 1983 and 1988, Mr. Belezos claims all damages, costs and attorney's fees that they are entitled by law to recover from the Selectmen for legal deprivations, injuries and losses set forth herein, which deprivations, injuries and losses were caused by said Selectmen under the color of law in violation of Mr. Belezos' federal constitutional rights.

## **COUNT XV**

### Unjust Enrichment

152.     Mr. Belezos repeats, re-alleges and incorporates by reference the above allegations as if hereinafter set forth in full.

153.     The above described traffic enforcement scheme by the Selectmen, i.e., illegally erecting and enforcing posted speed limit signs without special speed regulations

in violation of G.L. c. 90, §§ 17-18, the "Procedures for Speed Zoning on State and Municipal Roads" (2005), and "The Massachusetts Amendments to the 2009 Manual on Uniform Traffic Control Devices," § 10A-8 (January 2012) exceeds the authority granted to the Selectmen by the Commonwealth of Massachusetts, is therefore ultra vires, illegal and invalid, and cannot be used to prosecute Mr. Belezos.

154.    Upon information and belief, the Selectmen receive and retain money paid by Mr. Belezos in the form of assessments, surcharges and fees remitted by him in disposition of citations for Speeding in excess of illegal and unenforceable posted speed limits.  It is unconscionable and inequitable for the Selectmen to retain the money paid in the form of assessments surcharges and fees pursuant to that which is not an offense, namely for Speeding in excess of illegal and unenforceable posted speed limits.

155.    Equity and good conscience require that the Selectmen be precluded from reaping the financial benefits of their hoax that resulted in the judgment against Mr. Belezos.  As a result of the above described conduct, the Selectmen have been unjustly enriched in an amount yet to be determined.

156.    Mr. Belezos claims all legal and equitable remedies that he is entitled by law to recover from the Selectmen, including restitution, establishing a constructive trust for Mr. Belezos' benefit, or such other compensation as is appropriate in the circumstances, for the legal deprivations, injuries and losses set forth herein.

## **COUNT XVI**

### Conversion

157.     Mr. Belezos repeats, re-alleges and incorporates by reference the above allegations as if hereinafter set forth in full.

158.     Mr. Belezos acknowledged his responsibility under the terms and provisions of traffic citations for Speeding in excess of illegal and unenforceable posted speed limits, and paid assessments, surcharges and fees under legal duress and under the threat of greater financial and legal penalties, i.e., G.L. c. 90C, § 3(A)(6) which allows for automatic suspension of an operator violator's license to operate a motor vehicle or an owner violator's registration of a motor vehicle, by operation of law and without further notice or hearing, for failure to pay the full amount of the scheduled or imposed assessment to the Registrar for a civil motor vehicle infraction.

159.     Selectmen receive and retain money paid by Mr. Belezos in the form of assessments, surcharges and fees remitted by him in disposition of his citation for Speeding in excess of an illegal and unenforceable posted speed limit.    It is unconscionable and inequitable for the Selectmen to retain the money paid in the form of assessments surcharges and fees pursuant to that which is not an offense, namely for Speeding in excess of illegal and unenforceable posted speed limits.    Nevertheless, Selectmen have continued to exercise control and possession of Mr. Belezos' monies paid by them as a result of the Speeding case dispositions.

160.     Selectmen have exercised control over Mr. Belezos' property by withholding and retaining monies paid by Mr. Belezos in satisfaction of his assessment,

surcharge and fees. The Selectmen have acted and failed to act in a manner that is inconsistent with and willfully indifferent to Mr. Belezos' use, possession and ownership of said property and the Selectmen have also acted or failed to act in a manner that is willfully indifferent to the foreseeable impact that an erroneous driving record can and will have on Mr. Belezos' property right driving privileges and on Mr. Belezos' automobile liability insurance rates.

161.    The Selectmen have, in essence, converted the funds of Mr. Belezos, who trusted, when he paid his fine, that the speed limit sign was what it purported to be – duly established under the law and enforceable. The above described conduct constitutes an unlawful conversion by the Selectmen of Mr. Belezos' property and property rights.

162.    As a result of the above described conduct, the Selectmen have financially benefitted at Mr. Belezos' expense in an amount yet to be determined.

163.    Mr. Belezos claims all legal and equitable remedies that he is entitled by law to recover from the Selectmen, including damages, for the legal deprivations, injuries and losses set forth herein.

