IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| | ) | |
| UNITED STATES OF AMERICA ex rel. | ) | CIVIL ACTION NO. |
| FREDERIC P. ZOTOS, et al. | ) | 1:19-cv-12002-NMG |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| TOWN OF HINGHAM, Massachusetts, | ) | |
| et al. | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

## ATTORNEY-RELATOR'S OPPOSITION TO
## DEFENDANTS' JOINT MOTION TO DISMISS

Attorney-Relator Frederic P. Zotos hereby opposes Defendants' Joint Motion to Dismiss

(ECF # 21).   He brings this action on behalf of the United States Government and the

Commonwealth of Massachusetts under the qui tam provisions of the Federal False Claims Act

and Massachusetts False Claims Act alleging that the Town of Hingham and/or its agents and

employees have violated these laws by: (i) knowingly presenting (or causing to be presented)

false or fraudulent claims for payment or approval; (ii) knowingly making or using (or causing to

be made or used), false records or statements material to false or fraudulent claims; and (iii)

conspiring to commit such acts, in relationship to the Government's and the Commonwealth's

transportation funding programs.   Relator alleges that Defendants' claims are false for non-

compliance with express statutory, regulatory, and contract terms, and false certifications on

forms presented for payment.   As a result of these false records, statements and claims, the

Government was fraudulently induced to pay $3.3 mm to the Commonwealth, and the

Commonwealth was fraudulently induced to pay $7.3 mm to the Town of Hingham.

## Table of Contents

STATEMENT OF FACTS ........................................................................................................... 1

STATUTORY SCHEME AND REGULATORY FRAMEWORK ............................................ 4

ARGUMENT ............................................................................................................................... 7

   **I.**   **Res Judicata** ................................................................................................................ 8

   **II.**   **False Claims** ............................................................................................................. 10

      A.   Prima Facie Case ................................................................................................ 10

         i.   Falsity ......................................................................................................... 10

         ii.   Knowledge ................................................................................................. 15

         iii.   Materiality .................................................................................................. 16

      B.   Defenses ............................................................................................................. 17

         i.   Public Disclosure Bar ................................................................................ 17

         ii.   Rule 9(b) .................................................................................................... 19

         iii.   Individual Liability .................................................................................... 19

         iv.   Statute of Limitations ................................................................................ 20

CONCLUSION ......................................................................................................................... 21

REQUEST FOR ORAL ARGUMENT ..................................................................................... 21

TABLE OF AUTHORITIES ....................................................................................................... i

## STATEMENT OF FACTS

The United States of America (the "Government") has paid approximately $3.3m (with $2.7m remaining of the $6m aid) to the Commonwealth of Massachusetts (the "Commonwealth") through Federal Highway Administration ("FHWA") reimbursements (2009-2019) for projects located in the "Town of Hingham." (ECF # 1, Compl. ¶¶ 3, 36-43, Ex. ## 2-5).

The Commonwealth has paid approximately $7.3m (with $1.7m remaining of $9m Chapter 90 apportionments) to the Town of Hingham ("Hingham") through Mass. Gen. L. ch. 90, § 34 (aka "Chapter 90") transportation reimbursements (2009–2019). (Id. ¶¶ 4, 89, Ex. # 12).

On May 16, 2007, the Town Administrator, Hingham, executed "COMMONWEALTH OF MASSACHUSETTS STANDARD CONTRACT FORM AND INSTRUCTIONS" with the Massachusetts Highway Dept. ("MassHwy"), and he certified compliance. (Id. ¶ 45, Ex. # 7).[1]

On April 27, 2017, Town Administrator, Hingham, executed "MASSDOT STANDARD CONTRACT FORM" with MassHwy, and he certified compliance.  (Id. ¶ 46, Ex. # 8)[2]

In the contractual period from April 1, 2008, to February 28, 2019, Hingham received fourteen (14) Chapter 90 apportionments in the total amount of $8,966,059. (Id. ¶ 47, Ex. # 9).

Standard Chapter 90 Reimbursement Request forms are submitted by municipalities to the District office of the MassDOT Highway Division ("MassDOT" formerly MassHwy) to document expenditures in order to request reimbursement for previously approved Chapter 90 Projects, and to certify municipal officers' contractual compliance.  (Id. ¶ 48, Ex. # 10)

---

[1] "Contractor Certifications and Legal References" expressly referred to by the Contract provide in pertinent part: "By signing the Standard Contract Form the Contractor certifies, under the pains and penalties of perjury, that it is in compliance with, and shall remain in compliance with, all legal requirements governing performance of this Contract and the Contractor's doing business in Massachusetts.  ... **Please note that not all laws or requirements have been cited**. ... Massachusetts General Laws; Code of Massachusetts Regulations; ... .".

[2] "Contractor Certifications and Legal References" expressly referred to by the Contract provide in pertinent part: "... **Applicable Laws**.  The Contractor shall comply with all applicable state laws and regulations including but not limited to the applicable Massachusetts General Laws; the Official Code of Massachusetts Regulations; Code of Massachusetts Regulations (unofficial); ...".

(Hingham's certifying municipal officers: Roger Fernandez, Town Engineer; Tom Mayo, Ted Alexiades, and Kevin Paicos, Town Administrators; and Susan Nickerson, Town Accountant).[3, 4]

In the period from November 3, 2009, to July 2, 2018, MassHwy received twenty-four (24) Chapter 90 Reimbursement Requests (including a total of 186 invoices) from Hingham in the total amount of $7,324,688.  (Id. ¶ 74, Ex. # 10).

Standard Chapter 90 Final Report forms are submitted by municipalities to the District office of the MassDOT, with municipal officers' compliance certifications.  (Id. ¶ 75, Ex. # 11).[5]

In the period from May 16, 2011, to July 2, 2018, MassHwy received twelve (12) Chapter 90 Final Reports from Hingham documenting the total amount of $8,084,973. (Id. ¶ 88).

In a letter dated June 21, 1989, Sgt. Robert F. Myers, Traffic Safety Division, Hingham Police Department, Chairman, Traffic, Hingham Traffic Committee outlined the "PROCEDURE BY RESIDENT AND STEPS BY TOWN AND STATE" to reduce an existing posted speed sign or implement a speed sign where one has never been recorded.  (Id. ¶ 98, Ex. # 16).  The seven-step procedure requires an engineering study, multiple approvals from the Town Traffic Committee, Selectmen and the State D.P.W., and then legally recording the speed with the state.

---

[3] The Municipal Highway Officer's Certification is as follows: "I hereby certify under the penalty of perjury, that the charges for labor, materials, equipment, and services itemized and summarized on the attached forms are true and correct, and were *incurred on this project in conformance with the Massachusetts Highway Department [a.k.a. MassDOT Highway Division (2010)] Policies and established Municipal Standards* that were approved for this project." (emphasis added).

[4] The Accounting Officer's and Duly Authorized Municipal Official's Certification is as follows: "I/We certify under penalty of perjury that the forms as listed or summarized on the attached forms were examined; *that they are in conformity with* our existing wage schedule, equipment rates, and *all applicable statutes and regulations*; that they are properly chargeable to the appropriation(s) designated for this work; and that Executive Order No. 195, dated April 27, 1981 [and Chapter 11, Section 12 (2012)], is acknowledged as applicable." (emphasis added).

[5] Standard certification jointly for the Highway Officer, Accounting Officer, and Duly Authorized Municipal Official: "*We further certify* that all equipment rental costs are within the approved limits established by the MassDOT Highway Division, *that the Municipality has complied with all applicable statutes and regulations*, that the requests for reimbursements for allowable project expenses actually incurred are in conformance with the "Chapter 90" Project Request, and that the Municipality will be responsible for the future maintenance of this project including the cost thereof." (emphasis added).