## PRAYERS FOR RELIEF

WHEREFORE, the Plaintiff Nicholas G. Belezos, individually and on behalf of all others similarly situated, respectfully requests and prays that this Honorable Court enter judgment on each and every count of this Complaint against Selectmen and members of the Defendant Class in favor of Mr. Belezos and the Plaintiff Class as follows:

1. Determine and order that this action may proceed as a class action and certify the Classes either as described above or as otherwise found by the Court to be appropriate;

2. Appoint Mr. Belezos as representative of the Plaintiff Class;

3. Appoint Selectmen as representatives of the Defendant Class;

4. Appoint counsel for Mr. Belezos as Plaintiff Class Counsel;

5. Exercise its equitable powers, pursuant to Mass. R. Civ. P. 60(b), to vacate the judgments of responsible against Mr. Belezos and the members of the Plaintiff Class for Speeding in excess of illegal and unenforceable posted speed limits;

6. Exercise its equitable powers, pursuant to Mass. R. Civ. P. 60(b)(6), to vacate the judgments of responsible against Mr. Belezos and the members of the Plaintiff Class for Speeding in excess of illegal and unenforceable posted speed limits;

7. Declare that the Selectmen and the Defendant Class members' erection of posted speed limit signs in violation of G.L. c. 90, § 18, the "Procedures for Speed

Zoning on State and Municipal Roads" (2005), and "The Massachusetts Amendments to the 2009 Manual on Uniform Traffic Control Devices," § 10A-8 (January 2012) exceeds the authority granted to them by the Commonwealth of Massachusetts, is ultra vires and void, and therefore these posted speed signs are illegal and unenforceable, and the traffic citations for Speeding in excess of these speed limits are void;

8. Declare that the Selectmen and the Defendant Class members' enforcement of posted speed limit signs in violation of G.L. c. 90, §17 exceeds the authority granted to them by the Commonwealth of Massachusetts, is ultra vires and void, and therefore that traffic citations for Speeding in excess of these illegal and unenforceable posted speed limits are void;

9. Declare that failure to require evidentiary proof of a duly established Special Speed Regulation upon any way to establish that a speed limit has been duly established, in order that operation of a motor vehicle at a rate of speed in excess of such limit shall be prima facie evidence that such speed is greater than is reasonable and proper under G.L. c. 90, § 17, violates the Procedural Due Process Clause of the Fourteenth Amendment to the Constitution of the United States as secured by 42 U.S.C. § 1983;

10. Declare that the preponderance of credible evidence standard governing CMVI hearings under G.L.c. 90C, § 3 is below that which is necessary to preserve fundamental fairness in a government-initiated proceeding that threatens protected property and liberty interests, and violates the Procedural Due Process Clause of

the Fourteenth Amendment to the Constitution of the United States as secured by 42 U.S.C. § 1983;

11. Order the Selectmen and members of the Defendant Class to deposit all funds collected as fines, surcharges, costs and court fees from Speeding citations in a segregated account to be held on behalf of and for ultimate distribution to Mr. Belezos and members of the Plaintiff Class;

12. Order the Selectmen and members of the Defendant Class to identify and remove all illegal speed limit signs erected or maintained on ways within their control;

13. Order the Selectmen and members of the Defendant Class to identify all Speeding citations issued by them on any way with illegal speed limit signs;

14. Order the Selectmen and members of the Defendant Class to identify all members of the Plaintiff Class and notify each class member of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, published notice, or all of these things;

15. Order restitution or other equitable relief in favor of Mr. Belezos and members of the Plaintiff Class including a refund and return of all fines, costs, surcharges and fees collected, converted or possessed by the Selectmen and members of the Defendant Class as a result of their enforcement of the illegal and unenforceable speed limit signs;

16. Order the Selectmen and members of the Defendant Class to identify all members of the Plaintiff Class who have suffered an adverse legal consequence insofar as their driving privileges or traffic record status is concerned and further order them to remove citations or convictions resulting from their enforcement of illegal and unenforceable speed limit signs from the driving records of each member of the Plaintiff Class;

17. Order the Selectmen and members of the Defendant Class to identify all members of the Plaintiff Class whose driver's licenses or automobile registrations were restricted, limited, suspended or revoked as a result of nonpayment of Speeding citations and further order the rescission of such restriction, limitation, suspension or revocation;

18. Award Mr. Belezos and members of the Plaintiff Class compensatory damages, including nominal, actual, consequential and incidental damages according to proof against the Selectmen and members of the Defendant Class;

19. Award Mr. Belezos and members of the Plaintiff Class pre-judgment interest;

20. Award Mr. Belezos and members of the Plaintiff Class costs and reasonable attorney's fees; and,

21. Grant such further relief as this Honorable Court may deem equitable, just and appropriate.

## DEMAND FOR JURY TRIAL

Mr. Belezos and the members of the Plaintiff Class hereby request and demand a jury trial, as appropriate, on all issues and claims raised in this complaint.

Respectfully submitted,

Mr. Belezos and the members of the Plaintiff Class, by their attorney

FREDERIC P. ZOTOS

By */s/ Frederic P. Zotos*

Frederic P. Zotos, Esq.
BBO#565308
28 Old Coach Road
Cohasset, MA 02025
Tel: (781) 836-4295
E-Mail: fzotos@gmail.com

Dated: December 28, 2014