In a letter dated June 3, 2008, the Town Administrator, Hingham, wrote to the District 5 Highway Director, MassHwy:  *"We understand the process and the requirements associated with establishing or amending Special Speed Regulations* ...".  (Id. ¶ 99, Ex. # 17) (emphasis added).

As of March 2012, there were at least twenty-six Speed Limit signs (R2-1) posted on eight public roadways under the sole jurisdiction of Hingham, and without having approved Special Speed Regulations on file with MassDOT.  (Id. ¶ 106, Ex. # 18).  In addition, there were at least thirty-four Advisory Speed plaques (W13-1P) posted on twelve public roadways under the sole jurisdiction of Hingham, sixteen of which were improperly installed as separate sign installations.  (Id. ¶ 108).  As of July 2019, all these signs/plaques remained in place. (Id. ¶ 129).

In a letter dated August 24, 2012, Neil Boudreau, State Traffic Engineer, MassDOT, wrote to the Board of Selectmen, Hingham, regarding the "Installation of Regulatory Signs And Speed Limit Signs."  (Id. ¶ 130, Ex. # 26).  The letter notified Hingham that Mr. Zotos, "a concerned citizen", has notified MassDOT "that the special speed regulation signs set forth in Exhibit 28, Table 3 were not installed consistent with the requirements of MGL c. 85, Section 2 and MGL c. 90, Section 18."  It notes that MassDOT "is required ... to give MGL c.85, Section 2 Notice to the Town of Hingham regarding the Special Speed Regulations listed as improperly installed."  The letter otherwise documented the two (2) approved Special Speed Regulations on a total of five (5) roadways in Hingham.[6]  MassDOT reminded the Town of its Speed Zoning Procedures, and offered its assistance by providing guidance on policies and procedures.[7]

---

[6] "Consistent with the statutory duty under MGL c.85, Section 2 and MGL. C 90, Section 18, the Massachusetts Department of Transportation has reviewed its files and determined that its files contain Special Speed Regulations for the following [five (5)] town ways in the Town of Hingham and have been approved by the Department of Transportation and the Registrar of Motor Vehicles, as required by MGL c. 90, Section 18 …".

[7] "If the Town of Hingham wishes to establish speed limits in accordance with the aforementioned statutes on any way under its custody and control, the Massachusetts Department of Transportation Highway Division District Five Office would be more than willing to assist the Town of Hingham by providing guidance on policies and procedures."

**STATUTORY SCHEME AND REGULATORY FRAMEWORK**

When traffic control devices are installed on a Federal-aid project, they shall conform to the Manual on Uniform Traffic Control Devices ("MUTCD").[8]  Failure to comply with Federal laws and regulations may result in the withholding of "payment to the State of Federal funds [e.g., Federal-Aid Highway Program ("FAHP") funds] on account of such project …".[9]

With respect to Speed Limit Sign(s) (R2-1), the MUTCD § 2B.13 expressly provides: "Speed zones (other than statutory speed limits) *shall only be established on the basis of an engineering study* that has been performed in accordance with traffic engineering practices." MUTCD § 2B.13 at 56-58 (emphasis added).  With respect to Advisory Speed Plaque(s) (W13-1P), the MUTCD § 2C.08 expressly provides: "Except in emergencies or when the condition is temporary, an Advisory Speed plaque *shall not be installed until the advisory speed has been determined by an engineering study*."  MUTCD § 2C.08 at 112 (emphasis added).

Massachusetts cities and towns may erect and maintain traffic signs (except speed control signs (aka speed limit signs)) "on any way within its control" without department of highways approval "provided such signs ... are in conformance with the department's current manual on uniform traffic control devices...".  Mass. Gen. L. ch. 85, § 2 ("c. 85, § 2"), "Traffic signs or devices; erection and maintenance; rules and regulations" (enabling statute).  With respect to speed control signs: "*speed control signs may be established only in accordance with the*

---

[8] 23 C.F.R. 655.603(d)(2) (4-1-12 Edition) ("(d) *Compliance -* ... (2) *New or reconstructed highways.*  Federal-aid projects for the construction, reconstruction, resurfacing, restoration, or rehabilitation of streets and highways shall not be opened to the public for  unrestricted use until all appropriate traffic control devices, either temporary or permanent, are installed and functioning properly.  Both temporary and permanent devices shall conform to the MUTCD.").

[9] 23 C.F.R. 1.36, entitled "Compliance with Federal Laws and regulations" ("If the Administrator determines that a State has violated or failed to comply with the Federal laws or the regulations in this part with respect to a project, he may withhold payment to the State of Federal funds on account of such project, withhold approval of further projects in the State, and take such other action that he deems appropriate under the circumstances, until compliance or remedial action has been accomplished by the State to the satisfaction of the Administrator.").

4

*provisions of section eighteen of chapter ninety*." [10] (emphasis added).  Failure to comply with these provisions shall result in the withholding or withdrawal of the Commonwealth's Mass. Gen. L. ch. 90, § 34 (aka "Chapter 90") local transportation aid funding program funds.[11]

According to the Massachusetts Appeals Court ("MAC"), "[t]here are two principal statutes governing speed restrictions when operating a motor vehicle within the Commonwealth," namely, Mass. Gen. L. ch. 90, §§ 17 and 18.  Belezos v. Bd. of Selectmen of Hingham, 99 Mass.App.Ct. 1114 (November 14, 2017) (unpublished opinion) ("Belezos I"). The MAC construes Mass. Gen. L. ch. 90, § 17 ("c. 90, § 17"), as follows:

> General Laws c. 90, § 17, as appearing in St. 1986, c. 689, § 7, provides in pertinent part,
> "No person operating a motor vehicle on any way shall run it at a rate of speed greater
> than is reasonable and proper."  Section 17 further provides that speeds in excess of limits
> ranging from fifty miles per hour (m.p.h.) to twenty m.p.h. depending on the type of road
> and whether it is inside or outside of a "thickly settled or business district," shall be
> "prima facie evidence of a rate of speed greater than is reasonable and proper" unless said
> roads have a speed limit "posted in accordance with the provisions of section eighteen."

 (Id. at 1-2).  Next, the MAC construes Mass. Gen. L. ch. 90, § 18 ("c. 90, § 18"), as follows:

> General Laws c. 90, § 18, as appearing in St. 1986, c. 689, § 8, authorizes cities and
> towns to make "special regulations as to the speed of motor vehicles" within their
> jurisdiction subject to the approval of the Massachusetts Department of Transportation
> and the registrar of motor vehicles.  These special regulations of speed, when approved
> and posted on roadways, become the controlling speed limit notwithstanding anything to
> the contrary in § 17.  See G. L. c. 85, § 2.

---

[10] See, e.g., M & M Transp. Co. v. Wellesley, 333 Mass. 11, 13 (1955) (c. 90, § 18, history explains "special speed regulations") citing Commonwealth v. Newhall, 205 Mass. 344, 347 (1910) (local power to regulate speed subject to Massachusetts highway commission approval) (c. 90, § 18, history); 3 Op.Atty.Gen. 26, 28 (1906) ("... the special regulation is that established by any city or town under the authority of the statute; and in my judgment it is immaterial whether this regulation coincides with the extreme limit established by the statute or not.").

[11] Mass. Gen. L. ch. 85, § 2 ("If any city or town installs and maintains any of the aforesaid traffic control devices without either requesting or obtaining the required approval or after being notified of such disapproval, or in noncompliance with said manual [on uniform traffic devices], *the department shall withhold or withdraw the unexpended balance of any funds assigned to the said city or town under the provisions of section thirty-four of chapter ninety* [aka "Chapter 90" funds] or sections twenty-five and twenty-six of chapter eighty-one.") (emphasis added) (comments added in brackets).

(Id. at 2).   Finally, the MAC reads c. 90, §§ 17 & 18 together to suggest a statutory scheme:

> A reading of § 17 and § 18 together suggests a scheme for speed enforcement throughout the Commonwealth in which posted speed limits govern over the presumptive limits and the reasonable and proper standard set forth in § 17 and, on roadways without posted limits, vehicular speed is governed by § 17.  (Id. at 2).[12]

MassHwy's regulatory standards for speed limits and signs state that c. 90, § 18 authorizes posting numerical speed limits on <u>all</u> roadways, and c. 90, § 17 governs on unposted roadways, as follows:

> *<u>Chapter 90, Section 18 authorizes the posting of numerical speed limits on all roadways in Massachusetts.</u>*  The foundation for the actual posting of a speed limit is a thorough traffic engineering study.  After a study has been completed, a Special Speed Regulation is drafted and approved by the governing authority of the roadway, the Registry of Motor Vehicles and MassDOT.  <u>All</u> posted regulatory speed limit signs must adhere to this approval process.  *<u>If a speed limit is posted without this procedure, it is in violation of Chapter 90, Section 18, and is therefore considered illegal and unenforceable</u>.*  ...
>
> ... *<u>Chapter 90, Section 17 governs the speed of motor vehicles on unposted roadways.</u>*  The speed limits on roadways that fall into this category are often referred to as "prima facie" speed limits. ... *<u>prima facie speed limits cannot be posted</u>*, with the exception of a legally established school zone.

"Procedures for Speed Zoning on State and Municipal Roads," at 3-4 (2012) ("Speed Zoning") (emphasis added).[13]  With respect to Advisory Speed Plaque(s) (W13-1P): "The Advisory Speed plaque … shall not be installed as a separate sign installation." (Id. at 18-19).   "In addition, MassDOT and all municipalities are required by MGL c. 85 § 2 to conform to the Manual on Uniform Traffic Control Devices (MUTCD) for the posting of all regulatory and warning signage, including speed limit signs, on all streets and highways."  Speed Zoning at 2 (2017); (Id. at 7) ("MassDOT conforms to MUTCD standards and guidance … because it is the law … .").

---

[12] See also, e.g., <u>Commonwealth v. Diviacchi</u>, 85 Mass. App. Ct. 1125 (2014) (dictum) (unpublished opinion) ("[w]as the citation invalid because it was drawn under G. L. c. 90, § 17 (establishing a fine for speeding when a speed limit is not posted) as opposed to G. L. c. 90, § 18 (establishing a fine for speeding when a speed limit is posted)").

[13] Mass. Gen. L. ch. 90, § 18 ("No such special speed regulation shall be effective until there shall have been erected ... *<u>signs conforming to standards adopted by the department</u>*, setting forth the speed or other restrictions established by the regulation.") (emphasis added).

## ARGUMENT

This is an action to recover damages and penalties on behalf of the United States of America and the Commonwealth of Massachusetts arising from false records, statements and claims, and conspiracy to commit such acts in violation of the Federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.* ("FCA"), as amended by the Fraud Enforcement and Recovery Act of 2009, Pub. L. 111-21, 123 Stat. 1617 (2009) ("FERA"), and the Massachusetts False Claims Act, Mass. Gen. L. ch. 12, §§ 5A, *et seq.* ("MFCA"), as amended by St. 2012, c. 139, §§ 22, *et seq.*

Attorney-Relator Frederic P. Zotos ("Relator" or "Zotos") brings this action on behalf of the United States Government and the Commonwealth of Massachusetts under the qui tam provisions of the FCA and MFCA alleging that the Town of Hingham and/or its agents and employees, have violated these laws by: (i) knowingly presenting (or causing to be presented) false or fraudulent claims for payment or approval; (ii) knowingly making or using (or causing to be made or used), false records or statements material to false or fraudulent claims; and (iii) conspiring to commit such acts, in relationship to the Government's Federal Highway Administration ("FHWA") funding programs, including the Federal-Aid Highway Program ("FAHP"), and in relationship to the Commonwealth's Mass. Gen. L. ch. 90, § 34 (aka "Chapter 90") local transportation aid funding program. (ECF # 1, Compl. ¶ 2).

As a result of these false records, statements and claims, the Government was fraudulently induced to pay approximately $3.3 mm (with $2.7 mm remaining of $6 mm aid) to the Commonwealth through FHWA reimbursements (since 2009).  (Id. ¶ 3).  Furthermore, as a result of these false records, statements and claims, the Commonwealth was fraudulently induced to pay approximately $7.3 mm (with $1.7 mm remaining of $9 mm Chapter 90 apportionments) to the Town of Hingham through Chapter 90 reimbursements (since 2009).  (Id. ¶ 4).

## I.  Res Judicata

Claim preclusion and issue preclusion, "are collectively referred to as `res judicata.'" Taylor v. Sturgell, 553 U.S. 880, 892 (2008).  Defendants argue that Relator's claims are both "barred by the doctrine of claim preclusion," and "defeated by the doctrine of issue preclusion". (ECF # 22-1, Def. Mem. at 13).  They mischaracterize the instant complaint as Zotos' "fifth attempt at a civil action to challenge the lawfulness of the speed signs in the Town of Hingham, despite having the state and federal courts rule against him on each of the prior cases."  (Id. at 2).

Defendants' argument that prior decisions bar Relator's current action ignores one key fact - Relator brings this action not just in his own right, but also for the government.  Zotos is bringing this action for violations of the FCA "on behalf of himself and the Government, pursuant to 31 U.S.C. § 3730(b)", and for violations of the MFCA "on behalf of himself and the Commonwealth, pursuant to Mass. Gen. L. ch. 12, § 5C(2)."  (ECF # 1, Compl. ¶ 14).

Although the Supreme Court has held that the United States is not a "party" where it has decided not to intervene in an FCA qui tam case for purposes of the appellate filing deadline, U.S. ex rel. Eisenstein v. City of New York, 556 U.S. 928, 931-33 (2009), this does not mean that the prior cases noted by Defendants involved the same parties for purposes of res judicata. The United States remains "a real party in interest — which is to say that its financial interests are at stake." United States ex rel. Lusby v. Rolls-Royce Corp., 579 F.3d 849, 852 (7th Cir. 2009) (citing Eisenstein, 556 U.S. at 934-35).  "The special status of the United States counsels against reflexive transfer of rules of preclusion from private to public litigation."  Id.[14]

---

[14] (holding "The resolution of personal employment litigation does not preclude a qui tam action, in which the relator acts as a representative of the public.") (citing United States v. Mendoza, 464 U.S. 154 (1984) for the proposition that "non-mutual issue preclusion does not apply to suits involving the United States"); see also U.S. ex rel. Laird v. Lockheed Martin Eng'g & Sci. Servs. Co., 336 F.3d 346, 359-60 (5th Cir. 2003) (recognizing the differences between a plaintiff's personal and qui tam actions and finding that those differences preclude a finding of collateral estoppel).

This qui tam action simply belongs to the Government and the Commonwealth, and not to Zotos. Under the FCA, the United States has a financial interest in this action. It is entitled to at least 70% of any civil damages or penalty awarded to the Relator. 31 U.S.C. § 3730(d)(2). Cf. Mass. Gen. L. ch. 12, § 5F(4) (MFCA). It also still has the right to intervene in this action. Id. at § 3730(c)(3); MGLc. 12, § 5D(6). These rights and interests were not shared by Zotos in the prior actions. See Mendoza, 464 U.S. at 159 (recognizing that "the Government is not in a position identical to that of a private litigant" (citing INS v. Hibi, 414 U.S. 5, 8 (1973))).[15]

Both claim preclusion and issue preclusion require identity of the parties. Thus Defendants' res judicata defenses fail, because they plainly have not shown that any of the prior suits they reference involve either the same parties or their privies, i.e., the government.

In addition, this Court has previously found that res judicata is not triggered by either Hingham Police Dep't v. Zotos, 81 Mass. App. Ct. 1136 (2012), or Zotos v. Town of Hingham, 12-cv-11216-JGD (D. Mass. Sept. 19, 2013) ("Zotos I"). Zotos v. Town of Hingham, 13-cv-13065-DJC (D. Mass. Mar. 25, 2016) ("Zotos II") (because there was no identity of the cause of action in Hingham, and the Zotos I court dismissed the claims without prejudice).

Defendants' unsupported assertion - that there is "clearly privity" between Attorney-Relator Zotos and his former client, Mr. Belezos - is questionable at best. The majority view is that attorney-client relationship does not create privity. See Lane v. Bayview Loan Servicing, LLC., 831 S.E.2d 709, 715 (Va. 2019) ("[A]n attorney does not share the same legal interest as his or her client merely by virtue of his or her representation of that client.") (citing cases).

---

[15] See, e.g., United States ex rel. Sorenson v. Wadsworth Brothers Construction Company, Inc., 2:16-cv-875 (D. Utah June 5, 2019) ("Because the United States' interests and rights were not represented in Mr. Sorenson's state action, those issues were not 'completely, fully, and fairly litigated,' and Plaintiff is not now barred from litigating the issues raised in his Complaint."); United States et al. ex rel. Alejandro v. Philadelphia Vision Center et al., 20-2027 (E.D. Pa. January 4, 2021) (improper to bar qui tam claims as res judicata given "the Government's inability to participate in or prevent the resolution of" relator's previous claims) (and cases cited therein).

## II.   <u>False Claims</u>

### A.  <u>Prima Facie Case</u>

In this FCA/MFCA action, Relator pleads and alleges facts to prove a prima facie case consisting of the following three elements: (1) a false claim (or statement in support of a claim), (2) presented (or caused to be presented) for payment [alleged act of presentment uncontested by Defendants], (3) with the Defendants' knowledge of the falsity of the claim or statement in support of a claim.  Relator further alleges these claims were materially false or fraudulent.[16, 17]

#### i.   <u>Falsity</u>

Relator alleges that Defendants' claims are false for non-compliance with express statutory, regulatory, and contract terms, and false certifications on forms presented for payment. The First Circuit takes a broad view of what may constitute a false or fraudulent statement to avoid "foreclos[ing] FCA liability in situations that Congress intended to fall within the Act's scope." <u>US ex rel. Jones v. Brigham and Women's Hosp.</u>, 678 F. 3d 72, 85 (1st Cir. 2012).[18]

##### a.   <u>Hingham's Erection of Speed Limit Signs in Violation of c. 90, § 18</u>

Relator maintains that Hingham's conduct of erecting, maintaining and enforcing Speed Limit signs (R2-1) absent special speed regulations violates c. 90, § 18 (and set forth in c. 85, § 2), Speed Zoning, and "The Massachusetts Amendments to the 2009 Manual on Uniform Traffic Control Devices", and therefore renders these signs illegal and unenforceable.

---

[16] <u>Universal Health Services, Inc. v. United States ex rel. Escobar</u>, 136 S. Ct. 1989, 2002 (2016) (relator must show that the FCA violation would affect the "likely or actual behavior of" the government in paying the relevant claims).

[17] The Relator need not establish damages in order to maintain an FCA/MFCA action.  See <u>United States v. Rivera</u>, 55 F.3d 703, 709 (1st Cir. 1995) ("a contractor who submits a false claim for payment may still be liable under the FCA for statutory penalties, even if it did not actually induce the government to pay out funds or to suffer any loss."); Cf. <u>Massachusetts ex rel. Powell v. Holmes</u>, 546 F. Supp. 3d 58 (D. Mass. 2021) (individual MFCA liability for statutory penalties absent any damages) (Mass. Gen. Laws ch. 12, § 5B(a)).

[18] (quoting <u>US ex rel. Hutcheson v. Blackstone Medical, Inc.</u>, 647 F. 3d 377, 387 (1st Cir. 2011) (allegation that claims represented compliance with a material condition of payment that was not in fact met, states a claim under the FCA that claims for payment were materially false or fraudulent)).

Relator asserts that the speed limit signs at issue designate c. 90, § 18 "special regulations," but are "ineffective for lack of a certificate from the [State] department of public works that it is consistent with the public interests."  See M & M Transp., 333 Mass. at 13-14.

Defendants contest the legal assertion that "speed control signs may be established only in accordance with the provisions of [c. 90, § 18]."  They point to c. 90, § 17, as an alternative authority for posted speed limits.  In support, Defendants quote Zotos II: [19]

> ... in section 17 the language "[u]nless a way is otherwise posted in accordance with the provisions of section eighteen," particularly the use of "otherwise," indicates that section 18 is not the exclusive authority for posted speed limits.  Mass. Gen. L. c. 90, § 17. ...

Although the ambiguous phrase "otherwise posted" may perhaps indicate that c. 90, § 18, is not the exclusive authority for posted speed limits, it is not conclusive.  If the Legislature intended c. 90, § 17, to confer the authority to post speed limits, then it could have used express words to that effect.  See Registrar of Motor Vehicles v. Board of Appeal on Motor Vehicle Liab. Policies & Bonds, 382 Mass. 580, 585-586 (1981) (implied repeal).  It did not do so.

On the other hand, where multiple statutory provisions relate to the same subject matter, as they do here with posted speed limits, whenever it is possible "they should be construed together so as to constitute a harmonious whole consistent with the legislative purpose." Dowling v. Registrar of Motor Vehicles, 425 Mass. 523, 525 (1997) (citation omitted).

The hypothesis that c. 90, § 18, is not the exclusive authority for posted speed limits directly contradicts the Legislative mandate of c. 85, § 2, that "speed control signs may be established only in accordance with the provisions of [c. 90, § 18]."  Such a hypothesis "is so repugnant to and inconsistent with the later enactment covering the subject that both cannot stand."  Registrar of Motor Vehicles, 382 Mass. at 586, 589 (Legislature assumed aware of

---

[19] Zotos II, supra (no plausible basis presented to conclude speed limit signs were outside reach of c. 90, § 17) (quoting Hingham Police Dep't, 81 Mass. App. Ct. 1136 at *2 ("it appears that [Zotos] was traveling in an area identified as a 'thickly settled area,' in which [section 17] limits speeds to thirty miles per hour.")).

existing statutes); but cf. <u>Zotos II</u>, supra (District Court did not account for c. 85, § 2, mandate).

Even if c. 90, § 17 is a viable alternative authority for posted speed limit signs, the signs at issue still do not meet the c. 90, § 17(1)-(4) criteria.  These signs have several rates of speed:

(i) two, 15 m.p.h. signs (patently below c. 90, § 17's lowest limit of 20 m.p.h.);

(ii) nine, 20 m.p.h. signs (not within § 17(4) school zones); and,

(iii) fifteen, 30 m.p.h. signs (not within § 17(3) "thickly settled or business district").

(See ECF # 1, e.g., ¶¶ 106 (15, 20 and 30 m.p.h. signs), 115 (Fort Hill St.), 118 (Cushing St.), 121 (Gardner St.)).  These signs are simply irreconcilable with c. 90, § 17's presumptive speed limits, and so they belie the Defendants' pretextual defense of acting under c. 90, § 17.

The Defendants do not contest Relator's factual allegations that Hingham did not follow the statutory requirements of c. 90, § 18 in order to post the twenty-six (26) Speed Limit signs (R2-1) at issue.  He alleges (several times) that there are no special speed regulations on file with MassDOT for these signs.  (ECF # 1, ¶¶ 106; see, e.g., 115 (Ft. Hill St.), 116-118 (Cushing St.), 121 (Gardner St.)).  Such unauthorized signs are prima facie violations of c. 90, § 18.

### b.  <u>Hingham's Violations of MassHwy's "Procedures for Speed Zoning"</u>

MassHwy's regulatory standards are demonstrably consistent with c. 90, §§ 17 & 18.  As shown above, c. 90, § 17 speed limits are effective without being posted.  See <u>Belezos I</u>, supra, at 1-2.  In contrast, signing is a condition precedent to the effectiveness of c. 90, § 18 speed limits.  Id.[20]   The rationale is that special speed regulations made under c. 90, § 18, may stand as exceptions to the general speed regulations contained in c. 90, § 17.[21]

---

[20] Mass. Gen. L. ch. 90, § 18 ("No such special speed regulation shall be effective until there shall have been erected ... *signs conforming to standards adopted by the department*, setting forth the speed or other restrictions established by the regulation.") (emphasis added); see also, e.g., <u>Bailey v. Lenord</u>, 625 P.2d 849, 853 n.8 (Alaska 1981) (effectiveness of municipal speed limit conditioned upon posting signs) (citing cases).

[21] See Op.Atty.Gen. March 8, 1944, 141 ("By the provisions of these two sections the regulation of the speed of motor vehicles on such ways has been completely covered.").

MassHwy's regulatory standard, i.e., that § 17 speed limits cannot be posted, is entitled to "substantial deference."  See Goldberg v. Board of Health of Granby, 444 Mass. 627, 633-634 (2005) (environmental regulations).[22]  It just can't be disregarded, and so invalidated *sub silentio*.

MassHwy defines Speed Limit signs as follows: "*Speed Limit signs are* rectangular in shape, with black numerals on a white reflectorized background."  Speed Zoning, supra, at 21-22 (showing figure of Speed Limit sign "R2-1").  "*Speed limits shall be established only after an engineering and traffic investigation* has been conducted in compliance with established traffic engineering practices."  (Id., at 2).  Hingham knew this procedure applied to the twenty-six (26) "white" Speed Limit signs (R2-1) at issue.  (ECF # 1, ¶¶ 96-99, 103, 106) ("As for speed signs, the white signs need to be approved by the State after studies, etc.") (quoting Hingham Selectmen's minutes).  Yet, this procedure was more honored in the breach than the observance.

Relator alleges several instances where Hingham conducted traffic speed studies necessary to establish Speed Limit signs, but deliberately chose to ignore the results that did not suit it.  (ECF # 1, ¶¶ 112 (Beal St. and Fort Hill St.); 117 (Cushing St.); 119 (Gardner St.)).

On Gardner Street, e.g., Relator alleges the 85th percentile speed of motor vehicles is greater than 40 m.p.h., which is also greater than the 30 m.p.h. Speed Limit signs (R2-1) posted on Gardner Street (upper) and the 25 m.p.h. Advisory Speed plaques (W13-1P) posted on Gardner Street (lower).  (ECF # 1, ¶ 119-122).  Curiously, Hingham simultaneously maintains apparently contradictory positions that these signs "are not permitted but are still enforceable":

> *There are currently 30 MPH speed signs but there is no record of them.*  ... Sgt. Horte [Hingham Police Department] conducted a speed study and found the average speed travelled is 37 MPH which is not excessive.  *The signs which are currently posted are not*

---

[22] (deference especially appropriate where the statutes in question involve an explicit, broad grant of rule-making authority) citing Chevron U.S.A. Inc. v. Natural Resources Defense Council, 467 U.S. 837, 844 (1984) (regulations promulgated under explicit grant of authority "are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute").

*permitted but are still enforceable.  The question is whether they are challenged in court, if it would they would be found to be illegal and the Town might be sued.*  Sgt. Horte has contacted Town Counsel about this and will be speaking with them this week.

(Id. ¶ 119, Ex. 13-18) (quoting Selectmen's minutes) (deliberate enforcement of dubious signs).

On Cushing Street, e.g., Belezos likewise alleges the Selectmen maintain and enforce five, 30 m.p.h. Speed Limit signs (R2-1) (without special speed regulations).  (ECF # 1, ¶ 118).

Cushing Street Speed Study ...  The majority of the cars (82%) were travelling at a pace speed of between 34-43 mph.  Sergeant Dearth [Hingham Police Department] noted that the speed was lower than he would have predicted and indicates that speed isn't a factor on Cushing Street.  Another reason is that enforcement is consistent on the street and tickets are issued on a regular basis which is a deterrent.  *Sergeant Dearth advised against contacting the State to adjust the speed on the street as the posted speed limit [30 mph] would most likely be posted higher 40 (mph) which is not the desired outcome*.

(Id. ¶ 117, Ex. 13-8) (quoting Selectmen's minutes) (deliberate concealment from MassDOT).

Relator makes credible allegations that Hingham erected, maintained and enforced both "white" Speed Limit signs (R2-1) and "yellow" Advisory Speed plaques (W13-1P), and all in violation MassHwy's regulatory standards.  First and foremost, there are no records of these signs on file with MassDOT.  (Id. ¶ 106).  Second, Advisory Speed plaques were installed as separate sign installations.  (Id. ¶ 108).  Third, the signs at issue are arbitrarily set below the five (5) m.p.h. increment nearest to the 85th percentile speed (as justified by a traffic engineering speed study).  (Id. ¶¶ 110, 112, 117, 119).  Fourth, although Hingham acknowledged that these signs were "not permitted," it still decided against contacting "the State" for approval.  (Id. ¶¶ 117, 119).  Fifth, it nevertheless enforced these signs.  (Id. ¶¶ 107, 111, 117 ("tickets are issued on a regular basis"), 119).  Each and every one of these allegations constitutes a distinct prima facie violation of MassHwy's "Procedures for Speed Zoning on State and Municipal Roads", which in turn constitutes a distinct prima facie violation of the federal MUTCD standards and guidance for the posting of all regulatory and warning signage.  Speed Zoning at 2, 7 (2017).

14

ii.   **Knowledge**

A person acts "knowingly" if he or she "(1) had actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information."  US ex rel. Jones, 678 F. 3d at 82 (quoting 31 U.S.C. § 3729(b)).  A relator need not show any "proof of specific intent to defraud." Id.

Relator contends that he has satisfied the scienter requirement, as he has plausibly laid out enough facts from which it might be reasonably inferred that Defendants knowingly presented (or caused to be presented) false claims/records to the government.[23]  Most relevantly, Defendants clearly understood that MUTCD noncompliance results in the withholding or withdrawal of Chapter 90 funds.  (ECF. # 1, ¶¶ 90-92).  Qualified third parties notified Hingham of MUTCD noncompliant Speed Limit signs (R2-1).  (Id. ¶¶ 112, 116, 130).  Also, Hingham's municipal records contain its own candid acknowledgements regarding the regulatory requirements for Speed Limit signs and Advisory Speed plaques.  (Id. # 1, ¶¶ 98-99, 102-103, 110, 119).  These contemporaneous records pre-date any prior cases noted by the Defendants.

Defendants' contend they did not knowingly submit false claims, because (beginning in 2016) court decisions arguably upheld the lawfulness of the Speed Limit signs.  However, the Defendants naïve reliance on these decisions is misplaced absent some authoritative signal from the legislature or the courts of Massachusetts.  Dayton v. Peck, Stow and Wilcox Co., 739 F.2d 690, 694 n. 5 (1st Cir. 1984).[24]  "But these trial court decisions have no precedential force."  Corp. Techs., Inc. v. Harnett, 731 F.3d 6, 11 (1st Cir. 2013) (citing Dayton, 739 F.2d at 694 n. 5).

---

[23] See, e.g., Schatz v. Republican State Leadership Comm., 669 F.3d 50, 58 (1st Cir.2012) (malice reasonably inferred); US v. Universal Health Services, Inc., 780 F. 3d 504, 515 (1st Cir. 2015) (allegations established that defendant acted in reckless disregard or deliberate ignorance of the falsity of information contained in the claims, and satisfied the scienter requirement, as they plausibly pleaded that defendant knowingly submitted false claims).

[24] (unpublished order of the Massachusetts Superior Court "does not rise to the level of persuasive, let alone binding, precedential authority and we refuse to hinge our interpretation of existing Massachusetts law on it.").

### iii.  __Materiality__

Compliance, or lack thereof, with regulations seems the textbook example of representations that would "likely … induce a reasonable person to manifest his assent," in determining to pay for services.  See US ex rel. Escobar v. Universal Health Services, 842 F. 3d 103, 111 (1st Cir. 2016) (alleged misrepresentations of regulatory compliance were material).[25]

Relator alleges that the traffic control devices installed on Hingham's Federal-aid projects did not conform to the MUTCD as required, and that this failure to comply with Federal laws and regulations may result in the withdrawal of the Government's FAHP funds.  (ECF # 1, ¶¶ 36-37, 119 (Gardner St.); 40-41, 116 (Cushing St.); 23 C.F.R. 655.603(d)(2); 23 C.F.R. 1.36.

Likewise, Relator alleges that scores of regulatory and warning signs, including speed limit signs on many streets and highways in Hingham, do not conform to the MUTCD and Speed Zoning as required, and that failure to comply with these provisions shall result in the withholding or withdrawal of the Commonwealth's Chapter 90 funds.  See c. 85, § 2.

Relator argues that the truthful certification of compliance with applicable State and Federal laws or regulations is an integral aspect of the Government's FAHP and the Commonwealth's Chapter 90 funding programs, and these are material when looking "to effect on the likely or actual behavior of the recipient of the alleged misrepresentation."  See US ex rel. Escobar, 842 F. 3d at 111.  It's hard to imagine government payments absent such a certification.

The Government's FHWA vouchers for payment include certifications of compliance in accordance with applicable State and Federal laws or regulations, and the Commonwealth's Chapter 90 contracts, Reimbursement Request forms, and Final Report forms all contain certifications of individual and municipal compliance with MassHwy Policies, and all applicable statutes and regulations.  Ostensibly, these certifications are material representations to payors.

---

[25] (quoting Universal Health Services, Inc. v. United States ex rel. Escobar, 136 S.Ct. 1989, 2003 (2016)).

B. **Defenses**

    i.   **Public Disclosure Bar**

The First Circuit has held that "allegations of fraud distinct from previous disclosures are not blocked by the public disclosure bar." United States ex rel. Winkelman v. CVS Caremark Corp., 827 F.3d 201, 210 (1st Cir. 2016).[26]

Relator argues that the public disclosure bar does not apply to his claims, because there has not been a prior, public disclosure of the kind of fraud that this qui tam action is based upon.

Defendants' broadly claim this "entire suit is based almost entirely upon allegations of four prior actions." Namely, "[t]he core claim upon which the current suit is based – that the speed signs were posted ultra vires – is substantially the same as the four prior actions." However, the prior allegations of illegal speed limit signs merely evidence noncompliance with the transportation statutes and regulations, i.e., MUTCD and Speed Zoning. To the extent that any allegations of fraud were disclosed, these solely concerned fraud on unsuspecting motorists.

In contrast, this qui tam action is based upon previously, publicly undisclosed allegations that the Defendants presented (or caused to be presented) false claims/records to the government.

"A prior, public disclosure of fraud occurs "when the essential elements exposing the particular transaction as fraudulent find their way into the public domain." To be a disclosure "of fraud" the disclosure must contain either (1) a direct allegation of fraud, or (2) both a misrepresented state of facts and a true state of facts so that the listener or reader may infer fraud.[27]

Relator maintains that prior to this case, there were publicly neither direct allegations of the Defendants' fraud on the government fisc, nor facts leading to inference of such fraud.

---

[26] (citing United States ex rel. Estate of Cunningham v. Millennium Laboratories of California, Inc., 713 F.3d 662, 672-76 (1st Cir. 2013) (neither prior complaint nor the attached e-mails mention this kind of fraudulent scheme)).

[27] United States ex rel. Poteet v. Bahler Med., Inc., 619 F.3d 104, 107 (1st Cir. 2010) (quoting United States ex rel. Ondis v. City of Woonsocket, 587 F.3d 49, 54 (1st Cir. 2009)) (citing United States ex rel. Poteet v. Medtronic, Inc., 552 F.3d 503, 513 (6th Cir.2009)) (internal citations omitted).

### a. **Original Source Exception**

Alternatively, Relator argues that he falls within the original source exception to the public disclosure bar.  He alleges that he is an "original source" because he is an individual who either (1) prior to public disclosure has voluntarily disclosed to the Government and the Commonwealth the information on which allegations or transactions in the claims are based; or (2) has knowledge that is independent of and materially adds to the publicly-disclosed allegations or transactions, and who has voluntarily provided the information to the Government and the Commonwealth before filing this false claims action.  (ECF # 1, ¶¶ 10-11).

Relator has both direct and independent knowledge of the information upon which his complaint is based.  See Ondis, 587 F.3d at 58-59.  In this instance, this knowledge was based in part upon his own experience of receiving one warning and two Civil Motor Vehicle Infractions ("CMVIs") for Speeding in excess of 30 m.p.h. posted speed limits on Cushing St., Charles St., and Gardner St, and his later discovery that there was no Special Speed Regulations for these Hingham streets.  (ECF # 1, ¶¶ 123-125).  He subsequently conducted a visual and photographic GPS survey of roadways in the Town of Hingham and identified sixty (60) speed limit signs and advisory speed plaques for which there was no record (either in the Town or the MassDOT files) of any Special Speed Regulations having been issued.  (Id. ¶ 126). These were all located on eighteen (18) roadways all under the exclusive jurisdiction of the Town. (Id.).

Relator then provided this survey to the Commonwealth, and requested the withholding or withdrawal of the unexpended balance of funds assigned to Hingham under the provisions of c. 90, § 34 and c. 81, § 25.  (ECF # 1, ¶ 127).

Relator later obtained copies of false federal vouchers and Chapter 90 Reimbursement Requests through discovery in prior cases, and voluntarily provided copies to the government.

18

### ii.   Rule 9(b)

Relator contends that his allegations evidence actual false claims with specificity in compliance with heightened pleading requirements of Federal Rule of Civil Procedure Rule 9(b).

The Complaint sets forth details of numerous false claims, and provides information as to the dates and amounts of the false claims presented by Defendants.  These in turn are supported by exhibits including copies of the fraudulent vouchers for payment the Defendants caused to be transmitted to the Federal Government, and copies of the fraudulent Chapter 90 Reimbursement Requests the Defendants submitted to the Commonwealth.  (ECF # 1, ¶¶ 39, 43, 50-74).[28]

This apparently meets the First Circuit's standard "that Rule 9(b) requires that a plaintiff's averments of fraud specify the time, place, and content of the alleged false or fraudulent representations."  United States ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 226 (1st Cir. 2004).[29] "Evidence of an actual false claim is 'the sine qua non of a False Claims Act violation.'"  Id. at 225.[30]

### iii.   Individual Liability

"Corporate officers are liable, in their individual capacity, under the FCA if they knowingly make false claims for payment to the United States on behalf of the corporation."  United States ex rel. Augustine v. Century Health Services, Inc., 136 F. Supp. 2d 876, 895 (M.D. Tenn. 2000) (corporate officer individual capacity FCA liability despite no personal benefit).[31]

---

[28] See, e.g., United States ex rel. Duxbury v. Ortho Biotech Prods., L.P., 579 F.3d 13, 30 (1st Cir. 2009).

[29] (citing Arruda v. Sears, Roebuck & Co., 310 F.3d 13, 18-19 (1st Cir. 2002)).

[30] (quoting United States ex rel. Clausen v. Lab. Corp. of Am., Inc., 290 F.3d 1301, 1311 (11th Cir.2002), cert. denied, 537 U.S. 1105, 123 S.Ct. 870, 154 L.Ed.2d 774 (2003)).

[31] (quoting United States v. Advance Tool Co., 902 F.Supp. 1011, 1016, n. 4 (W.D.Mo.1995) (citing U.S. v. Entin, 750 F.Supp. 512 (S.D.Fla.1990) (holding the president and sole shareholder of an SBA lender personally liable for false certifications made to the SBA); see also U.S. ex rel. Haskins v. Omega Institute, Inc., 11 F.Supp.2d 555, 565-65 (D.N.J. 1998) (allowing fraud claim against corporate officers)).

Defendants cannot evade FCA liability in their individual capacity, and their reliance on Heimlich v. Friedfertig entirely misses the mark.  72 Mass. App. Ct. 1120 (2008) (unpublished Rule 1:28 decision).  In Heimlich, the tort claims were dismissed for failure to allege corporate officer personally participated in tortious conduct, but the claim for fraud stood on a different footing.  "A corporate officer who engages in fraud may be found personally liable."  (Id.).[32]

### iv.   **Statute of Limitations**

The Supreme Court recently held that the ten (10) year statute of limitations period in § 3731(b)(2) is available in a relator-initiated suit in which the Government has declined to intervene.  Cochise Consultancy, Inc. v. Hunt, 139 S. Ct. 1507 (2019) ("The limitations period in § 3731(b)(2) applies in a relator-initiated suit in which the Government has declined to intervene.").[33]

In light of Cochise,[34] Relator maintains the ten (10) year statute of limitation period in § 3731(b)(2) is available in this relator-initiated suit, because both the Government and the Commonwealth have declined to intervene in this suit.[35]  Thus, any alleged claims of FCA/MFCA violations made by the Defendants on or after September 24, 2009 (i.e., ten (10) years prior to the filing of the instant Complaint on September 24, 2019) are clearly allowed to proceed under § 3731(b)(2).

---

[32] Cf. Haskins, 11 F.Supp.2d at 564 (following Restatement (Second) of Agency, § 348 on individual liability); Powell, 546 F. Supp. 3d at 77 (police officers in their individual capacities "as natural persons, are 'person[s]' who may be found liable under the MFCA.  See Mass. Gen. Laws ch. 12, § 5A.").

[33] 31 U.S.C. § 3731(b) ("A civil action under section 3730 may not be brought - (1) more than 6 years after the date on which the violation of section 3729 is committed, or (2) more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed, whichever occurs last.").

[34] Defendant's brief does not mention either Cochise, or § 3731(b)(2).  Instead, they apply the 6 year statute of limitations under the previous version of the § 3731(b) statute. (ECF # 22-1, 24) (citing Rivera, 55 F.3d at 706).

[35] (ECF ## 9 (Notice by United States of America of Election to Decline to Intervene), 11 (Notice of Election to Decline to Intervene by Commonwealth of Massachusetts)).

## CONCLUSION

WHEREFORE, Attorney-Relator Frederic P. Zotos, respectfully requests and prays that this Honorable Court DENY the Defendants' Joint Motion to Dismiss.

Respectfully submitted,

By Attorney-Relator

FREDERIC P. ZOTOS

By */s/ Frederic P. Zotos*

Frederic P. Zotos, Esq.
BBO#565308
28 Old Coach Road
Cohasset, MA 02025
Tel: (781) 836-4295
Dated: October 7, 2022          E-Mail: fzotos@pathogenics.com


## REQUEST FOR ORAL ARGUMENT

Attorney-Relator believes that oral argument may assist the Court, and therefore wishes to be heard. Accordingly, Attorney-Relator hereby respectfully requests oral argument on Defendants' Joint Motion to Dismiss pursuant to L.R. 7.1 (D. Mass. 2012).


## CERTIFICATE OF SERVICE

I, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Frederic P. Zotos*
Dated: October 7, 2022                    Frederic P. Zotos

**TABLE OF AUTHORITIES**

**U.S. CASES**

*Chevron U.S.A. Inc. v. Natural Resources Defense Council,*
     467 U.S. 837 (1984)……………………………………………………………………...13

*Cochise Consultancy, Inc. v. Hunt,*
     139 S. Ct. 1507 (2019)……………………………………………………...……20

*U.S. ex rel. Eisenstein v. City of New York,*
     556 U.S. 928 (2009)……………………………………………………….…8

*INS v. Hibi,*
     414 U.S. 5 (1973) ……………………………………………………......9

*United States v. Mendoza,*
     464 U.S. 154 (1984)………………………………………………………….8-9

*Taylor v. Sturgell,*
     553 U.S. 880 (2008)……………………………………………………….8

*Universal Health Services, Inc. v. United States ex rel. Escobar,*
     136 S. Ct. 1989 (2016) ......................................................................10, 16

**1ST CIRCUIT CASES**

*Arruda v. Sears, Roebuck & Co.,*
     310 F.3d 13 (1st Cir. 2002)……………………………………………………19

*Corp. Techs., Inc. v. Harnett,*
     731 F.3d 6 (1st Cir. 2013)…………………………………………………...15

*United States ex rel. Duxbury v. Ortho Biotech Prods., L.P.,*
     579 F.3d 13 (1st Cir. 2009)……………………………………………............19

*United States ex rel. Estate of Cunningham v. Millennium Laboratories of California, Inc.,*
     713 F.3d 662 (1st Cir. 2013)…………………………………………………...17

i

# 1ST CIRCUIT CASES (cont.)

*Dayton v. Peck, Stow and Wilcox Co.,*
   739 F.2d 690 (1st Cir. 1984)……………………………………………...………15

*US ex rel. Escobar v. Universal Health Services,*
   842 F. 3d 103 (1st Cir. 2016)……………………………………………………...16

*US ex rel. Hutcheson v. Blackstone Medical, Inc.,*
   647 F. 3d 377 (1st Cir. 2011)……………………………………………………...10

*US ex rel. Jones v. Brigham and Women's Hosp.,*
   678 F. 3d 72 (1st Cir. 2012)…………………………………………………...10, 15

*United States ex rel. Karvelas v. Melrose-Wakefield Hosp.,*
   360 F.3d 220 (1st Cir. 2004)…………………………………………………....19

*United States ex rel. Ondis v. City of Woonsocket,*
   587 F.3d 49 (1st Cir. 2009)…………………………………...…………17-18

*United States ex rel. Poteet v. Bahler Med., Inc.,*
   619 F.3d 104 (1st Cir. 2010)……………………………………………...……17

*United States v. Rivera,*
   55 F.3d 703 (1st Cir. 1995)……………………………...………...…10, 20

*Schatz v. Republican State Leadership Comm.,*
   669 F.3d 50 (1st Cir.2012)……………………………………………………..15

*US v. Universal Health Services, Inc.,*
   780 F. 3d 504 (1st Cir. 2015)……………………………………...………15

*United States ex rel. Winkelman v. CVS Caremark Corp.,*
   827 F.3d 201 (1st Cir. 2016)…………………………………………...…17

## DISTRICT OF MASSACHUSETTS CASES

*Massachusetts ex rel. Powell v. Holmes*,
   546 F. Supp. 3d 58 (D. Mass. 2021) ………………………………..……10, 20

*Zotos v. Town of Hingham*,
   12-cv-11216-JGD (D. Mass. Sept. 19, 2013)....................................................9

*Zotos v. Town of Hingham*,
   13-cv-13605-DJC (D.Mass. Mar. 25, 2016)..............................................9, 11

## MASSACHUSETTS CASES

*Belezos v. Bd. of Selectmen of Hingham*,
   99 Mass.App.Ct. 1114 (2017).........................................................5, 12

*Commonwealth v. Diviacchi*,
   85 Mass. App. Ct. 1125 (2014)…………………………………………....6

*Dowling v. Registrar of Motor Vehicles*,
   425 Mass. 523 (1997)………………………………………………........11

*Goldberg v. Board of Health of Granby*,
   444 Mass. 627 (2005)…………………………………………………13

*Heimlich v. Friedfertig*,
   72 Mass. App. Ct. 1120 (2008)………………………………………20

*Hingham Police Dep't v. Zotos*,
   81 Mass. App. Ct. 1136 (2012)…………………………………....9

*M & M Transp. Co. v. Wellesley*,
   333 Mass. 11 (1955)...................................................................5, 11

*Commonwealth v. Newhall*,
   205 Mass. 344 (1910)...............................................................5

*Registrar of Motor Vehicles v. Board of Appeal on Motor Vehicle Liab. Policies & Bonds*,
   382 Mass. 580 (1981)………………………………………………....10

## <u>OTHER JURISDICTION CASES</u>

*United States v. Advance Tool Co.*,
   902 F.Supp. 1011 (W.D.Mo.1995)……………………………………………………19

*United States et al. ex rel. Alejandro v. Philadelphia Vision Center et al.*,
   20-2027 (E.D. Pa. January 4, 2021)…………………………………………………9

*United States ex rel. Augustine v. Century Health Services, Inc.*,
   136 F. Supp. 2d 876 (M.D. Tenn. 2000)……………………………………………19

*Bailey v. Lenord*,
   625 P.2d 849 (Alaska 1981)...........................................................................................12

*United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*,
   290 F.3d 1301 (11th Cir. 2002)………………………………………………………19

*U.S. v. Entin*,
   750 F.Supp. 512 (S.D.Fla.1990)……………………………………………………19

*U.S. ex rel. Haskins v. Omega Institute, Inc.*,
   11 F.Supp.2d 555 (D.N.J. 1998)……………………………………………...…19, 20

*U.S. ex rel. Laird v. Lockheed Martin Eng'g & Sci. Servs. Co.*,
   336 F.3d 346 (5th Cir. 2003)………………………………………………...……8

*Lane v. Bayview Loan Servicing, LLC.*,
   831 S.E.2d 709 (Va. 2019)...........................................................................................9

*United States ex rel. Lusby v. Rolls-Royce Corp.*,
   579 F.3d 849 (7th Cir. 2009)……………………………………………………...8

*United States ex rel. Poteet v. Medtronic, Inc.*,
   552 F.3d 503 (6th Cir.2009)……………………………………………………...…17

*United States ex rel. Sorenson v. Wadsworth Brothers Construction Company, Inc.*,
   2:16-cv-875 (D. Utah June 5, 2019) …………………………………………………...9

## **LAWS**

Pub. L. 111-21, 123 Stat. 1617 (2009)………………………………………………………7

St. 1986, c. 689, § 7………………………………………………………………………5

St. 1986, c. 689, § 8………………………………………………………………………5

St. 2012, c. 139, §§ 22, *et seq*………………………………………………………………7

## **STATUTES**

31 U.S.C. §§ 3729, *et seq*………………………………………………………………....7

31 U.S.C. §§ 3730(b)………………………………………………………………….......8

31 U.S.C. § 3730(c)(3)………………………………………………………………………9

31 U.S.C. § 3730(d)(2). ………………………………………………………………..……9

31 U.S.C. § 3731(b)…………………………………………………………………..……20

31 U.S.C. § 3731(b)(1)………………………………………………………………………20

31 U.S.C. § 3731(b)(2)…………………………………………………………………..……20

Mass. Gen. L. ch. 11, § 12…………………………………………………………………………2

Mass. Gen. L. ch. 12, §§ 5A, *et seq*………………………………………………………7

Mass. Gen. L. ch. 12, § 5A………………………………………………………………20

Mass. Gen. Laws ch. 12, § 5B(a) …………………………………………………………10

Mass. Gen. L. ch. 12, § 5C(2)…………………………………………………………………8

Mass. Gen. L. ch. 12, § 5D(6)………………………………………………………………9

Mass. Gen. L. ch. 12, § 5F(4)………………………………………………………………9

## STATUTES (cont.)

Mass. Gen. L. ch. 81, § 25.................................................................................................18

Mass. Gen. L. ch. 85, § 2............................................................................................3-6, 16

Mass. Gen. L. ch. 90, § 17......................................................................................5-6, 11-13

Mass. Gen. L. ch. 90, § 18...................................................................................2, 5-6, 10-12

Mass. Gen. L. ch. 90, § 34.................................................................................1, 5, 7, 18

## REGULATIONS

23 C.F.R. 1.36.............................................................................................................4, 16

23 C.F.R. 655.603(d)(2) (4-1-12 Edition).....................................................................4, 16

Manual on Uniform Traffic Control Devices (2009)..................................................4, 6, 14

    § 2B.13......................................................................................................................4

    § 2C.08......................................................................................................................4

The Massachusetts Amendments to the 2009 Manual on Uniform Traffic Control Devices,
    (January 2012)..........................................................................................................10

Procedures for Speed Zoning on State and Municipal Roads (2012)................................6, 10, 14

Procedures for Speed Zoning on State and Municipal Roads (2017)......................................6, 14

## OTHER AUTHORITIES

3 Op.Atty.Gen. 26 (1906)...........................................................................................5

Op.Atty.Gen. March 8, 1944, 141................................................................................12

Restatement (Second) of Agency, § 348..........................................................................20